No. 18-55474, No. 18-55475, No. 18-55476

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY, et al., DEFENDERS OF WILDLIFE, a non-profit conservation organization; et al., PEOPLE OF THE STATE OF CALIFORNIA, by and through Xavier Becerra, Attorney General and CALIFORNIA COASTAL COMMISSION**

*Plaintiffs-Appellants*,

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY; et al.,**

*Defendants-Appellees*.

On Appeal from the United States District Court for the Southern District of California, San Diego Division, Case Nos. 3:17-cv-01215-GPC-WVG; 3:17-cv-01873-GPC-WVG; 3:17-cv-01911-GPC-WVG
The Honorable Gonzalo Curiel, Judge

**APPELLANTS' OPENING BRIEF**

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
Senior Assistant Attorney General
EDWARD H. OCHOA (SBN 144842)
MICHAEL P. CAYABAN (SBN 179252)
DAVID G. ALDERSON (SBN 231597)
Supervising Deputy Attorneys General
JOHN APPELBAUM (SBN 149643)
NOAH GOLDEN-KRASNER (SBN 217556)
JANELLE M. SMITH (SBN 231801)
BAINE P. KERR (SBN 265894)
JESSICA B. STROBEL (SBN 280361)
JULIA FORGIE (SBN 304701)
Deputy Attorneys General
  600 West Broadway, Suite 1800
  San Diego, CA  92101
  Telephone: (619) 738-9313
  Fax: (619) 645-2271
  Email:  mike.cayaban@doj.ca.gov
*Attorneys for California Plaintiffs-Appellants*

*(additional counsel on signature page)*

**CORPORATE DISCLOSURE STATEMENT BY NON-PUBLIC ENTITY
PLAINTIFFS-APPELLANTS PURSUANT TO FRAP 26.1**

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Center for

Biological Diversity (CBD) certifies that it has no parent corporations and that no

publicly held corporation owns more than ten percent of Appellant CBD.

Dated:  May 15, 2018   Respectfully submitted,

          s/BRIAN SEGEE
          BRIAN SEGEE
          Center for Biological Diversity
          660 South Figueroa Street, Suite 1000
          Los Angeles, CA  90017
          T: (805) 750-8852
          bsegee@biologicaldiversity.org
          *Attorneys for Plaintiff-Appellant*
          *Center for Biological Diversity*

Plaintiff-Appellant Animal Legal Defense Fund has no parent corporation

nor any stock and, therefore, no publicly held company owns 10% or more of its

stock.

Dated: May 15, 2018   Respectfully submitted:

          s/ANTHONY T. ELISEUSON
          ANTHONY T. ELISEUSON
          Animal Legal Defense Fund
          150 South Wacker Drive
          Suite 2400
          Chicago, Illinois 60606
          (707) 795-2533
          *Attorneys for Plaintiff-Appellant*
          *Animal Legal Defense Fund*

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1, Plaintiff-Appellant Sierra Club respectfully submits the following disclosures: Sierra Club has no parent companies and no publicly held company has a 10% or greater ownership interest in Sierra Club. Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

Dated: May 15, 2018

Respectfully submitted:

s/GLORIA D. SMITH
GLORIA D. SMITH
Sierra Club
2101 Webster Street, Ste. 1300
Oakland, CA 94612
(415) 977-5532
*Attorneys for Plaintiff-Appellant Sierra Club*

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Local Rule 26.1, Plaintiff-Appellant Defenders of Wildlife asserts that it has no parent corporation, nor any stock and, therefore, no publicly held company owns 10% or more of its stock.

Dated: May 15, 2018

Respectfully submitted,

/S/ JASON C. RYLANDER
JASON C. RYLANDER
Defenders of Wildlife
1130 17th Street, NW
Washington, DC 20036
(202) 682-9400 *Attorneys for Plaintiff-Appellant Defenders of Wildlife*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................... 1

Jurisdictional Statement ................................................................ 3

Statement of the Issues ................................................................. 5

Statement of the Case ................................................................... 6

    I.    Section 102 and the Border Barrier Construction Waiver. ........ 6

    II.    The 2005 REAL ID Act Amendments to Section 102(c). ........ 8

    III.    The Secure Fence Act and the 2008 Amendment: Expansion and Relaxation of Specific Border Barrier Mandates Under Section 102(b). .............................................. 10

    IV.    Use of Waivers to Expedite Completion of the Section 102(b) Border Fencing Requirements (January 2007-April 2008). ...................................................................... 11

    V.    The January 25, 2017 Executive Order on Border Security and Immigration Enforcement Improvement, and DHS Wall Strategy Document. ....................................... 13

    VI.    Prototype and San Diego Projects Waiver (August 2017), and Calexico Project Waiver (September 2017) ..................... 15

    VII.    District Court Proceedings. ..................................................... 17

    VIII.    Appeal Proceedings. ............................................................... 19

Summary of Argument ................................................................. 19

Argument ..................................................................................... 23

    I.    This Court Has Jurisdiction to Determine Whether DHS Acted Outside Its Congressionally Delegated Authority Under Section 102(b). .............................................. 23

        A.    The Secretary's Power to Waive All Legal Requirements Is Predicated on the Power to Build Barriers Under Section 102(b). ..................................... 25

i

**TABLE OF CONTENTS**
**(continued)**

Page

B. The Predicate Legal Question, Whether DHS Acted Outside the Scope of Its Authority Under Section 102(b), Is Not Subject to the Judicial Review Bar of Section 102(c) ...................................... 28

C. The District Court Applied the Incorrect Legal Standard When Concluding That DHS Did Not Act Outside the Scope of Its Authority ......................... 32

D. Direct Appeal to the U.S. Supreme Court Does Not Apply to the Predicate Legal Questions at Issue in this Appeal. .................................................. 35

II. As a Matter of Law, DHS Acted Beyond Its Statutory Authority Under Section 102 in Authorizing the Construction of the Prototype, San Diego and Calexico Projects. ..................................................... 36

A. The Secretary's Authority to Waive Laws to Expedite Construction Expired on December 31, 2008 .................................................................. 37

1. Section 102's Framework and Its Amendment History Show that the Secretary's Authority to Waive Laws Expired on December 31, 2008. .......................... 38

2. Section 102(b)'s Distinct Use of "Subsection" and "Section" Denotes that the December 2008 Deadline in Section 102(b) also Applies to the Secretary's Waiver Authority in Section 102(c). ............................... 44

B. Alternatively, the Secretary's Wavier Authority Expired When the Construction Outlined in Section 102(b) Was Completed. ................................... 45

ii

# TABLE OF CONTENTS
## (continued)

**Page**

1. The Statutory History Demonstrates Congress's Intent for Section 102(b) to Limit DHS's Construction Authority Under Section 102. ........................................................ 46

2. Section 102's Legislative History Also Demonstrates that Congress Intended to Limit the Scope of the Section 102(c) Wavier Authority to Specific Border Barriers Required Under Section 102(b). ............ 49

3. Past Executive Practice Also Supports Limiting Use of the Wavier to Construction Projects Outlined in Section 102(b). .................. 50

C. DHS's Fence Replacement Projects are Not Authorized by Section 102, Which is Limited to the Construction of "Additional" Barriers. ................... 52

D. Based on the Undisputed Record, if Section 102(a) Alone Applies, Then DHS Cannot Establish that the Projects Are in "Areas of High Illegal Entry" Within the Meaning of Section 102 ............................. 58

III. The District Court Erred in Granting DHS Summary Judgment as to California's NEPA and CZMA Claims; DHS Did Not Meet Its Burden Of Proving Its Affirmative Defense. ............................................................... 63

A. California's NEPA and CZMA Claims and DHS's Affirmative Defense to These Claims. ......................... 63

B. The District Court Erred by Upending the Burden of Proof and Granting Judgment to DHS Based on an Affirmative Defense Absent a Showing that Section 102 Applies. ..................................................... 67

iii

**TABLE OF CONTENTS**
**(continued)**

**Page**

C. California Is Entitled to Judgment on Their NEPA and CZMA Claims Relating to the 14-Mile Secondary Fence in San Diego Because DHS Failed to Offer Any Substantive Defense....................... 69

IV. Plaintiffs Are Entitled to Judgment On Their *Ultra Vires* Claims.................................................................................. 70

A. The District Court Erred in its Application of Ninth Circuit Precedent Concerning the Standard for Ultra Vires Claims................................................... 70

B. Even if the District Court's Rigid Application of *Kyne* Applies, DHS Still Acted *Ultra Vires*. ................ 74

Conclusion ...................................................................................... 74

Statement of Related Cases............................................................. 78

Circuit Rule 25-5(E) Attestation.................................................... 79

Certificate of Compliance .............................................................. 80

Plaintiffs-Appellants' Addendum................................................... 81

iv

# TABLE OF AUTHORITIES

**Page**

CASES

*Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*
475 F.3d 1080 (9th Cir. 2007) .................................................................. 34

*Albino v. Baca*
747 F.3d 1162 (9th Cir. 2014) (en banc) ................................................. 69

*Barlow v. Collins*
397 U.S. 159 (1970) .................................................................................. 28

*Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*
718 F. Supp. 2d 1167 (N.D. Cal. 2010) .................................................... 66

*Bowen v. Georgetown University Hospital*
488 U.S. 204 (1988) ............................................................................ 23, 32

*Bowen v. Mich. Acad. of Family Physicians*
476 U.S. 667 (1986) .................................................................................. 29

*Chamber of Commerce of U.S. v. Reich*
74 F.3d 1322 (D.C. Cir. 1996) .................................................................. 73

*City of Kansas City, Mo. v. Dep't of Housing and Urban Dev.*
923 F.2d 188 (D.C. Cir. 1991) ...................................................... 34, 70, 71

*Clark v. Capital Credit & Collection Servs., Inc.*
460 F.3d 1162 (9th Cir. 2006) .................................................................. 69

*Clark v. Martinez*
543 U.S. 371 (2005) .................................................................................. 41

*Duncan v. Walker*
533 U.S. 167 (2001) .................................................................................. 41

*EEOC v. Arabian American Oil Co.*
499 U.S. 244 (1991) .................................................................................. 34

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Est. of Cowart v. Nicklos Drilling Co.*
505 U.S. 469 (1992)............................................................... 41

*FDA v. Brown & Williamson Tobacco Corp.*
529 U.S. 120 (2000)................................................... 38, 46, 59

*Federal Energy Admin. v. Algonquin SNG, Inc.*
426 U.S. 548 (1976)...................................................... 49, 50

*Flores-Miramontes v. INS*
212 F.3d 1133 (9th Cir. 2000) ......................................... *passim*

*Gephardt v. Nielsen*
879 F.3d 980 (9th Cir. 2018) ................................. 21, 24, 26, 31

*Hawaii v. Trump*
878 F.3d 662 (9th Cir. 2017) ................................. 41, 50, 59, 73

*Iasu v. Smith*
511 F.3d 881 (9th Cir. 2007) ................................. 21, 24, 26, 31

*International Brotherhood of Teamsters v. U.S. Department of Transportation*
861 F.3d 944 (9th Cir. 2017) ......................................... *passim*

*Kanne v. Connecticut Gen. Life Ins. Co.*
867 F.2d 489 (9th Cir. 1988) ................................................ 67

*Koons Buick Pontiac GMC v. Nigh*
543 U.S. 50 (2004)............................................................. 38

*Leedom v. Kyne*
358 U.S. 184 (1958).................................................... *passim*

*Louisiana Pub. Service Comm'n v. FCC*
476 U.S. 355 (1986)........................................................... 23

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Magana v. Com. of the N. Mariana Islands*
107 F.3d 1436 (9th Cir. 1997) .................................................. 66

*McNeill v. United States*
563 U.S. 816 (2011).................................................................. 54

*Meacham v. Knolls Atomic Power Lab.*
554 U.S. 84 (2008)................................................................... 67

*Michigan v. EPA*
268 F.3d 1075 (D.C. Cir. 2001).......................... 24, 33, 34, 71

*Morales v. Trans World Airlines, Inc.*
504 U.S. 374 (1992) ................................................................ 43

*Mount Graham Red Squirrel v. Madigan*
954 F.2d 1441 (9th Cir. 1992) .................................................. 50

*Perrin v. United States*
444 U.S. 37 (1979).................................................................... 53

*Pinnacle Armor, Inc. v. United States*
648 F.3d 708 (9th Cir. 2011) .................................................... 29

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*
566 U.S. 639 (2012)........................................................... 42, 43

*Robertson v. Methow Valley Citizen Council*
490 U.S. 332 (1989)................................................................. 64

*Setser v. U.S.*
566 U.S. 231 (2012)................................................................. 41

*Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*
676 F. App'x 654 (9th Cir. 2017)............................................ 66

vii

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Stone v. INS*
514 U.S. 386 (1995)..................................................................... 40

*Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop.*
*Located in Maricopa Cty.*
627 F.3d 1268 (9th Cir. 2010) .................................................... 53

*Traynor v. Turnage*
485 U.S. 535 (1988)..................................................................... 28

*TRW, Inc. v. Andrews*
534 U.S. 19 (2001)................................................................. 43, 48

*United States v. Mead Corp.*
533 U.S. 218 (2001)............................................................... 21, 33

*Vogel v. Huntington Oaks Deleware Partners, LLC*
291 F.R.D. 438 (C.D. Cal. 2013)................................................ 66

*Zivkovic v. S. California Edison Co.*
302 F.3d 1080 (9th Cir. 2002) .................................................... 66

STATUTES

8 U.S.C.
§ 1103 note ("Section 102") ............................................... *passim*
§ 1103(a)(5). .................................................... 6, 27, 48, 73
§ 1182(a)(2) ............................................................................ 31
§ 1182(f) .................................................................................. 73
§ 1185(a) .................................................................................. 73
§ 1252(a)(2(C) ........................................................................ 31

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

28 U.S.C.
  § 1291 ........................................................................ 4, 25, 35
  § 1331 ..................................................................................... 3

42 U.S.C.
  § 4332(2)(C) ......................................................................... 64

Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* .......................... *passim*

Coastal Zone Management Act, 16 U.S.C. § 1461 *et seq.* .................... *passim*

Department of Homeland Security Appropriations Act of 2018
  Pub. L. 115-141, Div. F Sec. 230(a)(1) .................................... 70

Emergency Supplemental Appropriations Act ................................................ 8

Endangered Species Act, 16 U.S.C. § 1531 et seq. ............................... *passim*

Freedom of Information Act .................................................................... 17, 18

Homeland Security Appropriations Act, 2008 (Pub. L. 110-161)
  ("2008 Amendment") ................................................................ *passim*

Illegal Immigration Reform and Immigrant Responsibility Act
  of 1996 Pub. L. 104-208, Div. C, Title I, § 102(a) to (c), 110
  Stat. 3009-554 .................................................................... *passim*

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq* ............... *passim*

National Labor Relations Act ..................................................................... 72

Real ID Act of 2005 Pub. L. 109-113, div. B, Tit. 1 § 102 (c)(1) ......... *passim*
  (H.R. 418) .................................................................................... 49

Secure Fence Act of 2006, Pub. L. 110-161 ......................................... *passim*

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**COURT RULES**

Federal Rule of Appellate Procedure
    Rule 4(a) ............................................................................... 4

Federal Rules of Civil Procedure
    Rule 8(c) ............................................................................. 66

**OTHER AUTHORITIES**

15 Code of Federal Regulations § 930.36(b)................................. 64

40 Code of Federal Regulations § 1501.2 ..................................... 64

72 Federal Register 2,535 (Jan. 19, 2007)...................................... 12

72 Federal Register 60,870 (Oct. 26, 2007) ................................... 12

73 Federal Register 19,077 (April 3, 2008).................................... 12

73 Federal Register 19,078 (April 3, 2008).................................... 12

Executive Order 13768 ................................................................. 13

H.R. Rep. 109-72 (2005) .............................................................. 49

https://en.oxforddictionaries.com/definition/additional (last
    viewed on May 2, 2018.) ........................................................ 54

https://www.merriam-webster.com/dictionary/additional (last
    viewed on May 2, 2018.) ........................................................ 54

https://www.merriam-webster.com/dictionary/replace (last
    viewed on May 2, 2018.) ........................................................ 54

Webster's Third New International Dictionary, Copyright 2002................. 53

x

**INTRODUCTION**

This case is about the federal government's attempt to build projects along the southern border of the United States without complying with existing long-standing federal environmental laws that serve to protect California's natural resources, including California's coastal zone, state and federally-listed threatened and endangered species, and environmentally sensitive habitat. The federal government relies on Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act ("Section 102") (Pub. L. 104–208; 8 U.S.C. § 1103 note), as amended, which *conditionally* authorized the Secretary of the Department of Homeland Security to "waive all legal requirements" to ensure the expeditious construction of barriers along the U.S. southwest border. But DHS has acted outside of its congressionally delegated authority by building projects that were never authorized by Congress and using waiver authority that no longer applies.

Section 102 granted the Secretary two types of authority: (1) the authority to build additional border barriers (Section 102(b)); and, (2) the authority to waive laws in order to expedite construction of those additional border barriers when the Secretary deemed that necessary (Section 102(c)). The Secretary's power to waive laws is predicated entirely on its power to build barriers that are authorized under Section 102(b) in the first instance.

1

Section 102 does not authorize Defendants-Appellees[1] to build the challenged barrier projects—including prototype walls and replacement barriers near San Diego and Calexico, California—or to waive environmental protection laws to expedite those projects. DHS's power to expedite the construction of border barriers expired on December 31, 2008, its power to build any barriers pursuant to Section 102 expired when DHS fulfilled its congressional mandate, and Section 102 authorized construction of additional mileage of barriers, not the replacement of existing barriers.

The district court applied the incorrect standard when resolving predicate legal questions necessary to determine whether DHS acted beyond its statutory authority when building barriers and waiving laws under Sections 102(b) and (c). The district court also erred by upending the burden of proof when it compelled Plaintiffs-Appellants[2] to disprove the

---

[1] Defendants-Appellees (collectively, "DHS") in the three lawsuit filed by Plaintiffs include the following parties: the United States of America; the U.S. Department of Homeland Security; U.S. Customs and Border Protection; Secretary Kirsten Nielsen, in her official capacity; and, Kevin K. McAleenan, in his official capacity.

[2] There are three sets of Plaintiffs-Appellants (collectively, "Plaintiffs"): 1) the People of the State of California, by and through California Attorney General Xavier Becerra, and the California Coastal Commission (collectively "California"); the Center for Biological Diversity ("CBD"); and, 3) the Defenders of Wildlife, the Sierra Club, and the Animal Legal Defense Fund (collectively "Coalition"). Plaintiffs filed separate

applicability of DHS's affirmative defense, rather than placing the ordinary burden on the defendant to prove his or her affirmative defense.

Finally, the district court committed reversible error in denying Plaintiffs summary judgment because, as a matter of law, DHS's proposed projects are not authorized by Section 102. Consequently, this Court should reverse the district court's decision granting DHS summary judgment with instructions to issue judgment in Plaintiffs' favor.[3]

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over these consolidated actions under 28 U.S.C. Section 1331, because the complaints allege that DHS violated the National Environmental Policy Act, 42 U.S.C. Section 4321 *et seq*. ("NEPA"), the Coastal Zone Management Act, 16 U.S.C. Section 1461 *et seq*. ("CZMA"), and the Administrative Procedure Act, 5 U.S.C. Section 551 *et seq*. ("APA"). On February 27, 2018, the district court granted DHS's motion for summary judgment as to all Plaintiffs and denied each Plaintiff group's motion for summary judgment. ER 7-107.

---

lawsuits at the district court and separate appeals before this Court. The appeals were consolidated, *sua sponte*, on April 19, 2018. DktEntry #7.

[3] The complete text of Section 102, as printed in 8 U.S.C. § 1103 (note), is provided in an addendum to this opening brief.

3

The district court entered a final judgment in each of these cases on March 26, 2018. ER 1-6. Plaintiffs filed timely notices of appeal on April 9, 2018, as to several of their non-constitutional law claims in this matter, in compliance with Federal Rule of Appellate Procedure rule 4(a).[4] ER 108-127. This Court has jurisdiction over all appeals from final judgments of the district court, unless direct review may be had in the United States Supreme Court. 28 U.S.C. § 1291. The causes of action included in this appeal may not be appealed directly to the United States Supreme Court.

The remaining causes of action that the district court dismissed attack DHS's waivers on constitutional grounds and must be appealed directly to the United States Supreme Court. *See* Section 102(c) (causes of action attacking a waiver under Section 102 on constitutional grounds "may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States").

---

[4] California appeals the district court judgment with respect to its first four claims for relief asserted in its complaint, including the following claims: DHS violated NEPA and the APA (First); DHS violated the CZMA and the APA (Second); DHS's projects are not authorized by Section 102 (Third); and, the authority to waive laws under Section 102(c) expired (Fourth). ER 116, 461-66. CBD appeals the judgment on its first claim for relief, asserting *ultra vires* violations concerning DHS's application of and reliance on Section 102. ER 122. The Coalition appeals the judgment on its first two claims for relief, asserting *ultra vires* claims under Section 102(c) and violations of Sections 102(a) and 102(b)(1)(C). ER 109.

## STATEMENT OF THE ISSUES

1.     Does Section 102 empower the Secretary of the United States Department of Homeland Security ("Secretary") with indefinite authority to construct barriers in priority areas on an expedited basis when Congress imposed a December 31, 2008 deadline to identify and construct such barriers under Section 102(b)?

2.     Does Section 102 empower the Secretary with indefinite authority to construct barriers along the southern border even after DHS confirmed that it completed Congress's mandate to construct barriers pursuant to Section 102(b)?

3.     When, in Section 102, Congress required the Secretary to "install additional barriers and roads," did Congress grant authority to the Secretary to "replace" existing barriers that will not add to the total mileage of barriers along the border?

4.     Does Section 102 authorize the Secretary to build the barriers at issue in the San Diego and Calexico areas, which are no longer in "areas of high illegal entry" within the meaning of the statute?

5.     Did the district court commit reversible error by requiring Plaintiffs to prove that DHS acted contrary to "clear and mandatory statutory language" when building the projects at issue in this case, rather than

5

applying the ordinary standard that courts must "set aside final agency action that is 'not in accordance with law,' [5 U.S.C.] § 706(2)(A), or [is] 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" 5 U.S.C. § 706(2)(C).

6.　　Did the district court commit reversible error by shifting the burden of proof and requiring California to affirmatively disprove the applicability of DHS's waiver affirmative defense to California's NEPA and CZMA claims?

7.　　Did the district court commit reversible error in denying Plaintiffs judgment on their *ultra vires* claims when, as a matter of law, DHS's projects violate the clear and mandatory terms of Section 102?

## STATEMENT OF THE CASE

### I.　SECTION 102 AND THE BORDER BARRIER CONSTRUCTION WAIVER.

The federal government has authority to secure the nation's borders through the construction and maintenance of security barriers. Prior to Section 102's enactment, the authority to construct border barriers derived from the general statutory responsibility of the Attorney General (now the Secretary) to "guard the boundaries and borders of the United States against the illegal entry of aliens." Immigration and Nationality Act, §103(a)(5), 8

6

U.S.C. §1103(a)(5).  In the early 1990s, for example, the federal government relied on this general authority to construct barriers along the border, such as the existing 14 miles of primary fence in San Diego.  ER 221.  That authority continues to exist independent of Section 102.

The precursor to Section 102, Section 102 of the 1996 Illegal Immigration Reform and Immigrant Responsibility Act, was the first congressional enactment to specifically require the construction of "physical barriers and roads" on the U.S.-Mexico border.[5]  Pub. L.104-208 (Sept. 30, 1996), div. C., *codified at* 8 U.S.C. §1103 note.  Section 102(a), which remains substantively the same today, stated that the Attorney General "shall take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Section 102(b), in turn, "carr[ies] out subsection (a)" by requiring specific border barrier construction.  At the time of the precursor to Section 102's enactment, that requirement was limited to the completion of "second and third fences" along the existing 14 miles of San Diego primary border fencing.  Finally, the original Section 102(c) provided the Attorney General

---

[5] This authority was originally delegated to the Attorney General, but is now delegated to DHS.

7

with authority to waive NEPA and the federal Endangered Species Act ("ESA"), 16 U.S.C. Section 1531 et seq., "to the extent . . . necessary to ensure expeditious construction of the barriers and roads under this section." Pub. L. 104-208.

## II. THE 2005 REAL ID ACT AMENDMENTS TO SECTION 102(c).

The original Section 102(c) waiver authority was never utilized by the Attorney General or DHS Secretary. Instead, DHS and its predecessor agency, the Immigration and Naturalization Service ("INS"), complied with environmental laws in completing the San Diego border fencing, preparing an Environmental Impact Statement ("EIS") and consulting under the ESA. ER 221-22, 391. In other words, INS and DHS used their authority to build the secondary and tertiary fencing pursuant to Section 102(b), regardless of their authority to waive the NEPA and the ESA. While the large majority of second and third layer fencing was completed, construction on a final portion was delayed as the California Coastal Commission sought improvements to lessen impacts on the coastal environment. ER 222, 396.

These delays led Congress to expand Section 102(c)'s waiver authority. ER 391. Enacted in 2005 as part of the "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005" ("Supplemental Appropriations Act"), Section 102 of the

8

REAL ID Act expanded the Section 102(c) waiver authority, which was initially limited to NEPA and the ESA, to permit the DHS Secretary "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." Pub. L. 109-13, div. B (May 11, 2005).

Section 102 of the REAL ID Act also amended the Section 102(c) waiver authority to restrict judicial review in the following respects: limiting "all causes or claims" against the Secretary or DHS arising from any waiver determination by the Secretary to constitutional claims; requiring any such constitutional challenges to be filed not later than 60 days after the Secretary's determination; and, eliminating appellate court review of the district court's judgment as to any causes of action brought alleging constitutional violations, instead only permitting review upon a writ of certiorari to the United States Supreme Court.

On September 22, 2005, the DHS Secretary invoked the Section 102(c) waiver authority to waive NEPA, ESA, and additional laws to expedite completion of the San Diego double and triple-layered wall, as required by Section 102(b). ER 288-89.

9

### III. THE SECURE FENCE ACT AND THE 2008 AMENDMENT: EXPANSION AND RELAXATION OF SPECIFIC BORDER BARRIER MANDATES UNDER SECTION 102(b).

Section 3 of the 2006 Secure Fence Act ("Construction of Fencing and Security Improvements in Border Area from Pacific Ocean to Gulf of Mexico") significantly expanded the construction authority in Section 102(b), which had been limited to the 14-mile San Diego double and triple-layer fence construction. Pub. L. 109-367 (Oct. 26, 2006). The 2006 version of Section 102(b) directed DHS to "provide for at least 2 layers of reinforced fencing [and] the installation of additional physical barriers, roads, lighting, cameras, and sensors" in five specific segments along the U.S.-Mexico border, totaling approximately 850 miles. Former §102(b)(1)(A)(i)-(v), Pub. L. 109-367.

Section 3 further amended Section 102(b) to add the specific requirement that two of these segments be considered "priority areas," with construction deadlines of May 30, 2008 and December 31, 2008. Former Section 102(b)(1)(B)(i)-(ii), Pub. L. 109-367 (Oct. 26, 2006). Congress did not specifically consider the impact of the Secure Fence Act amendments on the scope of the Section 102(c) waiver.

Shortly after enactment of the Secure Fence Act, the Department of Homeland Security Appropriations Act, 2008, again amended Section

10

102(b) to scale back DHS's duties concerning border barriers and roads that the 2006 Secure Fence Act amendments had mandated. (Pub. L. 110-161) ("2008 Amendment").  The 2008 Amendment - which remains the law today - included the following changes: (1) eliminating the requirement that border barriers be built in any specific location, and instead specifying that such barriers be placed "along not less than 700 miles of the southwest border where fencing would be most practical and effective"; (2) eliminating the requirement of double-layered fencing; and, (3) amending the "priority areas" requirement to direct that DHS identify and construct at least 370 miles of border barriers by no later than December 31, 2008.  Section 102(b)(1)(A)-(B).

**IV.  USE OF WAIVERS TO EXPEDITE COMPLETION OF THE SECTION 102(b) BORDER FENCING REQUIREMENTS (JANUARY 2007-APRIL 2008).**

Pursuant to the Secure Fence Act and the 2008 Amendment, DHS was required to build hundreds of miles of border fencing in a short amount of time.  In order to expedite this construction, the DHS Secretary issued four additional "notices of determination" in the *Federal Register* invoking the

11

Section 102(c) authority to waive more than 35 laws[6] that would have otherwise applied to construction of border fencing and roads.[7] ER 290-301.

Collectively, the five waivers the Secretary issued applied to approximately 624.5 miles of additional border barriers and road construction. By 2010, DHS had constructed 654 miles of "primary" border barriers, an additional 50 miles of double and triple-layered border barriers (for a total of 704 miles of barriers), and more than 1,000 miles of roads

---

[6] All five of these determinations waived application of NEPA and the ESA, as well as the Clean Water Act, 33 U.S.C. § 1251 et seq.; National Historic Preservation Act, Pub. Law 89-665; Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq.; Clean Air Act, 42 U.S.C. § 7401 et seq.; Archeological Resources Protection Act, 16 U.S.C. § 470aa et seq.; Safe Drinking Water Act, 42 U.S.C. § 300f et seq.; Wild and Scenic Rivers Act, 16 U.S.C. § 1281 et seq.; Wilderness Act, 16 U.S.C. § 1131 et seq.; National Forest Management Act, 16 U.S.C. § 1600 et seq.; Native American Graves Protection and Repatriation Act, 42 U.S.C. § 2000bb; and American Religious Freedom Act, 42 U.S.C. § 1996, as well as numerous additional laws.

[7] These waivers applied to border barrier and road construction in the following areas: (i) Barry M. Goldwater Range, Arizona, 72 Fed. Reg. 2,535 (Jan. 19, 2007)(37.3 miles); (ii) San Pedro Riparian National Conservation Area (administered by U.S. Bureau of Land Management), Arizona, 72 Fed. Reg. 60,870 (Oct. 26, 2007)(5.5 miles); (iii) Hidalgo County, Texas, 73 Fed. Reg. 19,077 (April 3, 2008)(corrected on April 8, 2008)(21 miles); (iv) Various Areas in Texas, New Mexico, Arizona, and California, 73 Fed. Reg. 19,078 (April 3, 2008)(corrected on April 8, 2008)(546.5 miles).

along the U.S.-Mexico border.  ER 202-04.[8] According to DHS, it has met its border barrier duties under Section 102(b).  ER 202-04.

## V.   THE JANUARY 25, 2017 EXECUTIVE ORDER ON BORDER SECURITY AND IMMIGRATION ENFORCEMENT IMPROVEMENT, AND DHS WALL STRATEGY DOCUMENT.

Less than a week after his inauguration, on January 25, 2017, President Donald J. Trump issued Executive Order 13768, directing DHS to construct a "secure, contiguous, and impassable physical barrier" along the entire nearly 2,000-mile-long U.S.-Mexico border.  ER 228-232.

To carry out the Executive Order, DHS prepared a March 2017 document entitled "Building The Wall: The Strategy & Way Forward" ("Wall Strategy Document").  ER 253-282.  The Wall Strategy Document identified several border wall construction projects that DHS intended to initiate during Fiscal Year 2017 (i.e., by September 30, 2017):

(1) the border wall "prototype project" in San Diego County ("Prototype Project");

---

[8] A 2015 Government Accountability Office report indicates that these totals were reached in 2010 and that, following the completion of this additional fencing, DHS reported it was "in compliance with its legal requirements for the construction of southwest border fencing" under Section 102.  ER 203.

13

(2) the replacement of 14 miles of existing primary fencing in San Diego County;

(3) the replacement of 14 miles of existing secondary fencing (possibly with solid concrete wall) in San Diego County (collectively with the replacement of the primary fence in the same location, the "San Diego Project");

(4) the replacement of 3 miles of existing primary fencing in the El Centro sector, near the city of Calexico ("Calexico Project"); and,

(5) the construction of approximately 34 miles of additional border walls in the U.S. Border Patrol Rio Grande Valley Sector in Texas. ER 253-282.

In April 2017, DHS moved forward with these plans by soliciting bid proposals from contractors for the purpose of building the Prototype Project and San Diego Project in San Diego County. ER 422-431. Significantly, all of these planning activities took place months before the publication of any waiver pursuant to Section 102(c), and DHS admits they did not conduct any public environmental review during the planning of these projects. ER 176-190.

The record establishes that these projects pose a significant risk of harm to natural resources. The Prototype and San Diego Projects are being

14

constructed in a global biodiversity hotspot that includes multiple fragile and sensitive habitats, over 30 plant species that are rare, threatened or endangered in California, and many protected wildlife species. ER 306-15, 318, 325-27, 344-46. A portion of the San Diego Project is also located within California's coastal zone, which the California Coastal Commission regulates under the CZMA to ensure that coastal uses and resources are protected. ER 343-46. This area includes the Tijuana River National Estuarine Research Reserve, which is designated as a "Wetland of International Importance" under the 1971 International Convention on Wetlands, and is one of only two intact estuaries in California and provides productive marsh habitat for invertebrates, fish and birds, and plants. ER 343-44. The Calexico fence replacement project, which includes the construction of a bridge over the New River, also poses additional significant risks to water quality. Case No. 18-55476, DktEntry 8 at 137-42.

## VI. PROTOTYPE AND SAN DIEGO PROJECTS WAIVER (AUGUST 2017), AND CALEXICO PROJECT WAIVER (SEPTEMBER 2017).

On August 2, 2017, former DHS Secretary John Kelly issued a determination in the *Federal Register* purporting to invoke Section 102(c) in order to waive the application of NEPA, CZMA, ESA, and more than 30 additional laws to "various border infrastructure projects" in the "project

15

area," which is defined as "an approximately fifteen-mile segment of the border within the San Diego Sector that starts at the Pacific Ocean and extends eastward," starting at "the Pacific Ocean and extending to approximately one mile east of Border Monument 251" ("San Diego Waiver"). ER 283-85. The San Diego Waiver identifies specific projects within the broader "project area" as including both the replacement of "existing primary fencing," as well as a "prototype border wall . . . near the eastern terminus of the existing secondary barrier." ER 283-84.[9]

On September 12, 2017, former DHS Secretary Elaine Duke issued a determination in the *Federal Register* purporting to invoke Section 102(c) in order to waive the application of NEPA, ESA, and more than 25 additional laws to replace border fencing on an approximately three-mile segment of border starting at the Calexico West Land Port of Entry and extending westward ("Calexico Waiver"). ER 285-87.

---

[9] In opposition to California's motion for summary judgment, DHS clarified that the San Diego Waiver is limited to the two projects specifically identified in that waiver: ". . .DHS does not construe this waiver determination to encompass any border infrastructure projects other than the projects specifically identified in the determination." S.D. Cal. 3:17-cv-01215, ECF Doc. 35-1, p. 88. Consequently, DHS did not comply with environmental laws with respect to the 14-mile secondary fence project and DHS acknowledges that its waiver defense does not apply.

Unlike the previous five waivers issued from 2006-2008, the San Diego and Calexico Waivers were invoked for border infrastructure projects not specifically mandated by Congress pursuant to Section 102(b). DHS contends it is authorized to build the Prototype, San Diego and Calexico Projects under Section 102(a), which DHS claims provides authority to build independent of Section 102(b). ER 134.[10]

## VII. DISTRICT COURT PROCEEDINGS.

In September 2017, Plaintiffs-Appellants filed three separate lawsuits that were consolidated by the district court.[11] ER 377-80. Collectively, Plaintiffs asserted three categories of claims: (1) environmental claims based

---

[10] As noted below, DHS's interpretation renders much of Section 102 meaningless and should be rejected under several cannons of statutory construction. DHS's arguments also appear disinguous in light of the language used in the San Diego and Calexico waivers, which cites to both subdivisions (a) and (b) as authority for the construction projects described in the waivers. ER 283-86. Moreover, DHS concedes it is obligated to comply with the consultation provision found at Section 102(b)(3) (ER 142), while at the same time arguing it is not bound by the requirements of Section 102(b)(1) and (2). Plaintiffs submit that this type of selective interpretation of a statute should be rejected. DHS can't pick and choose the provisions of law with which it will comply.

[11] Plaintiff-Appellant Center for Biological Diversity initiated federal litigation pertaining to the prototype and replacement wall projects prior to the waiver determinations. The Center initially filed suit on June 15, 2017 under the federal Freedom of Information Act, and then amended its complaint to add NEPA and ESA claims on July 7, 2017.

on violations of NEPA, CZMA, ESA and APA; (2) *ultra vires* claims that

DHS acted beyond the authority granted in Section 102; and, (3)

constitutional challenges to the waivers issued under Section 102(c).  ER

347-76, 432-534.  On October 24, 2017, the district court issued an order

consolidating the cases and establishing a summary judgment briefing and

hearing schedule.  ER 377-80.  Pursuant to that Order, DHS was relieved of

the obligation to file an answer and the parties submitted cross-motions for

summary judgment.

   A hearing on the cross motions for summary judgment took place

before the district court on February 9, 2018.  The district court took the

matter under advisement and ordered supplemental briefing on whether DHS

fulfilled its consultation duties as required by Section 102(b)(1)(C).  ER 543.

   On February 27, 2018 the district court issued an order denying

Plaintiffs' motions for summary judgment, and granting DHS's cross

motion.  ER 7-107.  Following resolution of the federal Freedom of

Information Act claim in the Center for Biological Diversity suit, the district

court issued judgments in each consolidated case on March 26, 2018.  ER 1-

6.

## VIII.  APPEAL PROCEEDINGS.

Plaintiffs in each of the three consolidated cases filed separate notices of appeal on April 9, 2018.  ER 108-127.  California appeals the district court's judgment with respect to its first four claims, including its claims that DHS violated NEPA and the CZMA, as well as its claims that DHS acted beyond its statutory authority.  ER 116, 461-466.  CBD and the Coalition appeal the district court's judgment on their claims that DHS acted beyond its statutory authority.  ER 109, 122.

On April 17, 2018, California filed an unopposed motion to expedite briefing and hearing on appeal.  Case No. 18-55476, Dkt Entry No. 8.  On April 19, 2018, this Court *sua sponte* issued an order consolidating the three appeals.  On April 26, 2018, the Court granted California's motion to expedite, while ordering Plaintiffs to file a single, joint brief.

## SUMMARY OF ARGUMENT

DHS claims authority to build the Prototype, San Diego and Calexico Projects pursuant to Section 102(a), which DHS maintains grants the Secretary with continuing authority to build any barriers the Secretary deems necessary along any border of the United States.  But DHS ignores the clear limitations provided by Congress in Section 102(b), which restrict building authority to the 700 or more miles already completed by DHS, and which

19

limit the authority to expeditiously build and complete barriers to barriers prioritized and completed on or before December 31, 2008. DHS's reading of Section 102 impermissibly renders much of the statute meaningless.

The district court incorrectly ruled below that under the standard set forth in *Leedom v. Kyne*, 358 U.S. 184 (1958), Plaintiffs could not establish that DHS's construction of the Prototype, San Diego and Calexico Projects violated clear and mandatory terms of Section 102(a) and Section 102(c). The district court did so despite finding that the parties offered competing "plausible" interpretations of Section 102, and that the statute was ambiguous as to whether DHS had such construction authority. ER 40, 43, 45, 50.

But as this Court has recognized, the United States Supreme Court's *Kyne* standard does not apply to predicate legal questions that fall under separate grants of authority, such as those at issue in this case. Here, the questions before this Court are whether the agency acted beyond its statutory authority when it authorized construction of the Prototype, San Diego and Calexico Projects pursuant to Section 102(a), and whether the power to waive "all laws" to build such projects expired on December 31, 2008, or alternatively, expired when DHS completed its mandated construction under Section 102(b). As this Court has held, such predicate legal questions must

20

be determined before any jurisdictional bar in Section 102(c) applies, and before the *Kyne* standard applies. *Iasu v. Smith*, 511 F.3d 881, 891 (9th Cir. 2007); *Flores-Miramontes v. INS*, 212 F.3d 1133, 1135 (9th Cir. 2000); and, *Gephardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018). These cases provide the framework that the district court should have followed below, because the *Kyne* standard only applies to decisions an agency makes that fall under a statutory jurisdictional bar.

Further, when deciding predicate legal questions, such as the legal questions before this Court, and determining whether the agency has acted pursuant to its statutory authority, the correct standard of review, as set forth in *International Brotherhood of Teamsters v. U.S. Department of Transportation*, 861 F.3d 944, 951-952 (9th Cir. 2017), is that courts must "set aside final agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' [5 U.S.C.] § 706(2)(A), or [is] 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" 5 U.S.C. § 706(2)(C). In order to determine if agency action is contrary to law or in excess of statutory authority, a court must first determine whether Congress has delegated legal authority to the agency to take the action that is disputed. *United States v. Mead Corp.*, 533 U.S. 218, 229-230 (2001).

21

Here, DHS is exceeding its statutory authority under Section 102(b)(1)(B) by attempting to expedite the construction of border barriers nearly 10 years after the expiration of a Congressionally-imposed deadline to expedite such barriers. DHS also lacks authority to build the Prototype, San Diego and Calexico Projects under Section 102 because, by its own admission, DHS has already met the statute's construction requirements, as set forth in Section 102(b)(1)(A). DHS also lacks authority for its current fence replacement projects because, even if one improperly ignores Congress' specific instructions under Section 102(b), such fence replacement projects are not authorized by Section 102(a). The district court erred in entering a judgment without reaching a conclusive determination concerning these predicate legal issues –issues that must be decided in order to determine whether the Section 102(c) waiver provision even applies.

The district court also erred by failing to apply the correct burden of proof to the causes of action and affirmative defenses at issue. Here, California[12] made its prima facie showing that DHS violated NEPA, CZMA,

---

[12] CBD and the Coalition plaintiffs raised similar claims with regard to NEPA and the ESA, and in the event the court finds the district court applied the incorrect burden of proof, CBD and the Coalition plaintiffs expect these claims would be resolved by the district court following remand.

and the APA.  DHS argues that these statutes have been waived pursuant to Section 102(c), an affirmative defense.  But well established law holds that DHS bore the burden of proving this defense, which is to prove that the waivers were properly invoked and apply to the projects at issue in this case. The district court upended this burden and actually concluded that the statute is ambiguous.  Having not met its burden, DHS failed to prove its affirmative defense and the district court should have ruled in Plaintiffs' favor.

Finally, even if the standard set forth in *Kyne* applies to this case, and Plaintiffs must show that DHS violated "clear and mandatory statutory language," the district court should still have found in Plaintiffs' favor.  As a matter of law, DHS's expedited construction of replacement barriers nearly ten years after a Congressionally imposed deadline to expedite barriers in priority areas violates the clear and mandatory terms of Section 102.

## ARGUMENT

I.    **THIS COURT HAS JURISDICTION TO DETERMINE WHETHER DHS ACTED OUTSIDE ITS CONGRESSIONALLY DELEGATED AUTHORITY UNDER SECTION 102(b).**

An administrative agency's power to act is limited to the authority delegated to it by Congress.  *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988); *Louisiana Pub. Service Comm'n v. FCC*, 476 U.S.

23

355, 374 (1986). DHS has "no constitutional or common law existence or authority, but only those authorities conferred upon [it] by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). If there is no statute conferring authority, a federal agency has none. *Id.*

Here, the district court erred by holding that its review of whether DHS acted within the delegated authority provided by Section 102(b) was *limited* by the jurisdictional bar set forth in Section 102(c)(2)(A). This holding is contrary to the plain reading of Section 102, which expressly states that the statute's jurisdictional bar only applies to the Secretary's decision to waive all legal requirements "pursuant to paragraph (1)." Section 102(c)(1), (c)(2)(a).

In other words, district court review of DHS's authority to construct border infrastructure pursuant to Section 102(a) or (b) is not subject to the jurisdictional bar in Section 102(c)(2)(A). Furthermore, the district court's decision is contrary to this Court's case authority holding that jurisdictional bars do not apply to predicate legal questions such as whether DHS acted outside the scope of its delegated authority provided under Section 102(b). *See e.g. Iasu*, 511 F.3d at 891; *Flores-Miramontes*, 212 F.3d at 1135; *Gephardt*, 879 F.3d 980. Instead, in reviewing whether DHS's actions in constructing border infrastructure are authorized under Section 102(b), the

24

district court was required to apply the "not in accordance with law" or "excess of statutory authority" standard of review applicable to final agency action. *International Brotherhood of Teamsters v. U.S. Department of Transportation*, 861 F.3d 944, 951-952 (9th Cir. 2017); 5 U.S.C. § 706(2)(A) and (2)(C). Finally, because the judicial review bar set forth in Section 102(c) does not apply, the ability to appeal this predicate legal question directly to the Supreme Court is not permitted. 28 U.S.C. § 1291.

**A.    The Secretary's Power to Waive All Legal Requirements Is Predicated on the Power to Build Barriers Under Section 102(b).**

Through Section 102, Congress provided the Secretary of DHS two distinct grants of authority. First, through Section 102(b)[13], Congress provided the Secretary and DHS the power to construct fencing along not less than 700 miles of the southwest border, including the power to obtain easements over private or public land as necessary. In addition, pursuant to Section 102(b)(1)(B), Congress provided the Secretary with authority to

---

[13] Section 102(a) sets forth general requirements for construction of "additional physical barriers and roads" in areas of "high illegal entry into the United States."

25

identify at least 370 miles along the southwest border for expedited construction.[14]

Second, through Section 102(c)(1), Congress provided the Secretary the power to waive all legal requirements he or she deems necessary to expeditiously complete the 370 or more miles of fencing identified in Section 102(b)(1)(B).

Before a court can determine if a waiver of legal requirements was lawful, a court must *first* determine if DHS acted within the scope of its delegated legal authority by authorizing the building of barriers in the first instance. This appeal concerns this predicate legal question, whether DHS acted outside the scope of its delegated authority to build barriers and roads under Section 102(a) or (b) and whether the authority to complete the 370 miles expeditiously by waiving laws has expired. *See e.g. Iasu*, 511 F.3d at 891; *Flores-Miramontes*, 212 F.3d at 1135; *Gephardt*, 879 F.3d 980.

Any reasonable interpretation of Section 102 leads to the conclusion that these powers are distinct. Section 102(b)(1)(A) states that the Secretary "shall construct reinforced fencing along not less than 700 miles of the

---

[14] Even if, as DHS is arguing here, there is a grant of authority to build pursuant to Section 102(a), that too is a distinct grant of authority apart from the authority to waive legal requirements under Section 102(c).

southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border." Section 102(b)(1)(B) states that when constructing the 700 miles under Section 102(b)(1)(A), the Secretary shall "(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective . . . and (ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i)." [15]

Section 102(c)(1) then provides that after authorizing the construction of such infrastructure, "the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of

---

[15] DHS's historical application Section 102 further confirms that the power to build under Section 102(b) is distinct from the power to waive under Section 102(c). Pursuant to Section 102(b), for example, DHS (and its predecessor agency, the INS) constructed 9.5 miles of secondary fencing and roads in San Diego from 1996 until September 2005 without invoking Section 102(c)'s waiver provision. ER 222. Moreover, DHS has also relied on authority independent of Section 102 to construct and maintain barriers along the border. The 14-mile primary fence in San Diego, for example, was constructed in the early 1990s pursuant to 8 U.S.C. section 1103(a)(5). ER 221.

the barriers and roads under this section." The only consistent way to read these separate subsections of Section 102 is to acknowledge that Congress intended the waiver authority of Section 102(c) to only be employed for purposes of actions taken within DHS's authority to build border infrastructure under Section 102(b).

**B. The Predicate Legal Question, Whether DHS Acted Outside the Scope of Its Authority Under Section 102(b), Is Not Subject to the Judicial Review Bar of Section 102(c).**

The Supreme Court has "repeatedly" acknowledged "the strong presumption that Congress intends judicial review of administrative action." *Traynor v. Turnage*, 485 U.S. 535, 542 (1988) (providing examples) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). "Indeed, judicial review of [] administrative action is the rule, and nonreviewability an exception which must be demonstrated… [by] 'clear and convincing evidence'" *Barlow v. Collins*, 397 U.S. 159, 166-67 (1970) (citation omitted). "This presumption is overcome only in two narrow circumstances. The first … is when Congress expressly bars review by statute… The second applies in 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'"

28

*Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718-19 (9th Cir. 2011) (citing 5 U.S.C. § 701(a)(1)); *see also Bowen*, 476 U.S. at 670.

The district court erred in this case by finding that the first exception to judicial review of administration decisions applied (statutory bar). The district court held the "judicial review bar of non-constitutional challenges applies to any action taken to invoke the section 102(c) waiver authority which includes actions under sections 102(a) and (b)." ER 71. This holding is contrary to the plain reading of the statute and the case law of this and other Circuit Courts.

Section 102(c)(2)(A) states:

> The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

In turn, Section 102(c)(1) (referenced as paragraph (1) in Section 102(c)(2)(A) above) is the section of the statute that grants the Secretary the authority to waive all legal requirements to ensure expeditious construction of the barriers under Section 102(b). But contrary to the text of the statute, the district court found that the judicial review bar applies to both the

29

authority Congress granted to waive all legal requirements, and to the predicate authority Congress granted to build infrastructure along the southwest border, and to do so expeditiously prior to December 31, 2008. Ruling that these are essentially one single grant of authority, the district court ignored the plain meaning of the statute and improperly expanded the statutory bar in Section 102(c)(2)(A).

The district court also interpreted the statute in a way that allows district court review of DHS's decision to build barriers under Section 102(a) or (b) when the Secretary chooses not to invoke a waiver at all, but bars review of that same authority when the Secretary invokes the waiver. This interpretation not only reads an inconsistency into the statute, it also creates an incentive for every Secretary to use the extraordinary power to waive legal requirements, if for no other reason than to avoid court review of his or her authority to build the barriers in the first instance.

The more consistent way to read the statute is that the jurisdictional bar applies to the very paragraph of the statute it states that it applies to, Section 102(c)(1), and was not intended to be expanded to encompass the predicate grant of authority to build infrastructure along the border, and the authority to expeditiously do so prior to December 31, 2008.

30

This narrower reading of the jurisdictional bar is also supported by case law. This Court has repeatedly found that jurisdictional bars do not apply to predicate legal questions. *Flores-Miramontes*, 212 F.3d at 1135; *Iasu*, 511 F.3d at 891; *Gephardt*, 879 F.3d 980.

In *Flores-Miramontes* this Court was faced with language, similar to the present case, that barred judicial review of a decision made by INS. The statute at issue in *Flores-Miramontes* stated: "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in [8 U.S.C. § ] 1182(a)(2) ..." 8 U.S.C. § 1252(a)(2(C). This Court found that although Congress barred judicial review of any final order by INS, the Court had jurisdiction to determine whether the agency acted outside the scope of its authority when making the determination that an individual committed the predicate criminal offense. *Flores-Miramontes*, 212 F.3d at 1135.

The same rationale applies here. The district court, when faced with a statute similar to that in *Flores-Miramontes*, ignored this Court's rulings in *Flores-Miramontes*, *Iasu* and *Gephardt* when it held that the jurisdictional bar in Section 102(c)(2)(B) applied to DHS's predicate decision to build

31

under Sections 102(a) and (b) and whether the power to waive laws to do so expeditiously has expired.

Like in *Flores-Miramontes*, the predicate legal questions in this case are not subject to the jurisdictional bar. The predicate legal question of whether DHS acted outside its congressionally delegated authority must be determined by the district court on its merits in the first instance, as held in numerous Supreme Court cases including *Bowen* and *Louisiana Public Service Commission*.

### C. The District Court Applied the Incorrect Legal Standard When Concluding That DHS Did Not Act Outside the Scope of Its Authority

Although the district court found that the jurisdictional bar in Section 102(c)(2)(B) applied in this case, the district court also held it had jurisdiction, pursuant to *Leedom v. Kyne*, 358 U.S. 184 (1958), to review DHS's decisions to waive all legal requirements under Section 102(c) and to build the infrastructure under Section 102(a) and (b). But the district court found that under *Kyne* and its progeny, it had only the limited power to review whether DHS acted "in excess of its delegated powers" contrary to "clear and mandatory statutory language." ER 36 (citing *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1208 (9th Cir. 2016)). Based on that standard, the

32

district court declared, lacking clarity from Congress, DHS acted within the scope of its delegated powers.

However, the district court applied the incorrect Supreme Court and Ninth Circuit standard. As discussed above, the jurisdictional bar does not apply to the predicate legal questions of whether DHS acted outside the scope of its authority when authorizing construction pursuant to Section 102(a) or (b), and whether or not the authority to build expeditiously by waiving all legal requirements has expired.

The correct standard as laid out in *International Brotherhood of Teamsters v. U.S. Department of Transportation*, 861 F.3d 944, 951-952 (9th Cir. 2017), is that courts must "set aside final agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' [5 U.S.C.] § 706(2)(A), or [is] 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" 5 U.S.C. § 706(2)(C). In order to determine if agency action is contrary to law or in excess of statutory authority, a court must first determine whether Congress has delegated legal authority to the agency to take the action that is disputed. *United States v. Mead Corp.*, 533 U.S. 218, 229-230, (2001).

"Mere ambiguity in a statute is not evidence of congressional delegation of authority." *Michigan, supra,* 268 F.3d 1075 at 1082. Agency

33

authority may not be lightly presumed. *Id.* The court must first determine if there is a delegation of power to an agency, prior to granting any deference to an agency's decisions. *City of Kansas City, Mo. v. Dep't of Housing and Urban Dev.*, 923 F.2d 188 192-193 (D.C. Cir. 1991). "Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Michigan,* 268 F.3d 1075 at 1082. This is especially true in cases when the agency is not granted authority to issue regulations or formal adjudication and is not acting with public participation to enact with the force of law. *Mead Corp., supra,* 533 U.S. at 229-30; *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 257 (1991).

As established in *Brotherhood of Teamsters* and *Michigan,* the correct approach the district court should have taken, is: first determine whether DHS acted outside the scope of its delegated statutory authority when authorizing the construction pursuant Section 102(a) or (b), with no deference to DHS's construction of the statute; and then, and only then, determine whether the statutory bar applies, and if so, whether the *Kyne* standard is appropriate.

34

### D. Direct Appeal to the U.S. Supreme Court Does Not Apply to the Predicate Legal Questions at Issue in this Appeal.

Section 102(c)(2)(C) states that any final decision of the district court under Section 102(c)(2)(A), "may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States." DHS may argue the district court's decision can only be reviewed upon petition to the Supreme Court because of the district court's conclusion that the jurisdictional bar applies to both the Secretary's decision to waive all legal requirements and to DHS's predicate decision to build the infrastructure. But just as the jurisdictional bar does not apply to the predicate legal questions of whether the agency acted outside the scope of its authority when deciding to build pursuant to Section 102(b), and whether or not the authority to build expeditiously by waiving all legal requirements has expired, the ability to appeal this predicate legal question directly to the Supreme Court is not permitted. 28 U.S.C. § 1291.[16]

---

[16] The application of the *Kyne* standard to predicate questions of jurisdiction and the elimination of appellate review is also inappropriate here because California asserts violations of NEPA and the CZMA that accrued independent of, and prior to, the Secretary's invocation of Section 102(c)'s waiver provision. As alleged in California's complaint and demonstrated in its moving papers, DHS engaged in the planning of projects that triggered compliance with NEPA and CZMA several months before the Secretary attempted to invoke the waiver provision. Thus, NEPA and CZMA claims

**II.** **AS A MATTER OF LAW, DHS ACTED BEYOND ITS STATUTORY AUTHORITY UNDER SECTION 102 IN AUTHORIZING THE CONSTRUCTION OF THE PROTOTYPE, SAN DIEGO AND CALEXICO PROJECTS.**

Section 102(a), in general terms, authorizes the Secretary to "install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry. . ." In subsection (b), Congress provided the Secretary with specific instructions on how to carry out the general terms described in subsection (a). Under the heading "Additional Fencing Along Southwest Border," Section 102(b)(1)(A) begins with the phrase, "[i]n carrying out subsection (a)." Then, through Section 102(b)(1)(B), Congress provided the Secretary further instructions "[i]n Carrying Out this Section," referencing all of Section 102.

A correct reading of Section 102 shows DHS exceeded its statutory authority on four discrete occasions: when (1) commencing the construction of the San Diego Project; (2) commencing the construction of the Calexico Project; (3) building the Prototype Project; and, (4) issuing the Section 102(c) waivers in order to expedite construction of the projects.

---

are not "arising from" an action taken by the Secretary under Section 102(c)(1) and (2)(A).

36

On these four occasions, DHS exceeded its statutory authority for the following four reasons. First, the authority to build in "priority areas" expeditiously pursuant to Section 102(b)(1)(B) expired on December 31, 2008. Second, the authority to build barriers pursuant to Section 102(b)(1)(A) expired at the latest in 2010, when DHS completed the barriers contemplated by Section 102(b)(1)(A). ER 203-04. And third and fourth, assuming as DHS maintains that it could proceed with construction based on the general provisions of Section 102(a) and ignore Congress' specific instructions under Section 102(b), DHS acted outside the scope of this purported authority by building barriers that are not "additional" barriers and are not in "areas of high illegal entry" as specified by Section 102.

### A. The Secretary's Authority to Waive Laws to Expedite Construction Expired on December 31, 2008.

Secretary Kelly and acting Secretary Duke issued the San Diego and Calexico Waivers under the purported authority of Section 102(c). But the express words and statutory construction of Section 102, together with DHS's past actions and interpretation of the statute, show that DHS's authority to build expeditiously in "priority areas" expired on December 31, 2008. Any other interpretation would mean that DHS holds a perpetual, unlimited, unchecked, and unprecedented authority to waive all laws as

37

applied to any border construction—contravening Congressional intent, statutory construction, and common sense.

The district court erred below by 1) misapplying well-established rules of statutory construction, because the statute on its face terminated the Secretary's authority to build expeditiously in 2008, and to build at all pursuant to Section 102 when DHS completed its mandate; and, 2) applying an incorrect standard when finding that a mere ambiguity in Section 102 evidenced a congressional delegation of authority to the Secretary of perpetual waiver power.

> **1.** **Section 102's Framework and Its Amendment History Show that the Secretary's Authority to Waive Laws Expired on December 31, 2008.**

"Statutory construction is a holistic endeavor." *Koons Buick Pontiac GMC v. Nigh*, 543 U.S. 50, 60 (2004). To determine Congress's intent concerning Section 102, a court should read the statute's words "in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). In addition, courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.*

38

In late 2007, Congress amended Section 102 a third and final time through the Department of Homeland Security Appropriations Act, 2008 (Pub. L. 110-161) ("2008 Amendment"). The 2008 Amendment included several significant changes to Section 102(b). Of particular import, the statute specified that by December 31, 2008, the Secretary must identify "priority areas" for expedited construction of fencing. Section 102(b)(1)(B).

Section 102(b)(1)(B) requires the Secretary to identify "the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective. . ." and complete such construction by the firm date of December 31, 2008 - within one year of the bill's enactment. Section 102(c) then authorizes the DHS Secretary to waive legal requirements, but only as "necessary to ensure *expeditious* construction . . . ." (emphasis added).

Congress's use of the word "expeditious" in Section 102(c)(1) relates it back to Section 102(b)(1)(B), which required construction in "priority areas" within one year of the bill's enactment. In this way, the sections of the statute harmonize together into a coherent whole. Congress expressed its intent for the Secretary to build "priority areas" of at least 370 miles within one year, and recognizing the difficulty of that timeline, authorized the

39

Secretary to waive legal requirements to expedite construction and meet the 2008 deadline.

DHS urges a reading of the statute that ignores these provisions. DHS argues that, through Section 102(a), "Congress is directing the Secretary of Homeland Security to construct additional barriers . . . and that authority extends beyond the specific projects that Congress identifies in 102(b)." ER 134. This interpretation must be rejected for several reasons.

First, allowing DHS to exhume the Section 102(c) waiver authority for projects initiated one decade after the 2008 amendments, untethered to any of the specific Congressional direction provided by Section 102(b), including requirements for priority areas set forth in Section 102(b)(1)(B), would render the express statutory term "expeditious" superfluous. It would allow the Secretary to determine that *any* border construction *at any time* warrants "expeditious" action, even though it may be several years or even decades *after* Congress last amended Section 102. And, it would violate the well-established rule that "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

Moreover, the explicit constraints on DHS's authority imposed by the expiration of authority in Section 102(b)(2)(i) and the construction deadline

40

in Section 102(b)(2)(ii) would be rendered a nullity. By reading the statute in a way that provides waiver authority for projects initiated one decade or longer after the 2008 amendments, the district court eviscerated the Congressional intent of Section 102(b) and (c), violating clear rules of statutory construction. *See*, *e.g.*, *Duncan v. Walker,* 533 U.S. 167, 174 (2001) (holding that court's duty is to "give effect" to "every clause and word of a statute" to avoid surplusage); *Setser v. U.S.*, 566 U.S. 231, 239 (2012); *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 497 (1992).

DHS's invitation to erase the December 31, 2008 deadline should also be rejected under the doctrine of constitutional avoidance. "It is a bedrock principle of statutory interpretation that where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Hawaii v. Trump*, 878 F.3d 662, 690 (9th Cir. 2017), *cert. granted on other grounds*, 138 S. Ct. 923 (2018); *see also*, *Clark v. Martinez*, 543 U.S. 371, 385 (2005). With previous iterations of Section 102, the power to waive laws was tied to the specific projects identified in subsection (b) – when the original San Diego triple fence project or the 800 miles of double-layered fencing was complete,

41

the power to waive laws was also extinguished. Pub. L. 104-208 (Sept. 30, 1996); Pub. L. 109-367 (Oct. 26, 2006).

With the current version of Section 102, Congress imposed mileage requirements and deadlines to restrict the Secretary's authority to waive laws. Here, DHS urges an interpretation of Section 102 that eliminates a key limitation that Congress delineated when it delegated its Article I powers to the Secretary – removing any time limits on the Secretary's authority to waive legal requirements at his or her choosing. DHS's view of Section 102 should be rejected because the removal of this congressionally imposed boundary raises serious constitutional problems under the Non-Delegation Doctrine.

And, finally, DHS's reading of Section 102 is contrary to the well-established rule of statutory construction relating to the specific statutory requirements that follow general statutory provisions – the specific governs the general. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (explaining that where "a general authorization and a more limited, specific authorization exist side by side," the specific authorization prevails over the general authorization "so as to avoid . . . the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that . . . effect shall be given to every clause and

42

part of a statute"); *Morales v. Trans World Airlines, Inc.* 504 U.S. 374, 384 (1992) (reiterating that a statute's "specific [terms] govern the general [terms]").

Here, Section 102 refers to Section 102(a) as a "General" provision in describing the Secretary's overall authority to install additional barriers. It is immediately followed by Section 102(b), which provided the Secretary with specific instructions for the express purpose of "carrying-out subsection (a)." Following *RadLAX* and *Morales,* these specific instructions must be given effect and should not be "swallowed by the general" provision. DHS's interpretation of Section 102 must be rejected because it gives the Secretary unbridled authority to execute waivers indefinitely, renders the limitations in Section 102(b) "insignificant, if not wholly superfluous," ignores Congress's instructions on how to carry-out construction and lets the general terms govern the specific. *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Instead of applying the correct standard of judicial review as set forth in 5 U.S.C. section 706(2)(A) and (2)(C) and applicable case law, the district court avoided interpreting Congress's intent by simply holding that an "ambiguous statute" necessitated a ruling in favor of DHS's authority to build pursuant to Section 102(a) and to use the waiver authority to do so. In so doing, the district court erred in granting DHS summary judgment.

43

### 2. Section 102(b)'s Distinct Use of "Subsection" and "Section" Denotes that the December 2008 Deadline in Section 102(b) also Applies to the Secretary's Waiver Authority in Section 102(c).

DHS argued, and the district court endorsed below, a reading of Section 102 that interprets Section 102(c)'s grant of waiver authority "to ensure expeditious construction of the barriers and roads under this section," to mean that the Secretary could waive all applicable state and federal laws whenever building pursuant to Section 102. ER 37, 45. Not surprisingly, DHS argued that this includes border projects undertaken pursuant to Section 102(a), which outlines general authority for the Secretary to install additional barriers and roads on the border in "areas of high illegal entry into the United States." ER 134, 135; Section 102(a). While DHS advocated for a broad reading of the phrase "under this section" as to the Secretary's waiver authority under Section 102(c), it refused to apply the same broad construction to Section 102(b), which uses the same term, but imposes a deadline on the Secretary's authority to identify and construct additional fencing and related roads under the statute.

Section 102(b), which applies to "[c]onstruction of fencing and road improvements along the border," expressly provides that "[i]n carrying out *this section* the Secretary of Homeland Security shall identify the 370 miles,

44

or other mileage determined by the Secretary" of priority fencing "whose authority to determine other mileage expires December 31, 2008 . . . ." Section 102(b)(1)(B)(i) (emphasis added). Congress reinforced this deadline by requiring that projects undertaken under this "section" also be completed by this same date. Section 102(b)(1)(B)(ii).

Section 102(b) explicitly uses the term "section" when referring to the Secretary's limited authority to identify and construct additional barriers and roads expeditiously. The express language, therefore, not only makes Section 102(b) applicable to the projects undertaken under Section 102(a), but also is another way in which Section 102(b)(1)(B) is related to Section 102(c), as both use the term section and demand expeditious construction of barriers.

In sum, the Secretary's authority to build expeditiously in "priority areas" by utilizing the waiver power granted in Section 102(c) expired on December 31, 2008. Consequently, the San Diego and Calexico Waivers are void.

**B.** **Alternatively, the Secretary's Wavier Authority Expired When the Construction Outlined in Section 102(b) Was Completed.**

The statutory construction, amendment history and plain meaning of Section 102, demonstrate that the waiver authority pursuant to Section

45

102(c) expired on December 31, 2008.  But even if this Court finds that the waiver authority did not expire on that date, Congress certainly meant for the authority to expire when DHS completed its statutory mandate to build pursuant to Section 102(b).

The structure of the statute, its purpose and legislative history, as well as legal precedent all demonstrate that the statutory authority to build barriers pursuant to Section 102 expired when DHS completed its statutory mandate.  As discussed above, in order to determine Congress's intent, a court should read the words of a statute "in their context and with a view to their place in the overall statutory scheme." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.  In addition, courts "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency." *Id.*

### 1. The Statutory History Demonstrates Congress's Intent for Section 102(b) To Limit DHS's Construction Authority Under Section 102.

The 2008 Amendment significantly changed Section 102(b).  It removed the requirement that DHS construct 800 miles of double-layered fencing (as set forth in the Secure Fence Act of 2006), replacing it with the requirements set forth in subparagraphs (b)(1)(A)-(D).  In particular, Section

46

102(b)(1) imposed new requirements and conditions pertaining to "Additional Fencing Along the Southwest Border." The statute specified that barriers be placed along not less than 700 miles where fencing would be "most practical and effective." Section 102(b)(1)(A). The statute also set a deadline of December 31, 2008 for the identification and expedited construction of fencing. Section 102(b)(1)(B). And, it provided a consultation requirement and directed the Secretary to promptly acquire easements for construction. Sections 102(b)(1)(C), (b)(2).

Significantly, Section 102(a) completely lacks the specificity that has been the hallmark of this legislation since its enactment in 1996. Congress instead has outlined specific construction requirements in Section 102(b). In 1996, Congress wanted 14 miles of fencing. In 2006, Congress demanded 850 miles of double-layered fencing. Finally, in 2008, it provided the current legislation, which requires at least 700 miles of fencing and 370 miles of fencing in priority areas before December 31, 2008. The notion that Section 102(a) provides DHS with general power to construct as it pleases, and to use a waiver to do so, is antithetical to the specificity Congress provided in Section 102(b).

Further, the reduction in miles from 2006 to 2008 that Congress demanded also indicates Congress did not intend for DHS to have waiver

47

power in perpetuity and for Section 102 to apply to whatever construction DHS desired. Why would Congress reduce the number of total miles in Section 102(b), if there is no limit on DHS's construction and waiver power?

Therefore, the plain language of Section 102 and its statutory history demonstrate that Section 102(b) limits DHS's authority to build, contrary to the district court's conclusion and DHS's claim that separate construction authority exists under Section 102(a). This reading of Section 102 meets the requirement that the general terms of a statute must not govern the specific. *TRW, Inc.*, 534 U.S. at 31. Furthermore, if this Court reverses the district court's decision in accordance with Section 102's plain meaning and statutory history, DHS may still build barriers to "guard the boundaries and borders of the United States against the illegal entry of aliens" pursuant to Section 103(a) of the Immigration and Nationality Act, as DHS previously relied upon to construct border fencing prior to Section 102's enactment. 8 U.S.C. §1103(a)(5), ER 218. Even so, the barriers contemplated by Section 102, as outlined in subsection (b), have been completed and DHS has met Congress's construction goals.

48

**2. Section 102's Legislative History Also Demonstrates that Congress Intended to Limit the Scope of the Section 102(c) Wavier Authority to Specific Border Barriers Required Under Section 102(b).**

Section 102 of the 2005 REAL ID Act (H.R. 418) amended the Section 102(c) waiver provision to its current language. Pub. L. 109-13, div. B. Although the REAL ID Act's legislative history is relatively sparse, it unequivocally shows the sponsor's and supporters' intent to limit the expanded Section 102(c) waiver authority to the San Diego fencing under Section 102(b). This intent is evidenced by the Conference Report, which focused solely on the San Diego triple-fence project described in Section 102(b). H.R. Rep. 109-72, at 171 (2005).

In addition, throughout the limited House Floor debate on the REAL ID Act, the bill's author and co-sponsors repeatedly made plain their intent that the expansion of the Section 102(c) waiver authority was specific to the border barrier segment identified under Section 102(b)—at that time, the completion of the San Diego double and triple layer fence. An explanation provided by bill sponsors during floor debate always "deserves to be accorded substantial weight in interpreting the statute." *Federal Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976). In circumstances where legislative consideration is rushed or truncated, such as the case with

49

the REAL ID Act, courts will give even "greater weight than [they] otherwise might to the statements of the individual legislators who spoke on behalf of the legislation." *Mount Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1453-54 (9th Cir. 1992).

The weight of the legislative history thus reinforces the conclusion that Congress intended the REAL ID Act's amendment and expansion of the Section 102(b) authority to build barriers and the Section 102(c) waiver authority, like the Section 102(c) waiver authority as originally enacted in 1996, to apply only to the specific border barriers required by Section 102(b).

### 3. Past Executive Practice Also Supports Limiting Use of the Wavier to Construction Projects Outlined in Section 102(b).

In addition to its framework, a court may also examine "prior executive practice" to interpret a statute. *Hawaii*, *supra,* 878 F.3d at 684, *cert. granted on other grounds*, 138 S. Ct. 923 (2018) (In statutory interpretation court looks to "framework as a whole, legislative history, and prior executive practice.") The Secretary's past conduct supports Plaintiffs' reading of the statute. As referenced by the district court, prior to 2017, the waiver authority has been invoked five times for fencing and road projects. ER 43. Recognizing the mandate to complete expedited fencing projects by the end

50

of the year, former Secretary Chertoff in 2008 identified more than 370 miles of priority areas for expedited construction, issued waivers for expedited construction, and committed DHS to a total of 661 miles of border fencing by the first half of 2009.  ER 225.

There have been no waivers initiated since Secretary Chertoff's 2008 waivers.  DHS in fact agrees that it has completed its construction pursuant to Section 102(b) and is not arguing here that it is in any way acting pursuant to authority of Section 102(b)(1)(A) or (b)(1)(B).  ER 109, 134, 135, 203, 207.  As of February 2017, DHS had constructed a total of 654 miles of "primary" border barriers, an additional 50 miles of double and triple-layered border barriers (for a total of 704 miles of barriers), and more than 1,000 miles of roads along the U.S.-Mexico border.  ER 109, 203, 207.

> DHS states:
>
> From fiscal years 2005 through 2015, CBP increased the total miles of primary border fencing on the southwest border from 119 miles to 654 miles—including 354 miles of primary pedestrian fencing and 300 miles of primary vehicle fencing. With 654 miles of primary fencing currently deployed, CBP officials have stated that CBP is in compliance with its legal requirements for the construction of the southwest border fencing on the substantial discretion provided to the Secretary of Homeland Security to determine the appropriate placement of fencing.

*Id.*

DHS simply wishes to resurrect the authority Congress granted to build the more than 700 miles of fencing that already exists, more than a decade after its intended use. DHS wants to graft this extraordinary power to waive all legal requirements on to its desire to build a barrier along the entire southern border. However, Section 102 was never designed to fulfill that purpose.

For this reason, the district court's reading of the statute was flawed and contrary to basic canons of statutory construction. DHS's power to build under Section 102 has expired, and the waiver authority has expired along with it. Following the rules of statutory construction when an agency is purportedly acting beyond its statutory authority as laid out in *International Brotherhood of Teamsters* and *Michigan*, the district court erred in failing to find that DHS acted outside the scope of its authority pursuant to Section 102.

**C. DHS's Fence Replacement Projects are Not Authorized by Section 102, Which is Limited to the Construction of "Additional" Barriers.**

A plain reading of Section 102 demonstrates Congressional authorization to build under Section 102 is limited to the installation of "additional" barriers and roads. The statute does not authorize the Secretary

52

to waive laws for the purpose of replacing or maintaining existing barriers.

At the outset, Section 102(a) provides:

> The Secretary of Homeland Security shall take such actions as may be necessary to *install additional physical barriers* and roads (including the removal of obstacles to the detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States. (emphasis added)

Section 102(a) (emphasis added).

As discussed above, when determining statutory meaning, courts must look first to the plain meaning of the text. *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 627 F.3d 1268, 1270 (9th Cir. 2010). "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). And, when determining the plain meaning of language, this court has noted that it is appropriate to "consult dictionary definitions." *Transwestern Pipeline Co.*, 627 F.3d at 1270 (citing *Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088 (9th Cir. 2007)).

The word "additional" is defined as "existing or coming by way of addition: added, further" (Webster's Third New International Dictionary,

Copyright 2002), "more than is usual or expected: added,"[17] or, "[a]dded, extra, or supplementary to what is already present or available."[18]  In contrast, "replace" means "to restore to a former place or position, to take the place of especially as a substitute or successor," or "to put something new in the place of."[19]

This Court should also consider the context in which the word "additional" is used.  *McNeill v. United States*, 563 U.S. 816, 819 (2011). Section 102(a), which describes the general prerequisites for construction under Section 102, is followed by subsection (b), through which Congress provided DHS specific instructions in "carrying-out" the general requirements of Section 102(a).  Section 102(b)(1) uses the title "*Additional fencing along southwest border . . .*" and goes on to describe specific mileage requirements.  Section 102(b)(1) (emphasis added.)

When applying its plain and ordinary meaning, and when placed in the context of how the word is used throughout Section 102, Congress understood the phrase "install additional barriers" to mean the construction

---

[17] https://www.merriam-webster.com/dictionary/additional (last viewed on May 2, 2018.)

[18] https://en.oxforddictionaries.com/definition/additional (last viewed on May 2, 2018.).

[19] https://www.merriam-webster.com/dictionary/replace (last viewed on May 2, 2018.)

of barriers that would add to the total miles of already existing fences by installing new barriers where none existed at the time. This interpretation of the word "additional" is consistent with the evolution of border infrastructure along the southwest border and the history of Section 102. With each new iteration of Section 102, Congress sought to install additional fencing in areas where none existed at the time.

For example, when Section 102 was originally enacted, Congress sought to add new layers of fencing to supplement the existing primary fence in San Diego. Pub. L. 104-208. In 2006, Congress sought to add at least 800 miles of double layered fencing along the border. Pub. L. 109-367. Finally, in amending the statute for the last time, Congress imposed a December 31, 2008 deadline for adding hundreds of more miles of fencing in priority areas on an expedited schedule. Pub. L. 110-161.

This plain-meaning interpretation of the word "additional" is also consistent with how Section 102 was applied in the five waivers initiated by former Secretary Chertoff between September 2005 and April 2008. ER 288-301. Each waiver identified projects that proposed the construction of additional fencing in areas where none existed at the time and none of the

55

waivers were initiated for the purpose of replacing, repairing, or enhancing existing barriers. *Id.*[20]

This plain-meaning, common-sense application of the word "additional" is also illustrated in the DHS's own planning documents. ER 253-282. DHS's March 2017 power point presentation, which describe several border wall projects for the fiscal years ending in 2017 and 2018, differentiates the replacement projects from projects where it will be creating "additional" barriers. ER 256, 268, 270, 273, 275. With respect to the San Diego fence replacement projects, DHS clearly described the projects calling for the replacement of existing barriers and did not describe the projects as creating "new" or "additional" barriers. ER 270. In contrast,

---

[20] The district court incorrectly stated that "DHS has used section 102 to replace fencing in 2011 in Arizona" and that it invoked Section 102(c)'s waiver authority, citing a waiver that was initiated by Secretary Chertoff in April 2008. ER 46-47. While DHS did cite Section 102(a) and (b), as well as other statutes, as authority for the replacement of fencing in Arizona in 2011, the court erred in assuming that DHS invoked a waiver to do so. The 2011 Environmental Stewardship Plan offered by DHS with its Reply brief (ER 141-142) does not establish the project was covered by a waiver; it establishes merely that DHS made the incredible assertion that the project was covered by a waiver that was invoked three years earlier and that, apparently, no party was willing bring a legal challenge to that assertion. According to DHS's own reports, the expedited construction called for in the April 2008 waivers was completed in 2010 and none of the waivers called for the replacement or maintenance of the existing fencing. ER 203-04, 225-27, 288-301.

DHS repeatedly used the terms "new" or "additional" to describe plans to construct barriers in Texas and New Mexico where no fences currently exist. ER 256, 268, 273, 275.

In response, DHS contends that Congress could have intended for that word "additional" to include their replacement projects because "the barriers will be taller and more substantial." ER 135. Appellees' tortured interpretation should be rejected because there is nothing in the word "additional" or in Section 102 that supports the authority to construct taller or more substantial barriers.

In an attempt to bolster its claim that the word "additional" means "replacement," DHS also cited to statements by United States Senator John Kyl in 2006, who referred to Section 102 and the previous San Diego project as "replacing the so-called landing mat fence . . ." ER 135. This argument should be rejected for several reasons. First, Senator Kyl was wrong in his description of the previous San Diego project, which called for the construction of the current secondary fence and tertiary fence; the landing mat primary fence remained in place. *Id*. Second, the fact that these comments were made 12 years ago and that none of the previous waivers called for the replacement of the landing mat fence in San Diego indicates the opposite of what DHS is trying to prove – it reflects the fact that DHS

57

believed the replacement project was not authorized by Section 102. Otherwise they would have utilized a waiver to replace the San Diego primary fence long ago.

Finally, the passage of time since enactment underscores why Section 102's waiver provision was never intended to apply to replacement projects. Section 102(c) waivers were intended for projects that needed to be expedited, not to items on a maintenance checklist that DHS has known about and could have addressed (while complying with all laws) over a decade ago.

This Court should apply the plain and ordinary meaning of the word "additional" and rule that, as a matter of law, Section 102 does not authorize the installation of replacement fencing described in the San Diego and Calexico Waivers.

**D. Based on the Undisputed Record, if Section 102(a) Alone Applies, Then DHS Cannot Establish That the Projects Are in "Areas of High Illegal Entry" Within the Meaning of Section 102**

As stated above, DHS contends that its construction authority was premised on Section 102(a), not Section 102(b). If this Court finds that Section 102(a) alone provides authority for DHS to build replacement barriers, which it should not, then this Court should still find that the

58

construction is beyond DHS's statutory authority. Pursuant to Section 102(a), the Secretary may only install additional barriers and roads "in areas of high illegal entry."

While Congress did not define the phrase "areas of high illegal entry," the rules of statutory construction mandate that those words be given force and effect consistent with Congressional intent. The phrase should also be interpreted in the context of its statutory framework, legislative history, and prior executive practice. *See Brown & Williamson Tobacco Corp.*, *supra,* 529 U.S. at 132–33 (2000); *Hawaii, supra,* 878 F.3d at 684 (9th Cir. 2017).

Congress did not authorize the construction of barriers across the entire southern border. Rather, it intended to draw a distinction between areas of high illegal entry and areas that were not. With the original version of the statute in 1996 and the Secure Fence Act of 2006's amendment to Section 102(b), Congress identified the specific areas where the additional barriers were to be built, in San Diego and specified areas in the four border-states, respectively. Pub. L. 104-208 (Sept. 30, 1996); Pub. L. 109-367 (Oct. 26, 2006).

Even if Section 102(a) is interpreted to grant the Secretary authority to build replacement barriers independent of the limits in Section 102(b), the Secretary's selection of a construction location is still subject to the general

59

terms set forth in Section 102(a). If Congress intended to authorize the construction of barriers across the entire southern border, then it would have done so explicitly and it would not have included the phrase "in areas of high illegal entry" or identified areas for construction. As one Senator noted in support of the Secure Fence Act of 2006, which greatly expanded the scope of Section 102, "[n]ow, we are not going to put the fencing along the entire border, obviously." ER 382. DHS now urges an interpretation of Section 102 that would allow it to construct anywhere and everywhere along the border – an interpretation that legislators understood to be "obviously" wrong.

Further, the best measure of what Congress considered "high" illegal entry areas is the Congressional response to areas with differing levels of illegal entry when it enacted or amended section 102.[21] For example, when Congress enacted Section 102 in 1996 and identified San Diego as the area where three-layers of fencing were required, there were nearly 500,000 apprehensions in the San Diego sector. Pub. L. 104-208 (Sept. 30, 1996);

---

[21] The United States Customs and Border Protection maintains data concerning the number of apprehensions that have occurred in each of its nine sectors along the southern border. ER 163, 191. DHS acknowledges that their apprehension data is the best measure of how many illegal entries are occurring. ER 163.

ER 191. Similarly, when Congress passed the Secure Fence Act of 2006 it focused on sectors that had apprehensions in the range of 100,000 each year. Pub. L. 109-367 (Oct. 26, 2006); ER 191.

The number of illegal entries occurring in the San Diego and El Centro (where Calexico is located) sectors are now a fraction of what they once were in 1996 and are lower than the sectors that Congress ignored in 2006 when it targeted specific areas for additional fencing. For example, DHS admits that the San Diego Sector's apprehensions dropped by 93% from 1996, the year Congress enacted section 102, to 2016. ER 179. Similar reductions were evidenced in the El Centro Sector from 2000 to 2016. ER 181. In 2016, there were 31,891 apprehensions in San Diego and 19,448 in El Centro, much lower than in sectors Congress has consistently ignored in enactment of and amendments to Section 102. ER 164; Pub. L. 109-367 (Oct. 26, 2006).[22] Thus, San Diego and El Centro are no longer areas of high illegal entry within the meaning of Section 102 at the time it was enacted or last amended.

Moreover, DHS admits that in recent years the apprehensions in the

---

[22] For example, the Del Rio and Laredo sectors, which had 42,636 and 74,840 apprehensions in 2006, respectively, were not identified as one of the areas of concern in the Secure Fence Act of 2006. ER 191.

San Diego and El Centro sectors accounted for only 7% and 4%, respectively, of the total number apprehensions across the southern border. ER 164. By comparison, one sector in Texas and another in Arizona together accounted for more than 60% of all southern apprehensions during that same time period. ER 192. DHS admits that the level of apprehensions is much lower in the California sectors than it is in sectors in other border states. ER 164. In other words, whether one chooses to define the term "high" under Section 102(a) by utilizing historical data or by comparing one sector to another, the Prototype, San Diego and Calexico Project areas are no longer areas of high illegal entry within the meaning of the statute.

DHS attempts to ignore these facts by arguing that Section 102 empowers the Secretary to expedite the construction of barriers anywhere along the southern border so long as the barriers are aimed at the goal of accomplishing "operational control" of the border, which DHS defines as "the prevention of all unlawful entries into the United States, including . . . unlawful aliens, . . . narcotics, and other contraband." ER 148-149. This interpretation of Section 102 should be rejected because it renders the phrase "areas of high illegal entry" superfluous. Simply put, if Congress intended not to draw a distinction between areas of higher and lower illegal entry it would have left that language out of the statute.

DHS cannot satisfy its burden of proving that Section 102 authorizes it to install barriers in San Diego and Calexico, because those areas are no longer areas of high illegal entry within the meaning of the statute. Thus, the district court committed reversible error and judgment should be entered in favor of Plaintiffs.

### III. THE DISTRICT COURT ERRED IN GRANTING DHS SUMMARY JUDGMENT AS TO CALIFORNIA'S NEPA AND CZMA CLAIMS; DHS DID NOT MEET ITS BURDEN OF PROVING ITS AFFIRMATIVE DEFENSE.

In reviewing DHS's border construction activities and holding that they were exempt from environmental review under NEPA and CZMA, the district court should have imposed the burden of proof on DHS to show that the waiver provision under Section 102(c) applied.

#### A. California's NEPA and CZMA Claims and DHS's Affirmative Defense to These Claims.

In its First and Second Claims for Relief, California[23] asserts that DHS violated NEPA, CZMA, and the APA by failing to comply with any of the public environmental review requirements mandated by those statutes. ER

---

[23] CBD and the Coalition plaintiffs raised similar claims with regard to NEPA and the ESA, and in the event the court finds the district court applied the incorrect burden of proof, CBD and the Coalition plaintiffs expect these claims would be resolved by the district court following remand.

461-463. Both NEPA (in the form of an Environmental Impact Statement) and CZMA (in the form of a consistency determination) mandate public review of a project's potential impacts at the earliest possible stage of the planning process. *Robertson v. Methow Valley Citizen Council*, 490 U.S. 332, 348–49 (1989); 42 U.S.C. § 4332(2)(C); 16 U.S.C. § 1456(c)(2); 15 C.F.R. § 930.36(b); 40 C.F.R. § 1501.2.

California's NEPA claim encompassed the individual projects announced in the months following President Trump's January 27, 2017 Executive Order, including:

- The Construction of Prototype Walls in San Diego;
- The 14-Mile Primary Fence Replacement Project in San Diego;
- The 14-Mile Secondary Fence Replacement Project in San Diego, and,
- The 3-Mile Primary Fence Replacement Project in Calexico.

ER 175-178, 422-431, 433-435, 450-451, 461-463. California's CZMA claim encompassed the portions of the San Diego fence replacement projects falling within the coastal zone. *Id.*

The record leaves no doubt that these prototype and fence replacement projects triggered compliance with NEPA and CZMA. ER 175-178. DHS

failed to rebut the evidence that the Projects, which were detailed in plans released as early as March 2017, are being constructed in areas that are rich in biodiversity and contain sensitive habitats that include thirty-three (33) plant varieties that are rare, threatened or endangered in California and also numerous endangered or threatened wildlife species. ER 175-178, 302-346. California produced unrebutted evidence that the primary and secondary fence-replacement projects in San Diego are located within the coastal zone and will have negative impacts on coastal resources. *Id.* And, significantly, DHS readily admitted that it failed to comply with these statutes. ER 175-178.

For California's NEPA and CZMA claims relating to the prototype barrier construction and the primary fence replacement projects in San Diego and the Calexico, DHS's entire defense is limited to two arguments: 1) California lacks standing to assert its claim for relief under NEPA (acknowledging that it has standing to sue under CZMA); and, 2) that NEPA, CZMA and the APA were waived pursuant to Section 102(c)(1).

A defense based on a plaintiff's lack of standing is one that challenges the plaintiff's ability to prove a prima facie element of recovery; it is a defense targeting a prima facie element that the plaintiff bears the burden of proving. Here, the district court easily disposed of DHS's standing

65

argument, concluding that California satisfied its burden with evidence of its procedural rights, quasi-sovereign interests, and sufficient evidence of an injury-in-fact. ER 22-25.[24]

In contrast, an affirmative defense is one that precludes liability even if all of the prima facie elements of the plaintiff's claim are proven; it is a defense that is not aimed at negating elements of the plaintiff's prima facie claim. *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002); *Vogel v. Huntington Oaks Delaware Partners, LLC*, 291 F.R.D. 438, 442 (C.D. Cal. 2013) *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010). A defendant's assertion that the plaintiff's otherwise valid claim has been waived, or, the defendant's assertion that it is exempt from an otherwise valid claim for recovery, are examples of affirmative defenses. *Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*, 676 F. App'x 654, 656 (9th Cir. 2017); *See, Magana v. Com. of the N. Mariana Islands*, 107 F.3d 1436, 1445 (9th Cir. 1997), as amended (May 1, 1997); *see also* FRCP Rule 8(c).

DHS's defense based on the waivers under Section 102(c) is an affirmative defense, because it is not aimed at negating the prima facie

---

[24] DHS did not attack the standing of the other Plaintiffs.

elements of California's NEPA, CZMA, and APA claims, but instead seeks to avoid liability without regard to the prima facie elements.

### B. The District Court Erred by Upending the Burden of Proof and Granting Judgment to DHS Based on an Affirmative Defense Absent a Showing that Section 102 Applies.

A defendant asserting an affirmative defense bears the burden of proving the applicability of that affirmative defense. *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92-93 (2008) (employer claiming it is exempt from laws that would otherwise render its conduct illegal is asserting "a defense for which the burden of persuasion falls" on the party claiming the exemption); *Kanne v. Connecticut Gen. Life Ins. Co.*, 867 F.2d 489, 492 n. 4 (9th Cir. 1988). Accordingly, DHS bore the burden of proving the applicability of its affirmative defense based on Section 102 and the waivers.[25]

The district court, however, neglected to consider the clear statutory violations of NEPA, CZMA, and the APA as independent claims for relief, and focused solely on whether Plaintiffs could prove that the waivers were initiated contrary to a clear, mandatory duty in Section 102. The district

---

[25] California raised this argument in Opposition to DHS's Cross-Motion for Summary Judgment. Case No. 3:17-cv-01215-GPC-WVG, ECF Doc. 39, p. 12.

court incorrectly assumed, for example, that California was asserting its NEPA and CZMA claims as an after-thought - simply "because [in California's view] the Waiver Determinations are void based on the *ultra vires* acts of the Secretaries." ER 19.

Consequently, the district court improperly shifted the burden of proving the non-applicability of Section 102 onto Plaintiffs and adopted DHS's affirmative defense without compelling DHS to demonstrate its applicability. ER 45-50. While acknowledging that Section 102 contains inconsistencies and "is not a model of legislative precision" (ER 40), and further acknowledging that Plaintiffs offered plausible interpretations of Section 102's essential terms (ER 45-50), the district court ultimately concluded that Plaintiffs could not disprove the applicability of DHS's affirmative defense, because they could not identify a violation of "clear and mandatory language." *Id.*

Thus, the district court erred not only by shifting the burden of proof, it erred by compelling Plaintiffs to disapprove the applicability of an affirmative defense under a nearly impossible standard – forcing them to identify violations of clear and mandatory language in a statute the district court acknowledged is unclear. In so doing, the district court committed a reversible error and summary judgment must be entered in Plaintiffs' favor.

68

*See Albino v. Baca*, 747 F.3d 1162, 1176–77 (9th Cir. 2014) (en banc) (reversing summary judgment for defendants and ordering entry of summary judgment for plaintiff on remand because defendants "failed to carry their initial burden of proving their affirmative defense"); *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (reversing ruling in defendants' favor on cross-motions for summary judgment because they failed to satisfy their "burden of proof" on their affirmative defense).

**C.  California Is Entitled to Judgment on Their NEPA and CZMA Claims Relating to the 14-Mile Secondary Fence in San Diego Because DHS Failed to Offer Any Substantive Defense.**

California's first two claims encompass DHS's plans to replace 14 miles of secondary fencing in San Diego.  DHS concedes the San Diego Waiver does not provide a defense to California's NEPA and CZMA claims concerning DHS's publicized plans to replace that area of secondary fencing.  ER 143-144, 175.  Because the undisputed record proves DHS has engaged in the planning of infrastructure projects that fall outside the scope of any waiver and failed to comply with either act, and because DHS failed

69

to offer a defense to these claims, the district court committed reversible error in granting DHS summary judgment.[26]

## IV. PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THEIR *ULTRA VIRES* CLAIMS.

### A. The District Court Erred in its Application of Ninth Circuit Precedent Concerning the Standard for *Ultra Vires* Claims.

The district court applied an impossibly high and legally incorrect burden on Plaintiffs for demonstrating that DHS' construction of the Prototype, San Diego and Calexico Projects was *ultra vires*.  As outlined above, the standard of review articulated in *International Brotherhood of Teamsters, City of Kansas City, Mo.* and *Michigan* applies to Plaintiffs' statutory claims, because the jurisdictional bar in Section 102(c) does not apply to the predicate legal questions of:  1) whether DHS acted within its statutory authority when authorizing the expeditious construction of barriers

---

[26] While DHS argued in its reply brief that claims concerning the 14-mile secondary fence project were not yet ripe (*See* Case No. 01215, ECF 42, p. 48), this argument ignores evidence that DHS had already prepared site-specific plans for the project.  ER 253, 256, 270.  Additionally, subsequent to the district court's order, Congress enacted the Department of Homeland Security Appropriations Act of 2018, which contains line-item funding for the secondary fence replacement project in San Diego.  PUB. L. 115-141, Div. F, Sec. 230(a)(1). The district court relied exclusively on DHS's waiver defense as grounds for granting judgment to Defendants.

under Section 102(a); and, 2) whether DHS met the requirements outlined in Sections 102(a) and (b).

These predicate questions must be resolved regardless of whether the Secretary invokes the waiver provision in Section 102(c). *International Brotherhood of Teamsters*, 861 F.3d at 951-52; *Michigan*, 268 F.3d at 1081-82; *City of Kansas City, Mo.*, 923 F.2d at 192-93. In addition, the Secretary's waiver authority only exists for border infrastructure that first meets Section 102 (a) and (b)'s requirements, which the San Diego and Calexico Projects do not.

Further, even if the non-statutory standard of review outlined in *Kyne* applies to Plaintiffs' claims, the district court still erred by using an overly stringent interpretation of that standard to assess whether the Prototype, San Diego and Calexico Projects and related waivers were *ultra vires*. ER 32-37. In *Kyne*, the U.S. Supreme Court held that the district court had jurisdiction to entertain a suit challenging the National Labor Relations Board's decision to certify a collective bargaining unit because the suit was "one to strike down an order of the Board made in excess of its delegated powers." *Kyne, supra,* 358 U.S. at 185, 188. The district court unduly limited *Kyne* in this case by concluding that for the "narrow exception of *Kyne* to apply," Plaintiffs must show that the Secretary's issuance of the San

71

Diego and Calexico Waivers violated "clear and mandatory language contained in section 102." ER 36.

The district court's interpretation of *Kyne* is erroneous because here the Secretary did not simply exercise statutory authority Congress allegedly delegated to DHS, but set aside federal and state statutes (such as CZMA) that other agencies are responsible for enforcing, and that concern areas (like environmental protection) beyond the Secretary's expertise. By contrast, the cases the district court cited in articulating its "clear and mandatory" standard involved statutes or regulations that the agency being sued was primarily responsible for enforcing.

In *Kyne*, for example, the National Labor Relations Board violated the National Labor Relations Act by depriving employees of rights granted to them under the NLRA. *Kyne, supra,* 358 U.S. at 185-87. In this case, the district court should have focused on the Plaintiffs' and the public's rights that the Secretary has waived, such as rights provided by NEPA and the CZMA . ER 283-287. Placing a rigid burden on the public to prove a violation of clear and mandatory language when their rights under existing federal statutes have been waived is contrary to *Kyne* and is not the standard the Supreme Court applied.

72

A less rigid standard of non-statutory, *ultra vires* review applies in this context, a standard similar to what this Court utilized in *Hawaii, supra,* to determine whether a presidential proclamation that indefinitely suspends immigration of nationals from seven countries is within the President's statutory authority. *Hawaii, supra,* 878 F.3d at 673-75. The court considered the text of the statutes in question (8 U.S.C. §§ 1182(f) and 1185(a)), the relevant statutory framework (the Immigration and Nationality Act ("INA")), the INA's legislative history, and prior executive practice. *Id.* at 683-690. Based on those factors, the court held that the proclamation was *ultra vires*. *Id.* at 688-89; *see also Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327-28, 1332- 34, 1339 (D.C. Cir. 1996) (evaluating similar factors and holding executive order not supported by statutory authority was *ultra vires*).

Under the correct *Kyne* standard, Plaintiffs have proven that DHS's actions were *ultra vires*. The text of Section 102, organization of the statute, its statutory history, Section 102's legislative history, and past executive practice all demonstrate that Section 102 does not authorize the Prototype, San Diego and Calexico Projects, and the waivers for those Projects. (*See, supra,* Arg. II.)

73

**B.    Even if the District Court's Rigid Application of *Kyne* Applies, DHS Still Acted *Ultra Vires*.**

As demonstrated in section II of the Argument, *supra*, DHS has failed to meet the predicate legal requirements under Section 102 for constructing border infrastructure.

Further, even if the court concludes that the standard of non-statutory review outlined in *Kyne* applies, Plaintiffs have still demonstrated – including under the district court's overly rigid interpretation of *Kyne* – that DHS's actions were *ultra vires*.  The Prototype, San Diego and Calexico Projects do not meet the clear and mandatory legal predicates in Section 102(a) and (b) under any standard.  Section 102(a), for example, authorizes DHS to construct additional barriers, but not the installation of replacement fencing, as DHS is doing here.  DHS also chooses to ignore Section 102(b)'s clear and mandatory expiration date of December 31, 2008, in utilizing waivers to construct border infrastructure ten years after DHS's authority to build expeditiously has expired.  Therefore, the district court erred in granting summary judgment to DHS on Plaintiffs' *ultra vires* claims.

## CONCLUSION

For the reasons discussed above, the district court committed reversible error by applying the incorrect standard when resolving predicate legal

74

questions necessary to determine whether DHS acted beyond its statutory authority when building barriers and waiving laws pursuant to Sections 102(b) and (c). When evaluating this case under the correct legal standard, it is clear that Congress intended the statutory power to construct barriers along the southern border, and to do so expeditiously by waiving legal requirements, to expire on December 31, 2008, or at the very latest when DHS completed its congressional mandate under Section 102(b).

The district court also erred by upending the burden of proof; compelling Plaintiffs to disprove the applicability of DHS's affirmative defense, rather than the ordinary burden on the defendant to prove his or her affirmative defense. If the district court had applied the correct burden of proof to DHS's affirmative defense, then it would have found that DHS could not meet its burden.

In addition, assuming the district court was correct that Section 102(a) grants DHS the authority to build independent of Congress's specific instructions, the district court erred because Section 102 only gives DHS the authority to build additional barriers, not to replace already existing barriers. Further, DHS may not build in areas such as San Diego and Calexico that are no longer areas of high illegal entry.

75

Finally, even if the district court applied the correct legal standard and the correct burden of proof, the statute should still be reasonably interpreted to deny DHS the authority to build the Prototype, San Diego and Calexico Projects. As a matter of law, the power build expeditiously expired on December 31, 2008, or at the very latest when DHS completed its congressional mandate under Section 102(b). For these reasons, the district court's decision should be reversed and judgment entered in Plaintiffs' favor.

Dated: May 14, 2018                    Respectfully submitted,

s/BRIAN SEGEE                          XAVIER BECERRA
BRIAN SEGEE                            Attorney General of California
JOHN PETER ROSE                        ROBERT W. BYRNE
Center for Biological Diversity        Senior Assistant Attorney General
660 South Figueroa St., St.1000
Los Angeles, CA 90017
(805) 750-8852                         s/MICHAEL P. CAYABAN
(213) 785-5400                         MICHAEL P. CAYABAN
                                       Supervising Deputy Attorney
BRENDAN CUMMINGS                       General
ANCHUN JEAN SU                         600 West Broadway, Suite 1800
Center for Biological Diversity        San Diego, CA  92101
1212 Broadway, Suite 800               (619) 738-9313
Oakland, CA 94612                      *Attorneys for California*
(510) 844-7100
*Attorneys for Center for Biological*
*Diversity*

76

s/ANTHONY T. ELISEUSON
ANTHONY T. ELISEUSON
Animal Legal Defense Fund
150 South Wacker Drive
Chicago, Illinois 60606
(707) 795-2533

SARA K. HANNEKEN
Animal Legal Defense Fund
919 SW Taylor Street, #400
Portland, OR 97205
(707) 795-2533
*Attorneys for Animal Legal
Defense Fund*

s/JASON RYLANDER
JASON RYLANDER
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C.
(202) 682-9400
*Attorneys for Defenders of Wildlife*

s/ GLORIA D. SMITH
GLORIA D. SMITH
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5532
*Attorneys for Sierra Club*

82020831.docx

77

No. 18-55474, No. 18-55475, No. 18-55476

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY, et al., DEFENDERS OF WILLIFE, a non-profit conservation organization; et al., PEOPLE OF THE STATE OF CALIFORNIA, by and through Xavier Becerra, Attorney General and CALIFORNIA COASTAL COMMISSION**

*Plaintiffs-Appellants*,

v.

**UNITED STATES DEPARTMENT OF HOMELAND SECURITY; et al.,**
*Defendants-Appellees*.

**STATEMENT OF RELATED CASES**

To the best of our knowledge, there are no related cases.

Dated:  May 14, 2018　　　　Respectfully Submitted,

　　　　　　　　　　　　　XAVIER BECERRA
　　　　　　　　　　　　　Attorney General of California

　　　　　　　　　　　　　s/MICHAEL P. CAYABAN
　　　　　　　　　　　　　MICHAEL P. CAYABAN
　　　　　　　　　　　　　Supervising Deputy Attorney General
　　　　　　　　　　　　　*Attorneys for Plaintiffs and Appellants*

78

## CIRCUIT RULE 25-5(E) ATTESTATION

I certify that all other parties on whose behalf this filing is submitted concur in the filing's content.

Dated:  May 14, 2018                 Respectfully Submitted,

XAVIER BECERRA
Attorney General of California


s/MICHAEL P. CAYABAN
MICHAEL P. CAYABAN
Supervising Deputy Attorney General
*Attorneys for Plaintiffs and Appellants*

79

## CERTIFICATE OF COMPLIANCE

This brief complies with the longer length limit authorized by court order dated April 26, 2018.  The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).  The brief is 16,088 words, excluding portions exempted by Fed. R. App. P. 32(f).

Dated:  May 14, 2018                    Respectfully Submitted,

                                        XAVIER BECERRA
                                        Attorney General of California


                                        s/MICHAEL P. CAYABAN
                                        MICHAEL P. CAYABAN
                                        Supervising Deputy Attorney General
                                        *Attorneys for Plaintiffs and Appellants*

# PLAINTIFFS-APPELLANTS' ADDENDUM

Pub. L 104-208, Div. C, Title I, §102(a) to (c), Sept. 30, 1996, 110 Stat. 3009-554, as amended Pub. L. 109-13, Div. B, Title I, §102, May 11, 2005, 119 Stat. 306; Pub. L. 103-367, § 3, Oct. 25, 2006, 120 Stat. 2638; Pub. L. 110-161, Div. E, Title V, §564(a), Dec. 26, 2007, 121 Stat. 2090, provided that:

(a) **In general.**--The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b) **Construction of fencing and road improvements along the border.--**

(1) **Additional fencing along southwest border.--**

(A) Reinforced fencing.--In carrying out subsection (a) [of this note], the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

(B) Priority areas.--In carrying out this section [Pub. L. 104-208, Div. C, Title I, § 102, Sept. 30, 1996, 110 Stat. 3009-554, which amended this section and enacted this note], the Secretary of Homeland Security shall--

(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

(ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

81

(C) **Consultation.--**

(i) **In general.--**In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

(ii) **Savings provision.--**Nothing in this subparagraph may be construed to—

(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

(II) affect the eminent domain laws of the United States or of any State.

(D) **Limitation on requirements.--**Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means toachieve and maintain operational control over the international border at such location.

(2) **Prompt acquisition of necessary easements.--**The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)) [subsec. (b) of this section], shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) **Safety features.--**The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to

82

ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) **Authorization of appropriations.--**There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) **Waiver.--**

(1) **In general.--**Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

(2) **Federal court review.—**

(A) **In general.--**The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) **Time for filing of complaint.--**Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

(C) **Ability to seek appellate review.--**An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States."

8 U.S.C. § 1103 note.

9th Circuit Case Number(s)    18-55474; 18-55475; 18-55476

NOTE: To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
## When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) [                    ] .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)    [                    ]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
## When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) [ May 14, 2018 ] .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Galen N. Thorp
Special Litigation Section
950 Pennsylvania Avenue NW
Washington, DC 20530

Signature (use "s/" format)    s/Michael Cayaban