**Nos. 18-55474, 18-55475, 18-55476**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the Southern District of California

---

## BRIEF FOR APPELLEES

---

CHAD A. READLER
  *Acting Assistant Attorney General*

ADAM L. BRAVERMAN
  *United States Attorney*

H. THOMAS BYRON III
BENJAMIN M. SHULTZ
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3518*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

STATEMENT OF JURISDICTION ...................................................................... 2

STATEMENT OF THE ISSUES ........................................................................... 3

PERTINENT STATUTES ...................................................................................... 4

STATEMENT OF THE CASE ............................................................................... 4

      A.    Statutory Background ..................................................................... 4

      B.    Factual Background......................................................................... 8

      C.    Prior Proceedings ......................................................................... 11

SUMMARY OF ARGUMENT ............................................................................. 12

STANDARD OF REVIEW ................................................................................... 14

ARGUMENT ......................................................................................................... 14

I.    This Court Lacks Jurisdiction Over Plaintiffs' Appeal........................... 14

      A.    Section 102(c) Precludes Jurisdiction Over Plaintiffs'
            Non-Constitutional Claims ........................................................ 15

            1.    The Text Of § 102(c) Demonstrates Congress's Intent To
                Preclude Jurisdiction ...................................................... 15

            2.    The Statute's Legislative History Confirms That Congress
                Intended To Foreclose Judicial Review ................................ 19

            3.    Congress Intended To Foreclose Ultra Vires Review......................... 21

            4.    Plaintiffs Cannot Avoid § 102(c)(2) By Styling Their Claims As
                "Predicate Legal Questions" ............................................... 25

      B.    This Court Lacks Appellate Jurisdiction Over Plaintiffs' Claims........... 27

II.     The APA Independently Bars Review Of The Secretary's Waiver Determination Because The Matter Is Committed To Agency Discretion By Law .................................................................................. 30

III.    Even If The Waivers Are Reviewable In Some Manner, There Is No Basis To Overturn The Secretary's Interpretation Of § 102 .............................. 32

     A.    The Secretary's Intepretation Is Not Ultra Vires In The Absence Of Clear And Mandatory Statutory Language ........................... 33

     B.    Even If The Ultra Vires Standard Does Not Apply, The Secretary's Interpretation Is Entitled To *Chevron* Deference ................... 36

     C.    The Secretary's Interpretation Of § 102 Is The Best Reading Of The Statute, And At A Minimum Easily Meets The Low Bars Demanded By Either The Ultra Vires Standard Or *Chevron* .................... 38

          1.  The Secretary's Waiver Authority Has Not Expired ........................... 39

             a.  Section 102(a) Authorizes Construction Without Any Stated Time Limit ............................................................................. 39

             b.  IIRIRA's § 102(c) Waiver Authority Applies To All Projects Authorized By § 102 ........................................................... 42

          2.  The Construction Projects At Issue Involve "Additional Barriers" .......................................................................................... 52

          3.  The Projects At Issue Are "In Areas Of High Illegal Entry" ............ 56

IV.    California's Remaining Claims Are Covered By The Waivers Or Are Nonjusticiable ................................................................................. 60

CONCLUSION ....................................................................................................... 65

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                   **Page(s)**

*Abbot Labs. v. Gardner*,
387 U.S. 136 (1967) .......................................................................... 22

*Aguilar v. U.S. Immigration & Customs Enf't Div.*,
510 F.3d 1 (1st Cir. 2007) .............................................................. 29

*Akiak Native Cmty. v. U.S. Postal Serv.*,
213 F.3d 1140 (9th Cir. 2000) ....................................................... 30

*Baker v. International All. of Theatrical State Emps. & Moving Picture Operators of U.S. & Canada*,
691 F.2d 1291 (9th Cir. 1982) ....................................................... 34

*Barnhart v. Walton*,
535 U.S. 212 (2002) .......................................................................... 38

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................... 64

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) .......................................................................... 15

*Board of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991) .................................................................13, 22, 23

*Bowen v. Michigan Acad. of Family Physicians*,
476 U.S. 667 (1986) .......................................................................... 15

*Briscoe v. Bell*,
432 U.S. 404 (1977) .......................................................................... 25

*Brown v. Rawson-Neal Psychiatric Hosp.*,
840 F.3d 1146 (9th Cir. 2016) ....................................................... 50

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984) .................................................................... 36, 37

iv

*City and County of San Francisco v. United States,*
   443 F. Supp. 1116 (N.D. Cal. 1977) ................................... 30
   615 F.2d 498 (9th Cir. 1980) ............................................... 30

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ..................................................... 37, 38

*Clapper v. Amnesty Int'l. USA,*
   568 U.S. 398 (2013) ........................................................... 63

*Do Sung Uhm v. Humana, Inc.,*
   620 F.3d 1134 (9th Cir. 2010) .......................................... 18

*Flores-Miramontes v. INS,*
   212 F.3d 1133 (9th Cir. 2000) .......................................... 27

*Gebhardt v. Nielsen,*
   879 F.3d 980 (9th Cir. 2018) ............................................ 26

*Griffith v. FLRA,*
   842 F.2d 487 (D.C. Cir. 1988) .......................................... 34

*Harkonen v. U.S. Dep't of Justice,*
   800 F.3d 1143 (9th Cir. 2015) .......................................... 37

*Hawaii v. Trump,*
   878 F.3d 662 (9th Cir. 2017) ....................................... 23, 35

*Humphries v. Various Fed. USINS Emps,*
   164 F. 3d 936 (5th Cir. 1999) ........................................... 18

*J.E.F.M. v. Lynch,*
   837 F.3d 1026 (9th Cir. 2016) .......................................... 18

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ........................................................... 36

*Kontrick v. Ryan,*
   540 U.S. 443 (2004) ........................................................... 15

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
   543 U.S. 50 (2004) ............................................................. 43

v

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ....................................................................21, 24, 33

*Lindahl v. OPM*,
  470 U.S. 768 (1985) ...................................................................... 25

*Marx v. General Revenue Corp.*,
  568 U.S. 371 (2013) ...................................................................... 42

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) ...................................................................... 61

*Michigan v. EPA*,
  268 F.3d 1075 (D.C. Cir. 2001) .................................................... 37

*Muniz v. United Parcel Serv., Inc.*,
  738 F.3d 214 (9th Cir. 2013) ........................................................ 63

*Namgyal Tsering v. U.S. Immigration & Customs*,
  *Enf't*, 403 F. App'x 339 (10th Cir. 2010) .................................... 18

*National Park Hosp. Ass'n v. Department of Interior*,
  538 U.S. 803 (2003) ...................................................................... 64

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*,
  513 U.S. 251 (1995) ...................................................................... 38

*NLRB v. SW Gen., Inc.*,
  137 S. Ct. 929 (2017) .................................................................... 43

*Northcoast Envt'l Ctr. v. Glickman*,
  136 F.3d 660 (9th Cir. 1998) ........................................................ 61

*Pacific Maritime Ass'n v. National Labor Relations Bd.*,
  827 F.3d 1203 (9th Cir. 2016) ..................................................33, 35

*Panaro v. City of North Las Vegas*,
  432 F.3d 949 (9th Cir. 2005) ........................................................ 60

*Permanent Mission of India to the U.N. v. City of New York*,
  551 U.S. 193 (2007) ...................................................................... 38

*Pinnacle Armor, Inc. v. United States,*
648 F.3d 708 (9th Cir. 2011) ........................................................ 26

*Regions Hosp. v. Shalala,*
522 U.S. 448 (1998) ................................................................ 36, 37

*Rubin v. Islamic Republic of Iran,*
138 S. Ct. 816 (2018) .............................................................. 41, 43

*San Carlos Apache Tribe v. United States,*
417 F.3d 1091 (9th Cir. 2005) ....................................................... 30

*SEC v. McCarthy,*
322 F.3d 650 (9th Cir. 2003) ........................................................ 45

*Silva v. United States,*
866 F.3d 938 (8th Cir. 2017) ........................................................ 18

*Singh v. Holder,*
638 F.3d 1196 (9th Cir. 2011) ....................................................... 18

*Skaff v. Meridien N. Am. Beverly Hills, LLC,*
506 F.3d 832 (9th Cir. 2007) ........................................................ 63

*Spencer Enters., Inc. v. United States,*
345 F.3d 683 (9th Cir. 2003) ........................................................ 25

*Staacke v. United States Sec'y of Labor,*
841 F.2d 278 (9th Cir. 1988) ................................................ 25, 33, 34

*United States v. Mead Corp.,*
533 U.S. 218 (2001) ................................................................ 37

*United States v. Oakland Cannabis Buyers' Coop.,*
532 U.S. 483 (2001) ................................................................ 50

*United States v. Turkette,*
452 U.S. 576 (1981) ................................................................ 47

*Universal Health Servs., Inc. v. Thompson,*
363 F.3d 1013 (9th Cir. 2004) ....................................................... 14

vii

*Webster v. Doe*,
   486 U.S. 592 (1988) ................................................................. 31

*Wilson v. A.H. Belo Corp.*,
   87 F.3d 393 (9th Cir. 1996) ...................................................... 14

*In re Zappos.com, Inc.*,
   888 F.3d 1020 (9th Cir. 2018) .................................................. 63

## Constitution:

U.S. Const. art. III, § 1............................................................... 15

## Statutes:

5 U.S.C. § 701(a)(1) ................................................................... 26

5 U.S.C. § 701(a)(2) ...........................................................30, 31, 32

5 U.S.C. § 704.............................................................................. 64

8 U.S.C. § 1103 note.................................................................... 4

12 U.S.C. § 1818(i)(1) ................................................................. 23

16 U.S.C. § 1456(c)(1)(A)............................................................ 62

28 U.S.C. § 1331 .......................................................................... 2

28 U.S.C. § 1346 .......................................................................... 2

Consolidated Appropriations Act, 2008,
   Pub. L. No. 110-161, 121 Stat. 1844 (2007) ........................8, 51, 59

Consolidated Appropriations Act, 2018,
   Pub. L. No. 115-141, 132 Stat. 1625-258 ................................ 62

Homeland Security Act of 2002,
   Pub. L. No. 107-296, 116 Stat. 2135 ...................................... 4

Illegal Immigration Reform and Immigrant Responsibility Act,
   Pub. L. No. 104-208, 110 Stat. 3009-546 ............................... 4
      § 102 (1996)......................................................................6, 7, 19

viii

§ 102 .......................................................................................................... 24
§ 102(a) (1996) .................................................................................. 40, 41
§ 102(a) ............................................................... 1, 5, 39, 40, 54, 56
§ 102(b) (1996) ........................................................................................ 40
§ 102(b)(1) (1996) ................................................................................ 5, 41
§ 102(b)(1)(A) ........................................... 39, 43, 46, 51, 52, 54, 57
§ 102(b)(1)(B) ...................................................................... 40, 46, 48
§ 102(b)(1)(B)(ii) ............................................................... 40, 48
§ 102(b)(1)(C) ..................................................................... 39, 44, 48
§ 102(b)(1)(C)(ii) .................................................................. 24, 43
§ 102(b)(1)(D) .................................................................. 40, 43, 57
§ 102(b)(2)-(4) ........................................................................... 44
§ 102(c) (1996) ................................................................... 6, 19, 45
§ 102(c) ............................................................................... 16, 48
§ 102(c)(1) ....................................... 1, 6, 31, 32, 37, 42, 44
§ 102(c)(2) ................................ 1, 3, 7, 16, 21, 26, 28
§ 102(c)(2)(A) ............................................ 14, 16, 17, 23, 44
§ 102(c)(2)(B) ............................................................................... 44
§ 102(c)(2)(B)-(C) .................................................................... 7
§ 102(c)(2)(C) ............................................................ 3, 15, 28, 29

Immigration and Nationality Act of 1952,
    Pub. L. No. 82-414, 66 Stat. 163 .................................................................. 4

REAL ID Act of 2005,
    Pub. L. No. 109-13, 119 Stat. 231 ............................................... 6, 7, 19, 23

Secure Fence Act,
    Pub. L. No. 109-367, 120 Stat. 2638 (2006) ................................ 7, 8, 45, 46, 51, 56, 57

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................................ 3

**Legislative Materials:**

142 Cong. Rec. 24779 (1996) (statement of Rep. Saxton) ............................................. 47

151 Cong. Rec. H453 (daily ed. Feb. 9, 2005) ............................................................. 19, 20

151 Cong. Rec. 1909 (2005) (statement of Rep. Conyers) ............................................. 47

151 Cong. Rec. 1914 (2005) (statement of Rep. Jackson-Lee) .................................46, 47

151 Cong. Rec. 2030 (2005) (statement of Rep. Harman) ................................................ 47

151 Cong. Rec. 2031 (2005) (statement of Rep. Blumenauer)........................................ 47

151 Cong. Rec. 2032-33 (2005) (statement of Rep. Farr)...........................................20, 47

152 Cong. Rec. S9871 (daily ed. Sept. 21, 2006) (statement of Sen. Kyl)................55, 56

H.R. 1268, 109th Cong. (engrossed in House, Mar. 16, 2005) ....................................... 20

H.R. Rep. No. 109-72 (2005) .......................................... 7, 20, 21, 23, 29, 41, 55

**Other Authorities:**

*The American Heritage Dictionary of The English Language* (5th ed. 2016) ............................ 53

Antonin Scalia & Bryan A. Garner, *Reading Law* (2012) ..................................................... 42

73 Fed. Reg. 19077 (Apr. 8, 2008)...................................................................................... 49

73 Fed. Reg. 19078 (Apr. 8, 2008)...................................................................................... 49

82 Fed. Reg. 35984 (Aug. 2, 2017) ................................................................................... 4, 8

82 Fed. Reg. 42829 (Sept. 12, 2017).................................................................................... 9

*Oxford English Dictionary* (3d ed., Nov. 2010).................................................................... 53

*The Random House Dictionary of the English Language* (2nd ed., Unabridged, 1987).......... 53

U.S. Gov't Accountability Office, GAO-17-331, Southwest Border Security:
   Additional Actions Needed to Better Assess Fencing Contributions to Operations
   & Provide Guidance for Identifying Capability Gaps (2017),
   https://www.gao.gov/assets/690/682838.pdf. .......................................................... 52

*Webster's Third New International Dictionary of The English
   Language* (Unabridged, 2002) ....................................................................................... 53

**INTRODUCTION**

This case concerns a statute—§ 102 of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)—that authorizes the Secretary of Homeland Security to undertake expedited construction of "additional physical barriers and roads" near border areas "of high illegal entry." IIRIRA § 102(a). To facilitate that construction, Congress gave the Secretary "sole discretion" to waive any laws whenever he or she finds a waiver is "necessary to ensure expeditious construction . . . under this section." *Id.* § 102(c)(1). And to ensure the effect of the Secretary's waiver is not delayed by litigation, the statute declares that district courts "shall not have jurisdiction" to hear non-constitutional claims arising from "any action undertaken" pursuant to the waiver authority or "any decision made" to invoke it, then further provides that an "order of the district court may be reviewed only" by petitioning the Supreme Court for certiorari. *Id.* § 102(c)(2). Thus, Congress barred non-constitutional claims and expressly prohibited seeking review in a court of appeals.

This case arises from two waiver determinations the Secretary made under § 102. Despite § 102's clear text, plaintiffs asked the district court to invalidate the waivers on constitutional *and* non-constitutional grounds.

The district court correctly rejected the constitutional claims raised below, and plaintiffs have not brought those arguments before this Court on appeal, recognizing that the statute requires those claims to proceed directly to the Supreme Court (although plaintiffs have delayed filing a petition for certiorari). The district court also

concluded that it lacked jurisdiction over plaintiffs' non-constitutional claims, and it rejected plaintiffs' efforts to attack the Secretary's waiver decision as ultra vires. Although the statute precludes even ultra vires review, the district court's approach was correct to the extent such review would be available.

Plaintiffs now ask this Court to disregard the express statutory prohibitions on judicial review generally and appellate jurisdiction specifically, and to disregard settled legal principles governing courts' limited authority to undertake ultra vires review. Their arguments are shrouded in theories about burdens of proof and "predicate legal questions" that neither apply nor assist them on the theories' own terms. But even if this Court could consider plaintiffs' arguments (which it cannot), and could look behind that confusing veil, plaintiffs' merits arguments simply misread the statute. And at an absolute minimum, plaintiffs fall far short of overcoming applicable deference principles. Thus whether for jurisdictional reasons, or on the merits, plaintiffs cannot prevail.

## STATEMENT OF JURISDICTION

Plaintiffs in these three consolidated cases invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1346, the Administrative Procedure Act, IIRIRA § 102, and (for constitutional claims) the Constitution itself. ER350, 437, 489.[1] As we explain in more detail below, however, the district court lacked

---

[1] Citations to plaintiffs' Excerpts of Record are abbreviated "ER__." Citations to the government's Supplemental Excerpts of Record are abbreviated "SER__."

2

jurisdiction over all of plaintiffs' non-constitutional claims by virtue of IIRIRA § 102(c)(2).

In all three cases, the district court entered final judgment for the government on March 26, 2018. ER1, 3, 5; *see also* SER198 (dismissing FOIA claims). Notices of appeal were filed in each case on April 9, 2018, ER108-09, 115-16, 121-23, within the time prescribed by Federal Rule of Appellate Procedure 4(a)(1)(B). As explained more fully below, however, this Court lacks appellate jurisdiction because, under IIRIRA § 102(c)(2)(C), the only available appellate review is in the United States Supreme Court.

## STATEMENT OF THE ISSUES

In 2017, the Secretary used IIRIRA's waiver authority to facilitate several border construction projects. Plaintiffs thereafter brought an action challenging the Secretary's waiver determinations on (as relevant here) various non-constitutional grounds. The questions presented are:

1) Whether the district court and this Court have jurisdiction to consider plaintiffs' non-constitutional claims at all.

2) Whether, even if jurisdiction exists, review is precluded because the matter is committed to agency discretion by law.

3) Whether, if review is available, the Secretary's waiver decisions were consistent with the limited, deferential review permitted under the ultra vires standard or principles of *Chevron* deference.

4) Whether any of plaintiffs' claims present justiciable challenges not covered by the Secretary's waiver.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

This case concerns a statutory provision originally enacted in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, div. C, § 102, 110 Stat. 3009, 3009-554 (codified at 8 U.S.C. § 1103 note), and amended several times thereafter.[2] Section 102 of that statute provides specific authorization for the federal government to undertake the construction of border infrastructure.[3] In that same section, Congress has also specifically authorized the Secretary of the Department of Homeland Security (DHS)[4] to ensure expeditious

---

[2] For ease of reference in the brief, we cite to a public law directly when citing historical versions of IIRIRA.  Citations to § 102 as it currently stands are cited as "IIRIRA § 102."

[3] Before 1996, no statute explicitly authorized or directed the federal government to construct infrastructure along the United States border.  During that period, the federal government derived authority to construct border infrastructure from more general laws, such as the Immigration and Nationality Act of 1952 (INA), Pub. L. No. 82-414, § 103.  That authority was well understood and accepted.  For example, in the early 1990s, the government constructed approximately fourteen miles of border fencing in the San Diego area.  *See* 82 Fed. Reg. 35984, 35985 (Aug. 2, 2017).

[4] The statute originally delegated authority to the Attorney General.  The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, created DHS

4

construction by waiving the applicability of other laws, and Congress has specified that judicial review of those waiver determinations is limited in order to avoid the risk of delay.

Specifically, § 102(a) of IIRIRA directs the Secretary to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). To "carry[] out" § 102(a)'s general mandate, Congress has identified specific border construction projects and priorities in IIRIRA § 102(b). As originally enacted in 1996, § 102(b) specified that, "[i]n carrying out subsection (a)," the Secretary was to "provide for the construction" of additional border infrastructure in San Diego, including additional miles of primary fencing and the construction of secondary and tertiary fencing. Pub. L. No. 104-208, div. C., § 102(b)(1). As discussed further below, Congress has amended § 102(b) from time to time to specify different projects for construction.

Section 102 as originally enacted in 1996 also authorized the Secretary to waive two specified environmental laws to the extent the Secretary "determines necessary to ensure expeditious construction of the barriers and roads under this section." Pub. L.

---

and transferred border enforcement authority to that agency, and IIRIRA was later amended to refer to the DHS Secretary. For simplicity, we refer to the "Secretary" when discussing all versions of the statute.

No. 104-208, div. C, § 102(c). Congress authorized the Secretary to waive these statutes so that the Secretary could construct needed border infrastructure without interference from certain environmental lawsuits.

Since IIRIRA's enactment in 1996, the general mandate and authority granted in § 102(a) has remained substantially unchanged. *See* IIRIRA § 102(a). But Congress has amended § 102(c) to substantially expand the Secretary's waiver authority, and to limit judicial challenges to the Secretary's waiver determinations. And Congress has amended § 102(b) in order to specify different priorities for border construction.

First, the REAL ID Act of 2005 (REAL ID Act) substantially broadened the Secretary's authority in § 102(c) to waive legal requirements. *See* Pub. L. No. 109-13, div. B., § 102, 119 Stat. 231. Frustrated by "[c]ontinued delays caused by litigation" that were preventing DHS from completing construction of the San Diego border fence, Congress resolved to expand the Secretary's waiver authority to include "other laws that might impede the expeditious construction of security infrastructure along the border." H.R. Rep. No. 109-72, at 171 (2005) (Conf. Rep.); *see* SER33; *see also* SER54, 75 (statements of individual Members of Congress). Accordingly, the REAL ID Act amended § 102(c) to authorize the Secretary to waive "*all* legal requirements"—not just the two previously specified environmental laws—that the Secretary, in the Secretary's "sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1) (emphasis added); *see also* Pub. L. No. 109-13, div. B, § 102.

6

In order to ensure that the Secretary's waiver determinations under § 102(c) would be meaningful and promptly effective, the REAL ID Act also amended § 102(c) to limit judicial challenges to the Secretary's waiver determinations, and to streamline any available judicial review. *See* Pub. L. No. 109-13, div. B, § 102. Specifically, in § 102(c)(2), Congress provided for limited jurisdiction over a claim "arising from" any waiver determination made by the Secretary: the only type of claim that the statute permits is one "alleging a violation of the Constitution," and federal district courts "shall not have jurisdiction" over any other claim. IIRIRA § 102(c)(2). To further streamline judicial review, Congress also provided that claims must be filed within sixty days of the Secretary's action, and that appellate review would be available "only upon petition for a writ of certiorari to the Supreme Court of the United States." *See id.* § 102(c)(2)(B)-(C). As the conference committee explained, this judicial review provision was intended "to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver." H.R. Rep. No. 109-72, at 172.

Congress has also amended § 102(b) of IIRIRA from time to time to specify different priorities for border construction, and to direct that the Secretary undertake specific border construction. Congress first amended § 102(b) in 2006 as part of the Secure Fence Act, Pub. L. No. 109-367, § 3, 120 Stat. 2638. This amendment eliminated § 102(b)'s previous requirement that the Secretary construct border

infrastructure in San Diego, and replaced that requirement with direction that the Secretary "provide for" the construction of "at least 2 layers of reinforced fencing," and "additional physical barriers, roads, lighting, cameras, and sensors," in five other specified locations along the southern border.  Pub. L. No. 109-367, § 3.

One year later, in 2007, Congress amended § 102(b) as part of the Consolidated Appropriations Act, 2008.  Pub. L. No. 110-161, div. E, § 564, 121 Stat. 1844.  This change replaced the location specifications set forth in the Secure Fence Act with a new requirement that the Secretary "construct[] reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective."  Pub. L. No. 110-161, div. E, § 564(2).  The amendments further authorized the Secretary to designate "[p]riority areas" for border construction, and to "complete construction of reinforced fencing" in those designated priority areas no later than December 31, 2008.  *Id.*

### B.    Factual Background

This appeal arises out of two waiver determinations issued by the Secretary under § 102(c) in 2017.

1. On August 2, 2017, the Secretary published in the Federal Register a waiver "[d]etermination [p]ursuant to Section 102," which waived over thirty laws "to ensure the expeditious construction of barriers" in the San Diego area (hereinafter, the "San Diego Waiver").  ER283; *see* 82 Fed. Reg. 35984 (Aug. 2, 2017).  The San Diego Waiver set forth specific findings that the United States Border Patrol's San Diego

8

Sector—and a defined stretch of that sector, specifically—is "an area of high illegal entry," and that there is a present "need to construct physical barriers and roads . . . to deter illegal crossings" in the specified area. ER283-84. The San Diego Waiver identified two projects to be completed in the San Diego Sector to "further Border Patrol's ability to deter and prevent illegal crossings." *Id.* One involved building several fence prototypes. ER284. The other involved replacing fourteen miles of primary fencing—which had been constructed in the 1990s using the outdated "landing mat" style—with taller, stronger, and more effective "bollard style" fencing. ER284; *see also* ER221-22; *infra* pp.52-53.

In order to "ensure the expeditious construction" of the two projects, the Secretary "determined that it is necessary" to exercise § 102(c)'s waiver authority. *See* ER284. Accordingly, the San Diego Waiver specified a variety of federal statutes subject to the waiver—including the Administrative Procedure Act (APA), the National Environmental Policy Act (NEPA), the Endangered Species Act (ESA), and the Coastal Zone Management Act (CZMA)—to ensure expeditious construction of the two San Diego Sector projects. *Id.*

2. On September 12, 2017, the Secretary issued a second waiver "[d]etermination [p]ursuant to Section 102 of the [IIRIRA]," which waived laws "to ensure the expeditious construction of barriers and roads" near Calexico, California, in the United States Border Patrol's El Centro Sector (hereinafter, the "Calexico Waiver"). ER285; *see* 82 Fed. Reg. 42829 (Sept. 12, 2017). The Calexico Waiver set

9

forth specific findings that the El Centro Sector—and a defined stretch of that sector, specifically—is an area of high illegal entry, and that there "is an immediate need to construct border barriers and roads" to prevent illegal entries. ER286. The Calexico waiver identified one project to be completed in furtherance of this goal: the replacement of existing primary fencing—which, like in San Diego, had been constructed in the 1990s using the outdated "landing mat" style—and improvements to the existing patrol road within the project area. *Id.* As with the San Diego Waiver, the Calexico Waiver set forth specific findings that, "to ensure the expeditious construction of the barriers and roads" in the project area, "it is necessary" for the Secretary to waive specific laws under § 102(c), including the APA, NEPA, ESA, and CZMA. *Id.*

3. Construction began on the San Diego prototype project in September 2017, and was completed in October 2018. SER183. Construction began for the Calexico replacement project in February 2018, and is currently ongoing. *See* SER192. Construction for the San Diego primary-fence replacement project began while this appeal was being briefed, and is also currently ongoing.

In undertaking these construction projects, DHS has consulted with relevant stakeholders in order to understand and minimize the environmental impacts of the projects. *See* SER184-87, 190-91, 193-96. For example, in undertaking the San Diego prototype projects, DHS consulted with a nearby landowner and with government agencies, prepared an analysis of potential environmental impacts, and relocated

certain construction projects based on the presence of wildlife. SER185-89. Similarly, with regard to the San Diego and Calexico fence replacement projects, DHS has conducted meetings with government agencies, conducted resource surveys, and has made adjustments based on environmental and historical concerns. SER190, 193-96.

## C.    Prior Proceedings

Plaintiffs—environmental groups and the state of California—filed complaints raising numerous statutory and constitutional claims relating to the Secretary's 2017 waiver determinations. ER347-76, 432-84, 485-534. Plaintiffs alleged (1) that the Secretary acted ultra vires of § 102 in issuing the 2017 waiver determinations; (2) that, because the Secretary's § 102 waivers were ultra vires, the construction pursuant to those waivers violated the statutes the Secretary purported to waive, including the APA, ESA, and NEPA; and (3) that § 102 violated numerous constitutional provisions. *See* ER365-74, 461-84, 518-32.

Plaintiffs' lawsuits were consolidated, and the parties filed cross-motions for summary judgment. *See* ER542. As relevant here, defendants argued that, under the plain language of § 102(c), the district court lacked the ability to hear plaintiffs' non-constitutional claims, including plaintiffs' claims that the Secretary acted ultra vires of § 102. Alternatively, defendants argued that even if the district court could review plaintiffs' ultra vires claims, the Secretary's actions were not plainly outside the scope of the Secretary's authority under the statute, and thus plaintiffs could not meet the high standard for establishing ultra vires action.

11

The district court denied plaintiffs' motions for summary judgment, and granted summary judgment in favor of defendants. *See* ER7-107. The district court agreed with defendants that § 102(c)(2) barred it from exercising subject matter jurisdiction over plaintiffs' non-constitutional claims. ER66 ("[T]he Court lacks jurisdiction to hear non-constitutional claims under section 102(c)(2)(A)."). The district court reasoned, however, that it could review plaintiffs' ultra vires claims to the extent necessary to determine whether defendants violated any "clear and mandatory" provision of § 102. ER34-35. After considering the statutory language and defendants' construction projects, the district court concluded that defendants did not violate any clear and mandatory provision of § 102, and thus § 102(c)(2)'s jurisdictional bar applied. ER35-66. The district court rejected all of plaintiffs' constitutional claims on the merits. ER71-107.[5]

## SUMMARY OF ARGUMENT

Section 102 expressly and unequivocally bars judicial review of plaintiffs' claims challenging the validity of the Secretary's waivers. The language of the statute and the intent of Congress could not be clearer: federal courts (and appellate courts in particular) lack jurisdiction to hear non-constitutional claims arising from the Secretary's waiver determinations. Indeed, the jurisdictional bar in § 102(c) is

---

[5] Plaintiffs have not sought review in this Court of the rejection of their constitutional claims. Additionally, no plaintiff has appealed any ESA claims. *See* Br. 4 n.4; *see also* ER109 (notice of appeal limited to first two causes of action); ER122 (notice of appeal limited to first cause of action).

sufficiently clear and broad that it prohibits ultra vires review altogether, just like the statute in *Board of Governors of Federal Reserve System v. MCorp Financial, Inc.*, 502 U.S. 32 (1991). And in any event, the terms of the statute expressly commit the waiver determination to the Secretary's discretion, precluding review of that decision.

Even if review is available, plaintiffs' statutory arguments are unavailing. To the extent any review can occur, the district court applied the correct standard for ultra vires challenges, recognizing that the terms of § 102 do not impose clear and mandatory statutory language that prohibited the Secretary's waiver determinations. Regardless, whether the statute is viewed through the lens of ultra vires review, the otherwise applicable standards of *Chevron* deference, or simple statutory interpretation, the text, structure, and legislative history of § 102 show that the Secretary acted permissibly in waiving specified laws to expeditiously facilitate construction. Section 102(a) plainly authorizes construction, and nothing in the statute imposes a time limit on either that construction authority or § 102(c)'s waiver authority. Moreover, § 102(c)'s waiver authority includes all construction authorized "under this section" as a whole; it is not limited just to those projects identified by Congress as particular minimums or priority areas. And plaintiffs' efforts to narrowly construe statutory terms such as "additional barriers" and "areas of high illegal entry" run afoul of the ordinary meanings of those terms, and create irreconcilable conflicts with other provisions of the statute.

13

None of plaintiffs' efforts to twist the statutory meaning can thus withstand even the slightest scrutiny, and they fall far short of the substantial hurdles posed by the standards for ultra vires review and *Chevron* deference. Nor can plaintiffs prevail by suggesting that preliminary planning actions preclude invocation of the Secretary's waiver authority. Whether on jurisdictional or substantive grounds, this Court should reject plaintiffs' efforts to impose artificial constraints on the Secretary's statutory authority under § 102.

## STANDARD OF REVIEW

The existence of subject matter jurisdiction is a question of law, which this Court reviews de novo. *See Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396 (9th Cir. 1996). A district court's grant of summary judgment is also reviewed de novo. *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004).

## ARGUMENT

### I. This Court Lacks Jurisdiction Over Plaintiffs' Appeal

The text and legislative history of § 102 demonstrate that Congress intended to preclude judicial review of the claims at issue in this appeal. Section 102(c)(2)(A) clearly and unambiguously precludes federal jurisdiction over "all causes or claims," except for constitutional claims, that "aris[e] from" a waiver determination by the Secretary. *See* IIRIRA § 102(c)(2)(A). The only claims at issue in this appeal are non-constitutional claims, and they undoubtedly "aris[e] from" the challenged waiver determinations. *See id.*

14

"Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const. art. III, § 1). Although there is a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), this presumption "may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent" to preclude judicial review. *Block v. Community Nutrition Inst.*, 467 U.S. 340, 349 (1984). Here, the text of § 102(c) is clear and unambiguous: Federal courts lack subject-matter jurisdiction to hear non-constitutional claims arising from a waiver determination.

At a minimum, this Court lacks appellate jurisdiction. Section 102(c) unambiguously provides that a "final judgment" or "order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States." IIRIRA § 102(c)(2)(C). Plaintiffs' attempt to bring their non-constitutional claims to this Court while raising their constitutional claims in the Supreme Court is contrary to the statutory text and purpose.

### A. Section 102(c) Precludes Jurisdiction Over Plaintiffs' Non-Constitutional Claims

#### 1. The Text Of § 102(c) Demonstrates Congress's Intent To Preclude Jurisdiction

Subparagraph 102(c)(2)(A) limits the jurisdiction of federal courts over "claims arising from any action undertaken, or any decision made, by the [Secretary] pursuant to paragraph (1)" of § 102(c), which sets forth the Secretary's "authority to waive all

15

legal requirements such Secretary, in such Secretary's sole discretion, determines

necessary to ensure expeditious construction of the barriers and roads under" § 102.

*See* IIRIRA § 102(c). The next sentences of § 102(c)(2)(A) provide that "[a] cause of

action or claim may only be brought alleging a violation of the Constitution of the

United States. The court shall not have jurisdiction to hear any claim not specified in

this subparagraph." *Id.* § 102(c)(2)(A).

The statute makes clear that the "only" authorized claims are those that allege

"a violation of the Constitution of the United States." IIRIRA § 102(c)(2). And

Congress removed any residual doubt about the meaning of this provision by adding

that a "court shall not have jurisdiction to hear any claim not specified" in

§ 102(c)(2)(A). Because constitutional claims are the only claims "specified" in

§ 102(c)(2)(A), courts do not have jurisdiction to review *any* non-constitutional claims

"arising from any action undertaken, or any decision made, by the [Secretary] pursuant

to" the Secretary's discretionary waiver authority. IIRIRA § 102(c)(2).

Plaintiffs' non-constitutional claims—the only claims at issue in this appeal, *see*

Br. 4 & n.4—are barred by the plain text of the statute. The Secretary published in

the Federal Register two waiver "[d]etermination[s] [p]ursuant to Section 102 of the

[IIRIRA]." *See* ER283-87. Plaintiffs directly challenge the Secretary's two waiver

determinations (the San Diego Waiver and the Calexico Waiver, respectively), alleging

that the Secretary acted outside the scope of his or her authority in issuing them. *See,*

*e.g.*, ER463-68, 518-22. Plaintiffs further contend that, because the Secretary's 2017

16

waiver determinations are invalid, defendants' construction pursuant to these waivers violates specific environmental laws and the APA—laws that the Secretary determined necessary to waive. *See, e.g.*, ER349-68, 461-84, 518-32. Plaintiffs ask this Court to "[s]et aside and declare null and void" the Secretary's "purported waiver[s] pursuant to IIRIRA section 102(c)," and to declare defendants in violation of waived laws. *See, e.g.*, ER531–32.

Plaintiffs thus directly challenge the Secretary's authority to issue the 2017 waiver determinations, ask the Court to set those waiver determinations aside, and seek to hold defendants liable under the laws the Secretary purported to waive. Judicial review of plaintiffs' claims would require the court to examine the Secretary's 2017 waiver determinations, and to decide whether the Secretary's waiver determinations were validly issued. These are precisely the types of claims that fall within the text of § 102(c)(2) because they "aris[e] from a[n] action undertaken, or [a] decision made, by the [Secretary] pursuant to paragraph (1)" of § 102(c). IIRIRA § 102(c)(2)(A). Indeed, it is hard to imagine challenges that are any more directly related to a Secretary's waiver determination than the challenges at issue here.

Even in situations further afield from this direct dispute about the validity of the waivers, courts have consistently interpreted the phrase "arising from" in jurisdictional provisions broadly, as the district court correctly recognized. *See* ER70. Courts have held that claims "aris[e] from" a relevant agency action where—at a minimum—the claims are connected directly and immediately to, or are inextricably

17

intertwined with, the relevant agency action. *See, e.g.*, *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032-33 (9th Cir. 2016); *Silva v. United States*, 866 F.3d 938, 940 (8th Cir. 2017) (citing *Humphries v. Various Fed. USINS Emps*, 164 F. 3d 936, 943 (5th Cir. 1999)); *Namgyal Tsering v. U.S. Immigration & Customs Enf't*, 403 F. App'x 339, 343 (10th Cir. 2010) (citing*Humphries*, 164 F.3d at 943); *cf. Singh v. Holder*, 638 F.3d 1196, 1212 (9th Cir. 2011) (finding claim fell within statute that precluded review of removal orders where the claim was "wholly intertwined" with a removal order and did "nothing more" than attack the removal order). That standard is easily satisfied here.

Moreover, by seeking to invoke exceptions such as the ultra vires doctrine or review of predicate legal questions, plaintiffs appear to acknowledge that their claims here come within the terms of the statutory bar.[6] This is not a case about claims at the margins of § 102(c). Plaintiffs are, "at bottom," challenging the Secretary's waiver determinations. *Cf. Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1142–43 (9th Cir. 2010) (finding claims "arise under" the Medicare Act, and thus fall within its judicial review provisions, if "at bottom, a plaintiff is complaining about the denial of Medicare benefits").

---

[6] Notably, plaintiffs acknowledge (Br. 4) that their constitutional claims challenging the Secretary's 2017 waiver determinations "arise[] from a[n] action undertaken" by the Secretary "pursuant to paragraph (1)" of § 102(c), and thus fall within the scope of § 102(c)(2)'s jurisdictional provisions. For this reason, plaintiffs intend to bring their constitutional claims directly to the Supreme Court by petition for certiorari, as § 102(c)(2)(C) instructs.

18

## 2. The Statute's Legislative History Confirms That Congress Intended To Foreclose Judicial Review

Section 102(c)'s legislative history confirms what the text makes plain. As originally enacted in 1996, § 102(c) permitted the Secretary to waive only NEPA and the ESA, and there was no provision concerning judicial review. *See* Pub. L. No. 104-208, div. C, § 102(c). That original waiver authority proved insufficient to achieve the legislative goal of avoiding litigation-caused delays to expedited construction. In 2005, Congress expanded the Secretary's waiver authority in § 102(c)(1) to authorize the Secretary to waive *all* laws the Secretary determined were necessary to ensure expeditious construction under § 102. *See* Pub. L. No. 109-13, div. B, § 102. At the same time, Congress added § 102(c)(2)'s judicial review provisions to the statute. *Id.* Through § 102(c)(2), Congress precluded judicial review of *any* non-constitutional claim "arising from" a waiver determination by the Secretary, as discussed above. *Id.* Congress also streamlined the limited judicial review available by requiring any complaints to be filed within sixty days of the Secretary's waiver determination, and by providing that any appeal from district court could proceed only by petition for certiorari to the Supreme Court. *Id.*

The reasons for these changes are clear from the congressional record. Congress was concerned that ongoing litigation was preventing DHS from completing several miles of border infrastructure construction in San Diego, notwithstanding a prior waiver of two environmental laws. *See, e.g.*, 151 Cong. Rec.

19

H453 (daily ed. Feb. 9, 2005). Congress thus expanded the Secretary's waiver authority to ensure that the Secretary could waive "*any* legal requirements that he or she, in his or her sole discretion, determines are necessary to ensure expeditious construction of border security infrastructure." H.R. Rep. No. 109-72, 171 (emphasis added). And Congress enacted § 102(c)(2)'s judicial review provisions to "ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure, thereby defeating the purpose of the Secretary's waiver." *See id.* at 172.

Indeed, the underlying bill passed by the House would have precluded *all* judicial review of the Secretary's waiver determinations, even of constitutional claims. *See* H.R. 1268, 109th Cong., div. B., § 102 (engrossed in House, Mar. 16, 2005). But questions were raised about the constitutionality of precluding judicial review of constitutional challenges. *See* 151 Cong. Rec. 2032-33 (2005) (statement of Rep. Farr) (submitting Congressional Research Service memorandum, which observed that it is "uncertain to what extent Congress has Article III authority to prevent courts . . . from addressing and remedying issues arising under the United States Constitution"). So the Conference Committee amended the House version to allow limited "federal judicial review for claims alleging that the actions or decisions of the Secretary violate the United States Constitution." *See* H.R. Rep. No. 109-72, at 171-72. Other claims remained barred altogether.

Plaintiffs assert (Br. 30) that the combined mechanism of waiver and limited judicial review somehow create an "inconsistency." But the two mechanisms work together to serve the purpose Congress identified. Congress granted the Secretary full and "sole discretion" to waive any legal requirement the Secretary determines necessary to ensure expeditious construction of border infrastructure. H.R. Rep. No. 109-72, at 171. To guarantee that litigation about the waiver itself would not create further delay, Congress intended § 102(c)(2)'s judicial preclusion to shield from judicial review *any* non-constitutional cause of action that "aris[es] from" the Secretary's discretionary decision to issue a § 102(c)(1) waiver. IIRIRA § 102(c)(2). This plainly includes claims that, like plaintiffs', challenge the Secretary's invocation of the waiver, and challenge DHS's construction of border infrastructure under the laws the Secretary purported to waive. Judicial review of such challenges would cause the very construction delays that Congress intended to prevent by enacting the REAL ID Act amendments in 2005. *See* H.R. Rep. No. 109-72, 171-72. Plaintiffs' claims are precisely the type of claims that Congress intended § 102(c)(2) to bar.

### 3. Congress Intended To Foreclose Ultra Vires Review

Despite the statute's clear text, plaintiffs contend that the district court nevertheless must have jurisdiction to review whether the Secretary's actions were ultra vires. Br. 71-72 (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)). But the Supreme Court explained in *Board of Governors of Federal Reserve System v. MCorp Financial, Inc.* (*MCorp*), that Congress may preclude courts from exercising jurisdiction over ultra

21

vires claims, just as Congress may preclude courts from exercising jurisdiction over other non-constitutional claims. 502 U.S. 32, 44 (1991). Here, the text and legislative history of § 102(c)(2) leave no doubt that Congress clearly intended to foreclose jurisdiction over *all* non-constitutional claims, including ultra vires claims.

The Supreme Court in *MCorp* rejected an argument—like the one urged by plaintiffs here—that courts retain jurisdiction under *Kyne* to review "any agency action that is alleged to have exceeded the agency's statutory authority," even in the face of a broad statutory preclusion-of-review provision. 502 U.S. at 43. The Court explained that *Kyne* instead "stands for the familiar proposition" that courts are presumed to have jurisdiction to review agency action, and this presumption can be overcome even as to ultra vires questions "upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Id.* at 44 (quoting *Abbot Labs. v. Gardner*, 387 U.S. 136, 141 (1967)); *see also id.* at 43 (additionally distinguishing *Kyne* on the grounds that *MCorp*, unlike *Kyne*, did not involve "'obliteration of a right which Congress' ha[d] given" the plaintiffs in the statute, and so there was no reason to infer that Congress intended judicial review to be available). Here, as in *MCorp*, there is "clear and convincing" evidence that Congress intended to foreclose judicial review of *all* of plaintiffs' non-constitutional claims, including plaintiffs' claims that the Secretary acted ultra vires.

First, as discussed above, the text of § 102(c)(2)'s preclusion provision is clear and comprehensive, and it precludes review over ultra vires claims. Section 102(c)(2) provides that "[a] cause of action or claim may only be brought alleging a violation of

22

the Constitution of the United States," and that courts "shall not have jurisdiction to hear any claim not specified" in § 102(c)(2)(A). IIRIRA § 102(c)(2)(A). An ultra vires claim is an equitable "cause of action," *Hawaii v. Trump*, 878 F.3d 662, 682–83 (9th Cir. 2017) (per curium), and it is "not specified" under § 102(c)(2), *see* IIRIRA § 102(c)(2)(A). Accordingly, under the terms of § 102(c)(2), the "court shall not have jurisdiction to hear" such a claim. *Id.* This statutory text is plain, and it is at least as clear as the preclusion provision at issue in *MCorp*, which provided that "[n]o court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section." 502 U.S. at 44 (quoting 12 U.S.C. § 1818(i)(1)) (emphasis omitted).

Second, § 102(c)(2)'s legislative history provides further evidence that Congress intended to preclude ultra vires review. As set forth above, § 102(c)(2)(A)'s jurisdictional bar was enacted at the same time that Congress broadened the Secretary's waiver authority to encompass *any* statute the Secretary determined was necessary to complete border infrastructure. *See* Pub. L. No. 109-13, div. B., § 102. Congress expanded the waiver authority, and enacted the corresponding preclusion provision, to ensure that the Secretary could effectively expedite border construction without interference from lawsuits, which would "defeat[] the purpose of the Secretary's waiver." *See* H.R. Rep. No. 109-72, at 172. Judicial review of ultra vires claims, like judicial review of other non-constitutional claims, would cause the very

23

litigation delays that Congress explicitly intended to foreclose through enacting § 102(c)(2).

Furthermore, and as noted above, *supra* p.30, § 102(c) was originally designed to preclude even constitutional claims, but was pared back in order to avoid the unique constitutional problems raised by the preclusion of those claims. As *MCorp* illustrates, no similar problems are posed by the elimination of ultra vires claims, and the clear text and intent of § 102(c)(2) demonstrate that Congress intended to bar them.

Finally, § 102 does not confer any right on plaintiffs, and precluding judicial review thus would not require the "sacrifice or obliteration of [such] a right." *Kyne*, 358 U.S. at 190. Section 102 speaks only to the statutory authority of the DHS Secretary: The statute authorizes the *Secretary* to construct border infrastructure, and grants the *Secretary* the sole and unreviewable authority to waive laws that the *Secretary* determines necessary to ensure the expeditious construction of border infrastructure. *See* IIRIRA § 102. Indeed, even where Congress directed DHS to consult with relevant stakeholders in the course of undertaking border infrastructure construction, the statute made explicitly clear that it did not intend to confer any statutory rights on any individuals or others. *See id.* § 102(b)(1)(C)(ii) ("Nothing in this subparagraph may be construed to . . . create . . . any right of action for a State, local government, or other person or entity affected by this subsection.").

Although the district court ultimately concluded that it lacked subject matter jurisdiction over plaintiffs' claims, it first conducted an ultra vires inquiry despite

24

§ 102(c)(2)'s jurisdictional bar. ER33. But the case law does not justify even this limited review. For example, *Staacke v. United States Secretary of Labor*, 841 F.2d 278, 281 (9th Cir. 1988), was decided before *MCorp*, and *MCorp* squarely rejected the argument that Congress can never preclude review of ultra vires claims. And plaintiffs gain no benefit from citation to cases involving statutes with significantly different text, structure, and purposes than § 102(c)(2). *See, e.g.*, *Lindahl v. OPM*, 470 U.S. 768, 779-83 (1985); *Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 688-90 (9th Cir. 2003). "Since different congressional enactments have distinct purposes and use diverse means to achieve them, each case raising an administrative reviewability question must be analyzed on the basis of the specific statutory provisions involved." *Briscoe v. Bell*, 432 U.S. 404, 413-14 (1977). In both clarity and scope, § 102(c)(2) is dramatically different than the provisions in those cases, and its text and legislative history leave no doubt that Congress intended to foreclose review over all aspects of plaintiffs' ultra vires claims.

### 4. Plaintiffs Cannot Avoid § 102(c)(2) By Styling Their Claims As "Predicate Legal Questions"

Notwithstanding the above, plaintiffs maintain (Br. 26-32) that the district court had jurisdiction to review "predicate legal questions" to the application of a jurisdictional bar. But the only predicate legal questions here are whether the Secretary invoked § 102(c)(1) to waive laws, and whether plaintiffs' claims arise out of that waiver (or actions taken pursuant to it). In the language of the statute, the

25

question is whether there is a "cause[] or claim[] arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1)" of § 102(c).  IIRIRA § 102(c)(2).

There can be no serious dispute those simple predicates are present, regardless of whether the Court believes the Secretary's invocation of the waiver authority was proper.  On their face, the Secretary's two waiver determinations state that they are "[d]etermination[s] [p]ursuant to Section 102," which all agree was an invocation of the Secretary's waiver authority.  ER283-87.  And as explained above, plaintiffs' claims "aris[e] from" these two waiver determinations because plaintiffs challenge the Secretary's authority to issue them, and seek to have them set aside.  That is the end of the matter.  Plaintiffs cannot transform that exceptionally narrow jurisdictional inquiry into a means of inviting a court to engage in full APA review over whether the 2017 waiver determinations were authorized by the statute.

Plaintiffs' invocation of the APA does nothing to alter this.  The APA does not apply "when Congress expressly bars review by statute." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011) (citing 5 U.S.C. § 701(a)(1)).  And as explained above, Congress has clearly done just that in § 102(c)(2) for plaintiffs' non-constitutional claims.  Plaintiffs cannot creatively characterize their merits arguments as relating to only predicate legal questions in order to avoid § 102(c)(2)'s clear application.  *See Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018) (finding

jurisdictional bar applied to claims that "directly" fell within the scope of a preclusion provision, "[n]o matter how [the] plaintiff characterize[d] [their] argument").

Plaintiffs' reliance on *Flores-Miramontes v. INS*, 212 F.3d 1133, 1135 (9th Cir. 2000), and similar cases is misplaced. *Flores-Miramontes* stands for the familiar proposition that courts have "jurisdiction to determine whether jurisdiction exists." *Id.* Accordingly, courts can exercise jurisdiction in order to decide jurisdictional facts or legal issues necessary to determine whether a jurisdictional bar applies. *See id.*[7] But that just begs the question of *what* the jurisdictionally relevant questions are, and we explained above that, under the plain terms of § 102(c), the only jurisdictionally relevant questions are whether the Secretary invoked his waiver authority, and whether plaintiffs' claims arise from that invocation—predicates which are both satisfied here.

## B. This Court Lacks Appellate Jurisdiction Over Plaintiffs' Claims

At a minimum, this Court lacks appellate jurisdiction over plaintiffs' claims. Plaintiffs indisputably seek review of a "final judgment, decree, or order of the district court," and the statute provides that such a decision "may be reviewed only upon

---

[7] Plaintiffs cite *Flores-Miramontes*, 212 F.3d at 1135, for the proposition that this Court "had jurisdiction to determine whether the agency acted outside the scope of its authority when making the determination that an individual committed the predicate criminal offense." Br. 31. But *Flores-Miramontes* says nothing of the sort. The petitioner in *Flores-Miramontes* conceded that he was an alien who had committed a qualifying offense, and thus this Court concluded the jurisdictional bar applied. 212 F.3d at 1135. The Court did not discuss the agency acting "outside the scope of its authority," Br. 31, as plaintiff contends. *See Flores-Miramontes*, 212 F.3d at 1135.

petition for a writ of certiorari to the Supreme Court of the United States." IIRIRA § 102(c)(2). Plaintiffs acknowledge (Br. 4) that they may challenge the district court's denial of their *constitutional* claims only by writ of certiorari to the Supreme Court, and they apparently plan to do so eventually. But plaintiffs contend (Br. 35) that this appellate review provision does not apply to their *non*-constitutional claims, repeating their argument that § 102(c)(2) does not apply to "predicate legal questions." There is no support in the statute or this Court's precedents for that argument.

As discussed above, plaintiffs' non-constitutional claims challenge the same 2017 waiver determinations as plaintiffs' constitutional claims, and they too "aris[e] from" an "action" or "decision" by the Secretary under § 102(c)(1). The district court dismissed plaintiffs' non-constitutional claims for lack of jurisdiction in the same opinion and order in which the district court denied plaintiffs' constitutional claims. Accordingly, plaintiffs' claims, and the district court's order rejecting those claims, fall within the text of § 102(c)(2)'s judicial-review provisions, and "may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States." IIRIRA § 102(c)(2)(C). There is no basis in the statutory text for plaintiffs' argument that on appeal they may bifurcate their claims, arising from the same waiver determinations and same district court opinion, between this Court and the Supreme Court.

As we have explained, plaintiffs' efforts to evade the plain meaning of § 102(c)'s jurisdictional bar are unavailing. But even if their arguments were colorable,

28

Congress clearly specified that the only appellate review of any district court decision is by writ of certiorari to the Supreme Court. Plaintiffs' efforts to split their claims on appeal between two courts fly in the face of both the text and the purpose of § 102(c)(2), and are contrary to fundamental principles of judicial efficiency.

Indeed, plaintiffs' claim-splitting is precisely the type of litigation tactic that Congress sought to prevent in enacting § 102(c)(2)(C). Section 102(c)(2)(C)'s appellate review provision was intended, like the other judicial review provisions of § 102(c)(2), "to ensure that judicial review of actions or decisions of the Secretary not delay the expeditious construction of border security infrastructure." H.R. Rep. No. 109-72, at 172. To streamline judicial review of district court orders under § 102(c), Congress required all appellate review to take place at one time, through one mechanism, in one forum: the Supreme Court. *See id.*; IIRIRA § 102(c)(2)(C). Plaintiffs' claim-splitting is contrary to this intent, and threatens the very litigation delays and judicial inefficiencies that § 102(c)(2)(C) was intended to prevent. *Cf. Aguilar v. U.S. Immigration & Customs Enf't Div.*, 510 F.3d 1, 9-10 (1st Cir. 2007) (finding litigants' tactic of "claim-splitting—pursuing selected arguments in the district court" and splitting other claims into immigration court "heralds an obvious loss of efficiency and bifurcation of review mechanisms," which was "among the principle evils that Congress sought to avoid" in enacting a statute directing where and how judicial review was to occur). Plaintiffs have already used the instant appeal in this Court as a reason to seek an extension on their deadline to file a petition for writ of

certiorari in the Supreme Court.[8]  This Court should dismiss the appeal and prevent

further delay in the resolution of plaintiffs' claims.

## II. The APA Independently Bars Review Of The Secretary's Waiver Determination Because The Matter Is Committed To Agency Discretion By Law

Even apart from the statutory bar on jurisdiction to consider the validity of the

waivers, plaintiffs would still need to identify a cause of action to bring these claims.

*See San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1093 & n.2 (9th Cir. 2005)

(recognizing that the APA is distinct from jurisdiction-granting statutes).  Here,

plaintiffs invoke the APA's cause of action.  *See* Br. 4 n.4 (acknowledging that the

APA, NEPA, and CZMA claims all rely on the APA); Br. 33 (asking the Court to

apply ordinary arbitrary and capricious review under the APA).[9]  But the APA

expressly bars review where the issue is committed to agency discretion by law.

Section 701 of the APA explicitly states that the APA does not apply "to the

extent that . . . agency action is committed to agency discretion by law."  5 U.S.C.

---

[8] *See* Application to extend the time to file a petition for a writ of certiorari from June 24, 2018 to August 23, 2018 (May 18, 2018), *Center for Biological Diversity v. U.S. Dep't of Homeland Sec., et al.*, No. 17A1285, https://www.supremecourt.gov/DocketPDF/17/17A1285/47440/20180518162159 329_00000001.pdf.

[9] Plaintiffs' concession is understandable, as NEPA and the CZMA do not provide independent causes of action, and thus rely on the APA.  *See San Carlos Apache Tribe v. U.S.*, 417 F.3d at 1097; *Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1144 (9th Cir. 2000); *City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980) (adopting in relevant part *City and County of San Francisco v. United States*, 443 F. Supp. 1116, 1127 (N.D. Cal. 1977)).

§ 701(a)(2). IIRIRA § 102 easily comes within that exception, as it quite clearly commits waiver determinations to the Secretary's discretion: it states that "[n]otwithstanding any other provision of law" the Secretary has authority to waive all requirements that the "Secretary, *in such Secretary's sole discretion*, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1) (emphasis added). By referring to the Secretary's "sole discretion," and making clear that this discretion overrides "any other provision of law," IIRIRA expressly and unambiguously places the Secretary's determination outside the APA. Indeed, this statute is even clearer than the statute in *Webster v. Doe*, 486 U.S. 592, 600 (1988), which was held to commit an issue to agency discretion. That statute permitted the agency head to terminate an employee whenever he "*deem[ed]*" it necessary, and did not even specifically mention the word "discretion." *Id.* Section 102, by contrast, expressly places the waiver determination in the Secretary's "sole discretion."

Moreover, § 102(c)(1)'s grant of discretion is extraordinarily broad. Section 102(c)(1) uses the term "Secretary's sole discretion" to refer to and modify the entire succeeding phrase: "determines necessary to ensure expeditious construction of the barriers and roads under this section." The Secretary thus has un-cabined discretion to make the specified determination. Once the Secretary makes a waiver "[d]etermination [p]ursuant to Section 102 of the [IIRIRA]," as occurred here, *see* ER283-87, the APA provides no basis to second-guess the Secretary's judgment that a

31

waiver was needed to ensure "expeditious construction," or that the waiver concerned construction "under this section." *See* IIRIRA § 102(c)(1).

Put another way, even if a district court had jurisdiction to consider plaintiffs' claims, those claims would only be reviewable to the extent they did not challenge a "determination" by the Secretary that he or she was exercising his § 102(c)(1) waiver authority pursuant to the statutory criteria. This might encompass such situations as the Secretary granting a waiver without suggesting that it was necessary for expedited construction, or granting a waiver despite expressly concluding that construction was not authorized by § 102. But no such situations are present here. Thus, even if this Court has subject matter jurisdiction, plaintiffs cannot prevail on any claim that requires the Court to look past the Secretary's waivers because those waiver determinations are committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

## III.   Even If The Waivers Are Reviewable In Some Manner, There Is No Basis To Overturn The Secretary's Interpretation Of § 102

Plaintiffs raise multiple arguments based on their interpretation of § 102, urging this Court to second-guess the Secretary's statutory determinations in the two waivers at issue. They contend that the statute silently expired, or that the waiver authority should be read as limited to specific priority projects. Br. 37-52. They also take issue with the Secretary's findings that the projects authorized by the two waiver decisions here involve "additional barriers" and are "in areas of high illegal entry." Br. 52-63. As we have explained, Congress made perfectly clear that courts cannot consider

32

those arguments. But even if the arguments could be considered, plaintiffs' claims would fail because they are inconsistent with the terms of the statute.

As the district court correctly recognized, only limited review (if any) would be permitted to determine whether the waivers here are ultra vires. ER 27-37. Nothing in § 102 constitutes the kind of clear and mandatory statutory language required to conclude that the Secretary's waiver determinations here are prohibited by the statute. The best and most natural reading of the statute, supported by the legislative history, demonstrates the flaws in plaintiffs' arguments. And to the extent that there are any ambiguities, the Secretary's authoritative interpretation is entitled to deference. Thus, whether viewed through the lens of the narrow ultra vires standard or the deferential *Chevron* standard, plaintiffs' arguments find no support in the statute. Indeed, even on their own terms, plaintiffs' arguments fail.

## A. The Secretary's Interpretation Is Not Ultra Vires In The Absence Of Clear And Mandatory Statutory Language

Given the clear preclusion of review in § 102(c), if the Secretary's waivers are reviewable at all, then they are only reviewable to the extent they are ultra vires—as the district court found was the relevant standard. And in order to demonstrate that defendants acted ultra vires of § 102(c), plaintiffs must establish that defendants violated "'clear and mandatory' statutory language." *Pacific Maritime Ass'n v. National Labor Relations Bd.*, 827 F.3d 1203, 1208 (9th Cir. 2016) (quoting *Kyne*, 358 U.S. at 188); *see also Staacke*, 841 F.2d at 281 (in conducting ultra vires review, "[o]ur task is limited

33

to determining whether the statute in question contains a clear command that the Secretary has transgressed"); *Baker v. International All. of Theatrical State Emps. & Moving Picture Operators of U.S. & Canada*, 691 F.2d 1291, 1296 (9th Cir. 1982) (rejecting argument under *Kyne* because appellants "ma[d]e no showing that the General Counsel acted entirely outside his authority" or "violated an express congressional command"). *Accord Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988) (explaining ultra vires standard is met only where "agency's error is patently a misconstruction of the Act," or where the "agency has disregarded a specific and unambiguous statutory directive" (quotation marks omitted)). This test is demanding. Where a "statute is capable of two plausible interpretations, the Secretary's decision to adopt one interpretation over the other cannot constitute a violation of a clear statutory mandate." *Staacke*, 841 F.2d at 282.

Plaintiffs cannot avoid the "clear and mandatory language" standard, which is well established as the appropriate limitation on the narrow review of ultra vires claims, as the district court recognized and as this Court's precedents confirm. Plaintiffs suggest (Br. 72–73) that this Court should depart from that established standard based on their assertion that this case involves the Secretary "set[ting] aside federal and state statutes . . . beyond the Secretary's expertise." But plaintiffs identify no case law in support of this proposition, and offer no principled reason for why the ordinary limitations on ultra vires review should be disregarded. Indeed, plaintiffs fail to clearly articulate the standard they believe the district court *should* have applied,

34

other than to suggest that the district court should have used "[a] less rigid standard" "similar" (*id.*) to the standard used in *Hawaii*, 878 F.3d at 673-75. But the court in *Hawaii* did not purport to apply a different standard for ultra vires review, and nothing in that case supports plaintiffs' argument or undermines the clear case law discussed above demonstrating the proper standard for ultra vires review.

Plaintiffs also argue that the ordinary ultra vires standard cannot apply because a Court must first determine whether certain authority has been "delegated" to DHS. Br. 32-34. But that argument has nothing to do with ultra vires review. Instead, plaintiffs try to import a very different inquiry from cases that consider whether *Chevron* deference is appropriate—not whether an agency action is ultra vires. *See id.* Ultra vires review is "a narrow exception" to a statute's preclusion of judicial review, and it is thus only appropriate where there is already some question whether a statute authorizes agency action (that is, whether the statute delegates the relevant authority to the agency). *See, e.g.*, *Pacific Maritime Ass'n*, 827 F.3d at 1207-08 (applying ordinary ultra vires review, including the "clear and mandatory language" standard, even though the court was "skeptical" that agency's "exercise of jurisdiction was proper"). Thus, the fact that a party thinks an agency exceeded its delegated authority is a necessary *predicate* to ultra vires review, *see id.* at 1208, not an excuse to ignore the governing standard entirely.

Nor can plaintiffs escape the ultra vires standard by characterizing it as an "affirmative defense," as if this were a question of factual or evidentiary proof. Br.

35

67-69. As an initial matter, this ignores the fact that the § 102(c)(2) bar is jurisdictional, and the party invoking a district court's subject matter jurisdiction always bears the burden of demonstrating that jurisdiction exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In any event, the proper standard of review for the Secretary's statutory interpretation is a pure question of law, and is unaffected by the burden of proof. Indeed, plaintiffs have pointed to no fact in dispute that might bear on this issue.

### B. Even If The Ultra Vires Standard Does Not Apply, The Secretary's Interpretation Is Entitled To *Chevron* Deference

As the above discussion shows, the Secretary's interpretation of § 102 must be upheld under ultra vires review so long as it is not contrary to some "clear and mandatory" provision of law. But even if ordinary review of agency action were available, the Secretary's interpretation would be entitled to *Chevron* deference, and this Court can affirm on the grounds that the Secretary's interpretation is at least reasonable.

It is blackletter law that when a statute is "silent or ambiguous with respect to the specific issue," the only task for the reviewing court is to determine if the agency's interpretation is based on "a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). This standard gives significant leeway to the agency. A statute is silent or ambiguous on an issue unless a particular interpretation is "an inevitable one." *Regions Hosp. v. Shalala*, 522 U.S. 448,

460 (1998). And in assessing whether an agency has permissibly interpreted an ambiguous statute, this Court's review is "highly deferential," *Harkonen v. U.S. Dep't of Justice*, 800 F.3d 1143, 1150 (9th Cir. 2015), and the Court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by" the agency, *Chevron*, 467 U.S. at 844.

The Supreme Court has further explained that *Chevron* applies when statutory circumstances suggest that Congress expected the agency to "speak with the force of law." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). That is the case here, as Congress expressly delegated to the Secretary the "sole discretion" to determine whether a waiver is "necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). And by explaining that the Secretary's decision "shall be effective" to waive the applicability of various laws "upon being published in the Federal Register," *id.*, Congress clearly understood that the Secretary's decisions would have "the force of law." *Chevron* deference thus applies here.

Plaintiffs argue that mere ambiguity in a statute does not necessary imply a delegation of power. Br. 33-34 (citing *Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001)). But this case involves an *express* delegation of interpretative authority, and the Supreme Court has in any event clarified that *Chevron* starts with a "background presumption" that ambiguities in a statute will be resolved by the administrative agency, *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013), and there is nothing here

37

that overrides that presumption.  Nor does it matter that plaintiffs are challenging the scope of the Secretary's powers, as the Supreme Court has held that *Chevron* deference applies even when the agency is interpreting a statute "that concerns the scope of the agency's statutory authority."  *Id.* at 296, 298.  And while plaintiffs imply there is some sort of "public participation" requirement before granting *Chevron* deference, the Supreme Court has rejected that notion.  *See Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002); *see also NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 255, 257-60 (1995) (granting *Chevron* deference to an agency letter).  Thus at a minimum, the Secretary's interpretation is entitled to deference and should be upheld.

### C. The Secretary's Interpretation Of § 102 Is The Best Reading Of The Statute, And At A Minimum Easily Meets The Low Bars Demanded By Either The Ultra Vires Standard Or *Chevron*

Any exercise of statutory interpretation must "begin, as always, with the text of the statute."  *Permanent Mission of India to the U.N.* v. *City of New York*, 551 U.S. 193, 197 (2007).  Here, the statutory text is clear, and the Secretary's unambiguous waiver authority is reinforced by the statute's history of enactment and amendment, as well as by contemporaneous legislative history.

Because the Secretary's interpretation is clearly correct, that can be the end of the matter.  But at a minimum the Secretary's reading is both plausible (and hence not ultra vires), and affirmatively reasonable (and hence entitled to *Chevron* deference if there were any reason to go beyond ultra vires review).

### 1. The Secretary's Waiver Authority Has Not Expired

#### a. Section 102(a) Authorizes Construction Without Any Stated Time Limit

Plaintiffs err in contending that the construction authority in § 102(a) somehow came to an end, even though the statute contains no time limit anywhere within its text. Section 102(a) directs the Secretary to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry." IIRIRA § 102(a). Section 102(a) thus provides clear authority for the Secretary to engage in specified construction activity anywhere "in the vicinity of the United States border," so long as that activity is designed "to deter illegal crossings in areas of high illegal entry." That statutory authority persists to this day and continues to authorize construction projects.

Subparagraph (b)(1)(A), which also has no time limit, merely sets a 700-mile minimum for the Secretary's construction activities under § 102(a) and does not otherwise retract any of the Secretary's powers conferred elsewhere in the statute. IIRIRA § 102(b)(1)(A). Subparagraph (b)(1)(C) adds a consultation requirement when the Secretary "carr[ies] out this section," but this provision too has no time limit, and thus does not aid plaintiffs' argument. *Id.* § 102(b)(1)(C). And Subparagraph (b)(1)(D), which has no time limit either, merely creates additional flexibility that the Secretary can use while working to meet the 700-mile minimum: it states that

39

"[n]otwithstanding" subparagraph (b)(1)(A), the Secretary is not required to undertake various construction activities "in a particular location" along the border if "the Secretary determines" that conducting those activities would not be "the most appropriate means to achieve and maintain operational control over" the border at that location. *Id.* § 102(b)(1)(D).

Subparagraph (b)(1)(B), entitled "Priority areas," required that at least 370 miles of reinforced fencing be constructed in priority areas by the end of 2008. IIRIRA § 102(b)(1)(B). But like the other parts of § 102(b)(1), this provision does not in any way detract from the Secretary's authority to conduct additional construction using § 102(a). And the deadline for the Secretary to act is unambiguously limited to the specific construction referenced in "clause (i)" of § 102(b)(1)(B) (*i.e.*, the 370 miles that were Congress's "[p]riority"). *Id.* § 102(b)(1)(B)(ii).

The history of the provision's enactment and amendment further confirms that § 102(a) authorizes construction beyond the particular projects that were required or prioritized in § 102(b). As originally enacted in 1996, in language that remains in the statute today without alteration, § 102(a) provided authority to construct barriers and road in "areas" (plural) of high illegal entry. *See* Pub. L. No. 104-208, div. C, § 102(a); IIRIRA § 102(a). At that time, § 102(b) referred to a construction project in only a *single* border area. *See* Pub. L. No. 104-208, div. C, § 102(b) (authorizing the project called "Construction Of Fencing And Road Improvements In The Border Area Near San Diego, California" (capitalization altered)). The fact that § 102(a) applied to more

than a single area thus illustrates that it was intended to be broader than § 102(b). Moreover, § 102(b) originally did not provide any discretion as to the nature or location of the specific project it authorized. *See id.* § 102(b)(1) (requiring construction of second and third fences, and a road between the fences, "along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward"). Yet § 102(a) more broadly authorized construction that was designed to "deter illegal crossings in areas [plural] of high illegal entry." *Id.* § 102(a); Br. 59. This broader geographic designation in § 102(a) demonstrates that Congress intended to authorize construction in locations beyond what was specifically identified in § 102(b). Plaintiffs' interpretation thus runs afoul of "one of the most basic interpretative canons," which is that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018). And given this textual clarity, it is unsurprising that when Congress later amended § 102(b) in 2005, the relevant conference report revealed that Congress, too, understood § 102(a) to reach more broadly than the San Diego project referenced in § 102(b). *See* H.R. Rep. No. 109-72, at 170 (explaining that § 102 as originally enacted served two purposes: it "provide[d] for construction and strengthening of barriers along U.S. land *borders* [plural] *and* specifically provide[d] for 14 miles of barriers and roads along the *border* [singular] near San Diego" (emphases added)).

41

Plaintiffs mistakenly invoke the principle that the "specific governs the general." Br. 42-43. But that principle has no application to this case because here the general and specific provisions address different applications. As explained above, § 102(a) grants a general construction authority, while § 102(b) says that while using this authority the Secretary must build at least 700 miles of fencing and complete a subset of that fencing by the end of 2008. Plaintiffs' argument is a well-known misapplication of the specific/general canon: they are using a specific provision to foreclose application of a general provision in situations that are not "covered by the specific provision." Antonin Scalia & Bryan A. Garner, *Reading Law* 184 (2012); *see also Marx v. General Revenue Corp.*, 568 U.S. 371, 386–87 (2013) (explaining that because the case did not fall within the specific provision, it was instead governed by the general provision).

### b. IIRIRA's § 102(c) Waiver Authority Applies To All Projects Authorized By § 102

1. Plaintiffs also seek to limit the waiver authority to the initial 370-mile priority construction project identified in Subparagraph 102(b)(1)(B). But the statutory text, structure, and history refute that argument. IIRIRA § 102(c)(1) states that "[n]otwithstanding any other provision of law, the Secretary . . . shall have the authority to waive all legal requirements such Secretary . . . determines necessary to ensure expeditious construction of the barriers and roads *under this section*." IIRIRA § 102(c)(1) (emphasis added). The text of the waiver authority does not refer to

42

Subparagraph 102(b)(1)(B), but instead to § 102 as a whole. By referencing "this section," the waiver provision can apply to all construction authorized by any part of § 102—including all construction encompassed by § 102(a).[10]

Legislative drafting normally follows an established hierarchy in which "sections" are distinct from "subsections," "paragraphs," and "subparagraphs." *See Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60-61 & n.4 (2004) (citing the House and Senate drafting manuals). Accordingly, when Congress directs that a particular provision applies to actions "under this section," the import is that the provision applies to the entire section rather than just "a particular subsection or paragraph." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 938-39 (2017); *see also Rubin*, 138 S. Ct. at 823 (explaining that the "natural reading" of a statutory reference to "this section" is that it refers to the section "as a whole").

Congress understood this drafting hierarchy, and correctly and consistently employed it throughout § 102, referring to specific subparts where appropriate. *See, e.g.*, IIRIRA § 102(b)(1)(A) (setting a 700-mile minimum for construction employed "[i]n carrying out subsection (a)"); *id.* § 102(b)(1)(C)(ii) (creating a savings provision for "this subparagraph"); *id.* § 102(b)(1)(D) ("[n]otwithstanding subparagraph (A)");

---

[10] Contrary to plaintiffs' suggestion (Br. 50-52), the government's interpretation of the statute has been consistent, even before the 2005 amendments. *See* Defs.' Mot. to Dismiss at 6-7, *Sierra Club v. Ashcroft*, No. 04-0272 (S.D. Cal. Nov. 17, 2005), ECF No. 36 (arguing that § 102(b)(1), as then in effect, simply provided "a required method of achieving [§ 102(a)'s] important goal in one geographic area").

*see also id.* § 102(b)(2)-(4) (multiple references to "this subsection"); *id.* § 102(c)(2)(A) (referencing actions taken by the Secretary under "paragraph (1)"); *id.* § 102(c)(2)(B) (referencing causes and claims "brought pursuant to subparagraph (A)"). If Congress had wanted the waiver authority to apply to only a specific part of § 102, Congress well knew how to achieve that result. Instead, it directed that the waiver authority apply to construction "under this section."

This interpretation of the Secretary's waiver authority is also consistent with the legislative purpose. By enacting § 102, Congress wanted to hasten the creation of border barriers in areas of high illegal entry. Giving the Secretary discretionary authority to waive conflicting laws for all such construction when needed—rather than just a subset of that construction—furthers that goal by ensuring that essential construction is not delayed by litigation. Moreover, this understanding accords with the fact that the consultation requirement applies when carrying out "this section," IIRIRA § 102(b)(1)(C), rather than any specific subsection or other subpart. Since the waiver authority can be used for any construction under § 102, and could thereby abrogate any consultation requirements imposed by other provisions of law, Congress elected to ensure that IIRIRA's own consultation provision would apply to all § 102 waivers instead of just a subset of them.

Plaintiffs nonetheless urge a narrower reading of § 102(c), suggesting that because the waiver authority applies whenever the Secretary determines a waiver is "necessary to ensure expeditious construction," IIRIRA § 102(c)(1), the reference to

44

"expeditious construction" should be read to include only the 370 priority miles mentioned in § 102(b)(1)(B). Br. 39.

This inferential leap has no basis in law or logic. To begin with, the phrase plaintiffs rely on—"expeditious construction"—appears nowhere in § 102(b), which undermines any suggestion that Congress intended that phrase to refer only to the 370-mile priority portion in that subsection. Congress instead referred to the 370-mile provision by the title "Priority areas," thus reinforcing what the statute already made plain: Congress thought the 370-mile section was a high priority that should be constructed by 2008, but Congress also contemplated that other projects might need to be constructed "expeditiously." *See SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (recognizing that the use of different terms in a statute "demonstrates that Congress intended to convey a different meaning for those words," and explaining that this interpretative canon applies even if the words have "remarkably similar definitions").

Plaintiffs' understanding of the phrase "expeditious construction" is also impossible to square with IIRIRA's enactment history. That particular phrase has been in IIRIRA's waiver provision since 1996, *see* Pub. L. No. 104-208, div. C, § 102(c), and has not been altered. Yet the 370-mile priority construction provision (and its 2008 deadline) were not added to § 102 until 2007. *See* Pub. L. No. 109-367, § 3(2). Upon IIRIRA's enactment, the phrase "expeditious construction" could not possibly have referred to the 370-mile priority provision. And there is no reason to

45

think that Congress somehow changed the meaning of that phrase in 2007 when it passed a statute that did not alter the language of the waiver provision (§ 102(c)(1)) in any way. *See* Pub. L. No. 109-367 § 3(2).

Section 102(c) also makes clear that the Secretary's waiver authority applies to "expeditious construction of the barriers *and roads* under this section." IIRIRA § 102(c)(1) (emphasis added). But the "[p]riority areas" provision only directs the Secretary to construct "reinforced fencing" along the 370 priority miles, and makes no mention of roads. IIRIRA § 102(b)(1)(B). If the waiver provision only applied to the priority area construction, as plaintiffs urge, its reference to "roads" would be superfluous.

Plaintiffs' interpretation also singles out one portion of § 102(b)—the 370-mile priority—but fails to account for the other portion—the 700-mile minimum in § 102(b)(1)(A). Both provisions are part of the Secretary's broader construction authority under § 102(a), *see* IIRIRA § 102(b)(1)(A), and only the 370-mile section was subject to the 2008 deadline. Plainly, Congress expected that the remainder would be constructed after 2008.

The legislative history, like the text of the statute, also demonstrates the error of plaintiffs' interpretation. During floor debates over the REAL ID Act, which broadened the waiver authority in § 102(c)(1), the bill's opponents frequently and without contradiction criticized the fact that § 102's waiver authority extended beyond the specific project or projects contemplated by § 102(b). *See, e.g.*, 151 Cong. Rec.

46

1914 (statement of Rep. Jackson-Lee) (waiver provision is "so broad that it would not just apply to the San Diego border" but "would apply [to] any other barrier or fence that may come about in the future"); *id.* at 1909 (statement of Rep. Conyers) (criticizing waiver authority as applying to "construction of barriers and fences anywhere within the United States"); *id.* at 2030 (statement of Rep. Harman) ("[T]he reach is beyond the San Diego border. According to the language in this legislation, it is all areas along and in the vicinity of our international borders with both Mexico and Canada."); *id.* at 2031 (statement of Rep. Blumenauer) (criticizing the bill for "creating a zone 7,514 miles long . . . where all laws are suspended"); *id.* at 2032 (statement of Rep. Farr) (submitting Congressional Research Service memorandum, which observed that the waiver authority "seem[s] to apply to all the barriers that may be constructed under the authority of § 102 of IIRIRA" and not just near San Diego). *See also* 142 Cong. Rec. 24779 (1996) (statement of Rep. Saxton) ("[T]he way this section is written, the exemption applies to the entire border of the United States, not just . . . near San Diego."). Congress nonetheless enacted the law without altering the language that prompted those objections.[11]

---

[11] Plaintiffs point to the fact that the San Diego project was the only specific project mentioned in a 2005 Conference Report, and the fact that sponsors invoked experiences with the San Diego project as justification for the statute. But the fact that the San Diego project was a salient example does not demonstrate that the statute then applied *only* to San Diego. *Cf. United States v. Turkette*, 452 U.S. 576, 591 (1981) (explaining that while a statute's legislative history "forcefully support[ed] the view" that Congress had a particular "major purpose" in mind, that did not "require[] the

47

Plaintiffs argue that the waiver provision's reference to "this section" cannot really mean "this section" because § 102(b) also uses the term "this section." Br. 44. But § 102(b)(1)(B) says that the Secretary must identify and build the 370 priority miles "[i]n carrying out" the broader authority conferred in "this section" as a whole. IIRIRA § 102(b)(1)(B). Thus, the Secretary must prioritize construction of 370 miles of fencing when exercising the broader authority granted under § 102. And § 102(b)(1)(C) creates a consultation requirement when the Secretary is "carrying out this section," but there is no dispute that the consultation requirement applies to all projects the Secretary elects to construct using his or her § 102 powers, not just the projects in § 102(b).[12]

Plaintiffs also argue (Br. 40) that their interpretation is compelled by the word "expeditious" in § 102(c)(1), which they assert would otherwise be superfluous. But § 102(c)(1) authorizes the Secretary to waive the applicability of laws if the Secretary determines that a waiver is "necessary to ensure expeditious construction." IIRIRA § 102(c). The word "expeditious" thus guides the Secretary's exercise of discretion in

---

negative inference" that Congress intend to foreclose all other applications of the statute "in accordance with its terms"). Plaintiffs fail to provide any support for their assertion that sponsors "made plain their intent that the expansion of the Section 102(c) waiver authority was specific to the border barrier segment identified under Section 102(b)." Br. 49.

[12] Plaintiffs (Br. 45) also cite § 102(b)(1)(B)(ii), but that provision very clearly states that by 2008 the Secretary must "complete construction of reinforced fencing along the miles identified *under clause (i)*," not § 102 as a whole. IIRIRA § 102(b)(1)(B)(ii) (emphasis added).

choosing whether or not to invoke the waiver provision. Indeed, plaintiffs acknowledge that the Secretary has elected not to use his waiver authority for some past § 102 construction projects. *See* Br. 27 n.15.[13]

Prior government practice under § 102 confirms the breadth of that discretion, and shows that is it not limited by the projects in § 102(b)(1)(B). In two 2008 determinations, the Secretary invoked his waiver authority for projects that were not exclusively for the construction of reinforced fencing as set out by the priority areas provision, and were therefore inconsistent with plaintiffs' interpretation. *See* 73 Fed. Reg. 19077 (Apr. 8, 2008) (determination included road construction); 73 Fed. Reg. 19078 (Apr. 8, 2008) (same, as to a different project area). And the Secretary's discretion is amply supported, not undermined, by the fact that there had been no waivers between 2009 and the determinations at issue in this case. Br. 51.

Finally, plaintiffs claim (Br. 41-42) that their interpretation is compelled by the doctrine of constitutional avoidance. But plaintiffs have not actually brought any constitutional claims to this Court, *see* Br. 4; this claim-splitting has thus put them in the awkward position of asking this Court to "avoid" a constitutional question that the Court has no power to reach, even if it wanted to. Regardless, constitutional

---

[13] The 2007 amendments to § 102 are not rendered superfluous either. Those amendments directed the Secretary to complete a 370-mile stretch of fencing by the end of 2008, and also set a 700-mile minimum. And as we have explained, those provisions are consistent with the broader construction authority in § 102(a) and the waiver authority in § 102(c).

avoidance only applies if the governing statute is ambiguous after utilizing all of the tools of statutory construction, and if a serious constitutional doubt is actually presented. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001). Here, the statute is clear. And there is in any event no serious argument that the waiver provision is an unconstitutional delegation of legislative power. Indeed, the district court aptly explained why plaintiffs' non-delegation challenge had no merit, *see* ER71-85, 105-06, and plaintiffs make no effort to explain either why the district court's analysis was wrong, or why a time limit would be needed to save the statute despite the fact that it has other discernible intelligible principles. *See* Br. 41-42. Plaintiffs have waived their argument by failing to adequately brief it, *see, e.g., Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1149 (9th Cir. 2016), and the argument in any event fails for the reasons already explained by the district court.

2. As a fallback position, plaintiffs contend (Br. 45) that even if the Secretary's waiver authority can extend beyond the 2008 deadline for the priority areas identified in § 102(b)(1)(B), it is somehow still limited to the construction specified in § 102(b)—presumably (although plaintiffs do not fully explain it) the 700-mile minimum in § 102(b)(1)(A). This argument fails for many of the same reasons as their principal argument about the 370-mile priority areas: it flies in the face of § 102(c)(1)'s express language referencing "this section," rather than any specific subsection; it relies on a misapplication of the specific/general canon; it is difficult to square with the breadth of the consultation provision; and it is inconsistent with legislative history.

It also lacks any support in the text or structure of the statute. There is no textual hook to link § 102(c)(1) to § 102(b). Plaintiffs offer vague notions about the contrast between § 102(a)'s generality and § 102(b)'s specificity (Br. 47) but that just underscores their misapplication of the specific/general canon. And they misunderstand (Br. 47-48) the 2007 amendment, which eliminated the selection of specific projects and instead told the Secretary to reach a minimum number of miles—that amendment did not "reduce" (relative to 2006) the minimum number of miles that had to be constructed. *Compare* Pub. L. No. 109-367, § 3(2) (requiring that the Secretary include several specific construction projects in carrying out his § 102(a) duties), *with* Pub. L. No. 110-161, div. E, § 564(2)(b)(1)(ii) (eliminating reference to specific projects and instead directing Secretary to reach a minimum number of miles).

Moreover, if the waiver authority does *not* encompass § 102(a) construction, plaintiffs' fallback theory becomes internally inconsistent. Necessarily, plaintiffs' fallback position extends the waiver authority to construction under § 102(b)(1)(A). But that very provision makes clear that construction under it is part of the Secretary's responsibility to "carry[] out subsection (a)." IIRIRA § 102(b)(1)(A). Thus if the waiver authority extends to § 102(b)(1)(A), it must also extend to construction under § 102(a).

Furthermore, § 102(b)(1)(A)'s use of the term "not less than 700 miles" creates a 700-mile *minimum*, but does not impose any maximum amount of construction; it

51

thus plainly contemplates that the Secretary's authority goes beyond 700 miles and has no expiration. IIRIRA § 102(b)(1)(A). If all the Secretary has to do to ensure that his or her waiver authority includes § 102(a) is also cite § 102(b)(1)(A), it is wholly unclear what plaintiffs' interpretation accomplishes.

Ultimately, plaintiffs' fallback position fares no better than their primary one. Section 102(c)(1) can apply to all construction "under this section," and that includes construction authorized by § 102(a).

### 2. The Construction Projects At Issue Involve "Additional Barriers"

In authorizing the San Diego and Calexico projects at issue, the Secretary explained that certain areas of primary fencing were "built in the early 1990s using a fence design that is no longer optimal for Border Patrol operations." ER284; *see also* ER286. Accordingly, these projects aim to replace sections of the existing primary fencing with new fencing that is taller, stronger, and better able to prevent illegal entry. *See* ER284–86 (Calexico project will replace 14-foot landing mat style fencing); ER221–22 (legacy San Diego primacy fence was constructed from 10-foot-high surplus landing mats); GAO Report 17-331,[14] at 11 (photographs contrasting modern "bollard style" fencing with legacy "landing mat" fencing); *id.* at 21-23 (explaining

---

[14] U.S. Gov't Accountability Office, GAO-17-331, Southwest Border Security: Additional Actions Needed to Better Assess Fencing Contributions to Operations & Provide Guidance for Identifying Capability Gaps (2017), https://www.gao.gov/assets/690/682838.pdf.

how bollard fencing is harder for illegal entrants to cut through, and also provides greater visibility for agents, which enhances their ability to apprehend illegal entrants). The result will leave these border areas with "additional physical barriers"—that is, taller and stronger barriers that were not there before.

The term "additional" encompasses something "more" or "added" as compared to what was previously in place. *See, e.g.*, *The American Heritage Dictionary of The English Language* (5th ed. 2016) ("added"); *Oxford English Dictionary* (3d ed., Nov. 2010) ("added, extra, supplementary"); *Webster's Third New International Dictionary of The English Language* (Unabridged, 2002) (coming by way of a process where "anything is added," particularly if it "improves or increases value"); *The Random House Dictionary of the English Language* (2nd ed., Unabridged, 1987) ("added," "more," or "supplementary"). The projects here fall within that definition because they will result in a better barrier that was not there before.

Plaintiffs contend that the San Diego and Calexico replacement projects cannot constitute "additional" barriers because they do not add to the total *horizontal* miles of existing border fencing.[15] Their argument acknowledges the dictionary definitions of the statutory term "additional," but then relies on a different term that is *not* in the statute ("replace") and contends that a replacement can never result in something

_____

[15] Plaintiffs' brief does not dispute that the prototype project created "additional barriers." Any challenge to that project is in any event moot since construction of the prototypes is complete.

"added." Br. 53-54. The question is not, however, whether the San Diego and Calexico replacement projects fit plaintiffs' curated definition of "replacement." The relevant phrase is just the statutory term "additional physical barriers," and that phrase readily contemplates barriers that are taller, stronger, and more effective than any in place now.

Surrounding statutory provisions confirm that "additional" does not have plaintiffs' narrow definition. In particular, § 102(a) clarifies that the authorized construction "includ[es] the removal of obstacles to detection of illegal entrants." IIRIRA § 102(a). Authorized construction thus need not add to the total horizontal miles of fencing. Furthermore, IIRIRA § 102(b)(1)(A), cited in plaintiffs' brief (Br. 54), makes clear that some of the actions the Secretary can take in "carrying out subsection (a)" include installing "lighting, cameras, and sensors," yet those actions also do not add to the total horizontal miles of fencing. And the fact that Congress has over time *also* provided for the construction of additional horizontal miles of fencing surely does not foreclose the notion that "additional barriers" can include construction that otherwise improves border security.

Plaintiffs' narrow interpretation would also lead to the odd conclusion that Congress had only envisioned "one-and-done" construction, regardless of need or deterioration. Congress presumably understood that physical barriers degrade over time, are subject to potential vandalism, and can become insufficient in light of changing needs or improved technology. Nothing in the text or structure of § 102

54

suggests that Congress meant to exclude construction designed to remedy those anticipated concerns.

Nor is there any reason to doubt that construction projects designed to replace and upgrade obsolete barriers might need to be expedited. For instance, damage caused by vandalism or a natural disaster might create a sudden need for replacement. Appropriations restrictions might hamper the Secretary's ability to schedule construction as far in advance as the Secretary might like. And given that environmental litigation might otherwise hold up a project for a decade or more—and in some areas might even permanently prevent construction, *see* SER111—it is not hard to see why a waiver would be needed to expedite even a project that was foreseen several years in advance.

To the extent any doubt remains, legislative history confirms that Congress understood the phrase "additional barriers" in this manner. *See* H.R. Rep. No. 109-72, at 170 (explaining that § 102 "provides for construction *and strengthening* of barriers along U.S. land borders" (emphasis added)); 152 Cong. Rec. S9871 (daily ed. Sept. 21, 2006) (statement of Sen. Kyl) (discussing using § 102 authority for "replacing the so-called landing mat fencing," in part because it "is deteriorating," is "very difficult to

repair because of its age," and is disadvantageous because Border Patrol "can't see through it.").[16]

The fact that the Secretary has mostly used § 102 for areas without any existing fencing shows only that the Secretary has generally prioritized other kinds of construction, not that the Secretary believed § 102 did not authorize projects like this. Indeed, in 2011 the Secretary clearly expressed the view that § 102 covers replacement projects like the ones at issue here. *See* ER141-42.[17] And that is not undermined by a 2017 PowerPoint presentation, which in any event referenced additional "miles" of new border barrier construction, ER268, 273, 275, and plainly was not an attempt to interpret the statutory phrase "additional physical barriers" in § 102(a).

### 3. The Projects At Issue Are "In Areas Of High Illegal Entry"

Section 102(a) authorizes construction "in areas of high illegal entry." IIRIRA § 102(a). The statutory term "high" does not require any particular objective or comparative threshold. Instead, it contemplates a range of discretionary determinations that is not limited to numerically higher rates of entry, as compared to

---

[16] Contrary to plaintiffs' assertion (Br. 57) Senator Kyl was not referring to the San Diego project in the quoted portion of his remarks; he was instead speaking more broadly about the Secure Fence Act, which modified § 102 to require the completion of additional projects. *See* 152 Cong. Rec. at S9871; Pub. L. No. 109-367, § 3(2).

[17] Plaintiffs incorrectly contend that the earlier waiver did not actually cover this construction, *see* Br. 56 n.20 (confusing the question of whether this construction met the 700-mile minimum with the question of whether it was covered by a 2008 waiver), but even that objection acknowledges that the Secretary in 2011 *believed* an earlier waiver was valid and applicable for such construction.

other areas, but also includes a risk of entry that poses a particularly significant concern, such as areas where entrants can more easily evade detection or arrest or can readily bring weapons or other contraband across the border. (For instance, one might think that if even a very small percentage of commercial airline flights have an accident, or if even a very small percentage of nuclear reactors melt down, that incident rate is still too "high.").

That flexibility becomes particularly clear when one considers that § 102 makes reference in several places to the goal of attaining "operational control" over the border. *See* IIRIRA § 102(b)(1)(A) (directing the Secretary to use § 102(a) to gain "operational control of the southwest border" over at least 700 miles); *id.* § 102(b)(1)(D) (creating an exception to this requirement where certain types of construction will not be "the most appropriate means to achieve and maintain operational control" at a given location); *see also* Pub. L. No. 109-367, § 2(b) (defining "operational control" as "the prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband"). Congress thus understood that in determining whether or not an area had "high" illegal entry, the Secretary could account (among other things) for whether or not operational control has yet been achieved. And here, where the most recent year's data from the relevant border sectors showed the apprehension of over 31,000 individuals attempting illegal entry in the San Diego Sector, the apprehension of over 19,000 individuals attempting illegal entry in the El

57

Centro Sector, and substantial amounts of contraband illegally entering in both areas, SER175, the Secretary quite reasonably found that the areas at issue had "high" illegal entry.[18]

In any event, the areas at issue here come within even a narrower interpretation of "high" as a measure of the number of entrants compared to other border areas. Both the El Centro Sector (where the Calexico project is located) and the San Diego Sector are among the top 35% of border sectors in terms of the number of individuals apprehended attempting to illegally enter the country.[19] SER175 (ranking them seventh and fourth, respectively). It does not matter that there are a few other sectors with even higher apprehension numbers, *see* SER175, as the statute does not limit construction authority to areas with the "highest" rates of illegal entry. Nor does the statute require the Secretary to analyze areas based on the average sector in any particular state. *See* Br. 62 (citing ER164, which is only a partial list of all border sectors).

---

[18] We do not contend that every area of the border, at all times and in all circumstances, would be an area of "high illegal entry." Our interpretation thus creates no superfluity concerns, as plaintiffs erroneously contend (Br. 62). In any event, as noted in the next paragraph, the Secretary's interpretation of "high" as including the areas at issue is also consistent with the comparative standard of "high relative to other border sectors," and plaintiffs do not contend that that standard creates any superfluity.

[19] They are also in the top 45% in terms of pounds of cocaine and marijuana found. *See* SER175.

Plaintiffs suggest that an area can only have "high" illegal entry if the most recent number of apprehensions was roughly comparable to what it was in 2006 in certain locations specified by the Secure Fence Act, or in 1996 in the San Diego Sector. Br. 60-61. But the statute includes no such constraint; indeed, earlier statutory references to those locations (which did not even indicate that those locations were the only ones that could have "high illegal entry") were replaced with provisions that told the Secretary to use § 102(a) powers to maintain "operational control" over the border. *See* Pub. L. No. 110-161, div. E, § 564. In any event, as explained above, the individual projects outlined in the earlier versions of the statute were just specific projects Congress wanted to prioritize, not the full limits of § 102(a)'s reach. Plaintiffs' argument is really just a backdoor attempt to rehash the erroneous notion that § 102(a)'s full reach is defined by § 102(b).

Plaintiffs also appear to suggest that an area cannot have "high" levels of illegal entry if illegal entry there is now lower than it was at that same location in the 1990s or early 2000s. But illegal entry can still be "high," even if it is not as high as it once was. Moreover, at the time that Congress passed the REAL ID Act in 2005, alien apprehension rates in the San Diego sector were significantly down from their 1996 levels. *See* ER191 (126,904 in 2005, down from 483,815 in 1996). Plaintiffs' theory would accordingly suggest that San Diego in 2005 was no longer an area of "high" illegal entry, yet even they acknowledge that the 2005 statute applied to San Diego.

59

**IV. California's Remaining Claims Are Covered By The Waivers Or Are Nonjusticiable**

Plaintiffs recognize that the Secretary's waivers, unless found invalid, at minimum provide a complete defense to most of their environmental and APA claims.[20] But California seeks to narrow the effect of the waivers by suggesting that they do not cover certain pre-waiver planning activities. Relatedly, California also speculates about a future project—a non-final plan to replace secondary fencing in the San Diego sector—that might eventually be the subject of a future waiver.

1. California is mistaken in suggesting that the waivers exclude pre-waiver planning activities. By their terms, the waivers at issue here waived listed statutes "in their entirety . . . with respect to the construction of roads and physical barriers (including, but not limited to, accessing the Project Area, creating and using staging areas, the conduct of earthwork, excavation, fill, and site preparation, and installation and upkeep of physical barriers, roads, supporting elements, drainage, erosion

---

[20] Plaintiffs repeat (Br. 67-69) their inapt argument about an "affirmative defense," but we have explained that the legal question about the validity of the waivers is not subject to an evidentiary burden of proof. In any event, the undisputed facts showed that the waivers are valid—whether under the ultra vires standard, as a matter of *Chevron* deference, or simply because the government's interpretation of § 102 is the best reading of the statute. *See, e.g.*, *Panaro v. City of North Las Vegas*, 432 F.3d 949, 952-54 (9th Cir. 2005) (defendant entitled to summary judgment on affirmative defense when undisputed facts showed the defense applied). Plaintiffs' contention (Br. 68) that § 102 is "unclear" emphasizes the point that questions about the statute's meaning, and the extent to which courts must defer to the Secretary's interpretation, are legal questions that a court can answer if it otherwise has jurisdiction and review has not been precluded.

controls, and safety features)." ER284, 286. Because this capacious waiver language broadly applies "with respect to" construction, pre-construction planning activities are necessarily included.

California's contrary interpretation would be bizarre. Because the actual construction is undisputedly encompassed by the waiver, plaintiffs have no ability to enjoin any construction activities, and NEPA and the CZMA do not authorize monetary damages against the United States. Moreover, as part of determining that it was necessary to invoke the waiver provision in the first place, the Secretary would have had to engage in certain planning activities to have a sense of the anticipated construction. California's argument leads to the absurdity of contending that the Secretary could never invoke the waiver authority because it could never cover every necessary step in the planning process.

In any event, such long-range planning activities, divorced from the actual construction projects covered by the waiver, do not trigger any obligations under either NEPA or the CZMA. NEPA obligations only apply to the extent an agency is doing something that actually affects the physical environment, *see Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983); *Northcoast Envt'l Ctr. v. Glickman*, 136 F.3d 660, 666 (9th Cir. 1998), and mere planning activities—when wholly divorced from any construction—have no impact on the physical environment. Similarly, the CZMA only applies if a federal agency engages in an "activity . . . that affects any land or water use or natural resource of the coastal zone."

61

16 U.S.C. § 1456(c)(1)(A). Pure planning activities cannot affect land or water use anywhere when separated from physical construction activities.[21]

2. California's claims about a San Diego secondary fence replacement are premature. As the government readily acknowledged below, *see* SER177, 179, the San Diego Waiver determination did not encompass the secondary fence replacement. Indeed, it is unsurprising that the Secretary had not yet determined that a waiver was necessary for that project: both at the time of the San Diego Waiver determination, and at the time this lawsuit was filed, the secondary fence project was still in very preliminary planning stages and Congress had not yet appropriated funds for its construction. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. F, § 230(a)(1) (March 23, 2018, appropriation for San Diego secondary fence construction); ER 253, 254, 270 (March 2017 planning presentation, marked "predecisional," which indicates that for Fiscal 2017 DHS would like to request funds to replace the San Diego secondary fence, but provides no other details on construction).

Given the still-developing situation with regard to the San Diego secondary fence project, California's NEPA and CZMA claims regarding that project fail on

---

[21] If such planning activities were encompassed by NEPA and the CZMA, moreover, it is hard to see how plaintiffs could ever obtain meaningful relief. The pre-waiver planning activities are already completed, and any challenges solely directed to those activities are moot.

several threshold grounds.[22]  Most obviously, California lacks standing to raise these claims.  Standing is determined at the time a complaint is filed, *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838-39 (9th Cir. 2007) (per curiam), which here means that California had to have standing no later than September 20, 2017, *see* ER432.  Among other requirements, a plaintiff asserting standing normally must show that a threatened injury is "certainly impending," or (in some contexts) that there is a "substantial risk" that the harm will occur; it is insufficient to merely prove a reasonable likelihood of future injury.  *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409-10 (2013); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1025-27 (9th Cir. 2018).  This requirement is particularly rigorous in a case (like this one) where courts are asked to review executive action with a foreign affairs implication, *Zappos*, 888 F.3d at 1026, and injuries that depend on a chain of speculative inference are insufficient to confer standing, *see id.*  California therefore lacks standing because as of September 2017, any "injury" to the state was not imminent, and it instead depended on several speculative inferences: (1) that DHS would ultimately decide it wanted to go through with the secondary fence replacement project; (2) that Congress would appropriate money for it; and (3) that DHS would eventually decide to waive the applicability of NEPA and the CZMA.

---

[22] This Court may affirm the judgment "on any basis supported by the record, whether or not relied upon by the district court."  *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 219 (9th Cir. 2013)

Even apart from standing, the still-developing situation with regard to the secondary fence shows that California's claims are not yet ripe. The ripeness inquiry examines both the fitness of the issues for judicial decision and the hardship to the parties if the court withholds consideration. *See National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 807-08 (2003). Here, California's NEPA and CZMA claims are not yet fit for decision because DHS has not yet made a final determination to undertake the secondary fence replacement project, nor has it yet determined whether it will waive the applicability of NEPA and the CZMA. Nor is there any harm to California from waiting until the dispute ripens because mere pre-construction planning activities, antecedent to a potential waiver determination, cannot threaten California's interests.

Finally, California's claims fail because there has been no final agency action. Both NEPA and the CZMA depend on the APA for a cause of action, *see supra* p.30 & n.9, and thus both are subject to the final agency action requirement in 5 U.S.C. § 704. DHS has not decided whether to undertake the secondary fence replacement project without complying with NEPA and the CZMA, and so any challenged DHS action is not yet final. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (explaining that final agency action both represents the consummation of the agency's decisionmaking process, and has legal effect).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed or the appeal should be dismissed.

Respectfully submitted,

CHAD A. READLER
  *Acting Assistant Attorney General*

ADAM L. BRAVERMAN
  *United States Attorney*

H. THOMAS BYRON III
 *s/ Benjamin M. Shultz*

BENJAMIN M. SHULTZ
COURTNEY L. DIXON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3518*
  *benjamin.shultz@usdoj.gov*

June 2018

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellees state that they know of no related case pending in this Court.

*s/ Benjamin M. Shultz*

Benjamin M. Shultz

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure, as modified by this Court's April 26, 2018 order, because it contains 16,395 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Benjamin M. Shultz*
Benjamin M. Shultz

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2018, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Benjamin M. Shultz*
Benjamin M. Shultz

**ADDENDUM**

# TABLE OF CONTENTS

IIRIRA § 102 (as amended) (codified at 8 U.S.C. § 1103 note).................................... A1

IIRIRA § 102 (as originally enacted), Pub. L. No. 104-208, Div. C § 102 ................... A4

REAL ID Act of 2005, Pub. L. No. 109-13, Div. B § 102 ........................................... A5

Secure Fence Act of 2006, Pub. L. No. 109-37, §3 ....................................................... A6

Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E §564 ............. A8

**IIRIRA § 102 (as amended) (codified at 8 U.S.C. § 1103 note)**

**Improvement Of Barriers At Border**

(a)  In general.--The Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States.

(b)  Construction of fencing and road improvements along the border.--

(1)  Additional fencing along southwest border.--

(A)  Reinforced fencing.--In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

(B)  Priority areas.--In carrying out this section, the Secretary of Homeland Security shall--

(i)  identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

(ii)  not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

(C)  Consultation.--

(i)  In general.--In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

(ii)  Savings provision.--Nothing in this subparagraph may be construed to--

(I)  create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

(II)  affect the eminent domain laws of the United States or of any State.

(D) Limitation on requirements.--Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location.

(2) Prompt acquisition of necessary easements.--The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

(3) Safety features.--The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

(4) Authorization of appropriations.--There are authorized to be appropriated such sums as may be necessary to carry out this subsection. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) Waiver.--

(1) In general.--Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

(2) Federal court review.—

(A) In general.--The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

(B) Time for filing of complaint.--Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the

A2

action or decision made by the Secretary of Homeland Security.   A claim shall be barred unless it is filed within the time specified.

(C)  Ability to seek appellate review.--An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.

**IIRIRA § 102 (as originally enacted), Pub. L. No. 104-208, Div. C § 102**

**Improvement Of Barriers At Border**

(a) IN GENERAL.—The Attorney General, in consultation with the Commissioner of Immigration and Naturalization, shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas  of high illegal entry into the United States.

(b) CONSTRUCTION OF FENCING AND ROAD IMPROVEMENTS IN THE BORDER AREA NEAR SAN DIEGO, CALIFORNIA.—

> (1) IN GENERAL.—In carrying out subsection (a), the Attorney General shall provide for the construction along the 14 miles of the international land border of the United States, starting at the Pacific Ocean and extending eastward, of second and third fences, in addition to the existing reinforced fence, and for roads between the fences.

> (2) PROMPT ACQUISITION OF NECESSARY EASEMENTS.—The Attorney General, acting under the authority conferred in section 103(b) of the Immigration and Nationality Act (as inserted by subsection (d)), shall promptly acquire such easements as may be necessary to carry out this subsection and shall commence construction of fences immediately following such acquisition (or conclusion of portions thereof).

> (3) SAFETY FEATURES.—The Attorney General, while constructing the additional fencing under this subsection, shall incorporate such safety features into the design of the fence system as are necessary to ensure the well-being of border patrol agents deployed within or in near proximity to the system.

> (4) AUTHORIZATION OF APPROPRIATIONS.—There are authorized to be appropriated to carry out this subsection not to exceed $12,000,000. Amounts appropriated under this paragraph are authorized to remain available until expended.

(c) WAIVER.—The provisions of the Endangered Species Act of 1973 and the National Environmental Policy Act of 1969 are waived to the extent the Attorney General determines necessary to ensure expeditious construction of the barriers and roads under this section.

**REAL ID Act of 2005, Pub. L. No. 109-13, Div. B § 102**

**Waiver Of Legal Requirements Necessary For Improvement Of Barriers At Borders; Federal Court Review.**

Section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended to read as follows:

"(c) WAIVER.—

"(1) IN GENERAL.—Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section. Any such decision by the Secretary shall be effective upon being published in the Federal Register.

"(2) FEDERAL COURT REVIEW.—

"(A) IN GENERAL.—The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.

"(B) TIME FOR FILING OF COMPLAINT.—Any cause or claim brought pursuant to subparagraph (A) shall be filed not later than 60 days after the date of the action or decision made by the Secretary of Homeland Security. A claim shall be barred unless it is filed within the time specified.

"(C) ABILITY TO SEEK APPELLATE REVIEW.—An interlocutory or final judgment, decree, or order of the district court may be reviewed only upon petition for a writ of certiorari to the Supreme Court of the United States.".

**Secure Fence Act of 2006, Pub. L. No. 109-37, §3**

**Construction Of Fencing And Security Improvements In Border Area From Pacific Ocean To Gulf Of Mexico**

Section 102(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208; 8 U.S.C. 1103 note) is amended—

(1) in the subsection heading by striking "Near San Diego, California"; and

(2) by amending paragraph (1) to read as follows:

"(1) SECURITY FEATURES.—

"(A) REINFORCED FENCING.—In carrying out subsection (a), the Secretary of Homeland Security shall provide for least 2 layers of reinforced fencing, the installation of additional physical barriers, roads, lighting, cameras, and sensors—

"(i) extending from 10 miles west of the Tecate, California, port of entry to 10 miles east of the Tecate, California, port of entry;

"(ii) extending from 10 miles west of the Calexico, California, port of entry to 5 miles east of the Douglas, Arizona, port of entry;

"(iii) extending from 5 miles west of the Columbus, New Mexico, port of entry to 10 miles east of El Paso, Texas;

"(iv) extending from 5 miles northwest of the Del Rio, Texas, port of entry to 5 miles southeast of the Eagle Pass, Texas, port of entry; and

"(v) extending 15 miles northwest of the Laredo, Texas, port of entry to the Brownsville, Texas, port of entry.

"(B) PRIORITY AREAS.—With respect to the border described—

"(i) in subparagraph (A)(ii), the Secretary shall ensure that an interlocking surveillance camera system is installed along such area by May 30, 2007, and that fence construction is completed by May 30, 2008; and

"(ii) in subparagraph (A)(v), the Secretary shall ensure that fence construction from 15 miles northwest of the Laredo, Texas, port of entry to 15 southeast of the Laredo, Texas, port of entry is completed by December 31, 2008.

A6

"(C) EXCEPTION.—If the topography of a specific area has an elevation grade that exceeds 10 percent, the Secretary may use other means to secure such area, including the use of surveillance and barrier tools.".

A7

**Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E §564**

**Improvement of Barriers At Border**

(a) Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended—

(1) in subsection (a), by striking "Attorney General, in consultation with the Commissioner of Immigration and Naturalization," and inserting "Secretary of Homeland Security"; and

(2) in subsection (b)—

(A) in the subsection heading, by striking "in the Border Area" and inserting "Along the Border";

(B) in paragraph (1)—

(i) in the heading, by striking "SECURITY FEATURES" and inserting "ADDITIONAL FENCING ALONG SOUTHWEST BORDER"; and

(ii) by striking subparagraphs (A) through (C) and inserting the following:

"(A) REINFORCED FENCING.—In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

"(B) PRIORITY AREAS.—In carrying out this section, the Secretary of Homeland Security shall—

"(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing

A8

would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and

"(ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

"(C) CONSULTATION.—

"(i) IN GENERAL.—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

"(ii) SAVINGS PROVISION.—Nothing in this subparagraph may be construed to—

"(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

"(II) affect the eminent domain laws of the United States or of any State.

"(D) LIMITATION ON REQUIREMENTS.—Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location."; and

(C) in paragraph (4), by striking "to carry out this subsection not to exceed $12,000,000" and inserting "such sums as may be necessary to carry out this subsection".

(b) No funds appropriated in this Act for U.S. Customs and Border Protection "Border Security Fencing, Infrastructure, and Technology" may be obligated unless

A9

the Secretary of Homeland Security has complied with section 102(b)(2)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) as amended by subsection (a)(2)

A10